## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| FISKER INC., *et al.*, | Case No. 24-11390 (TMH) |
| Debtors.[1] | (Jointly Administered) |
|  | **Proposed Hearing Date:**<br>**July 9, 2024, at 10:00 a.m. (ET)** |
|  | **Proposed Objection Deadline:**<br>**July 8, 2024, at 4:00 p.m. (ET)** |

### MOTION OF DEBTORS FOR ENTRY OF AN ORDER (I) AUTHORIZING AND APPROVING THE SALE OF CERTAIN OF THE DEBTORS' ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS, (II) AUTHORIZING THE DEBTORS TO ENTER INTO AND PERFORM UNDER THE FLEET SALES AGREEMENT, AND (III) GRANTING RELATED RELIEF

Fisker Inc. and certain of its affiliates (collectively, the "**Debtors**"),[2] each of which is a debtor and debtor in possession in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**"), hereby file this *Motion of Debtors for Entry of an Order (I) Authorizing and Approving the Sale of Certain of the Debtors' Assets Free and Clear of Liens, Claims, Encumbrances, and Interests, (II) Authorizing the Debtors to Enter Into and Perform Under the Fleet Sales Agreement, and (III) Granting Related Relief* (this "**Motion**"). This Motion is supported by the (a) *Declaration of John C. DiDonato in Support of the Motion of Debtors for Entry of an Order (I) Authorizing and Approving the Sale of Certain of the Debtors' Assets Free and Clear of Liens, Claims,*

---

[1] The debtors and debtors in possession in these chapter 11 cases, along with the last four digits of their respective employer identification numbers or Delaware file numbers, are as follows: Fisker Inc. (0340); Fisker Group Inc. (3342); Fisker TN LLC (6212); Blue Current Holding LLC (6668); Platinum IPR LLC (4839); and Terra Energy Inc. (0739). The address of the debtors' corporate headquarters is 14 Centerpointe Drive, La Palma, CA 90623.

[2] The Debtors and their direct and indirect non-Debtor subsidiaries are collectively referred to herein as "**Fisker.**"

*Encumbrances, and Interests, (II) Authorizing the Debtors to Enter Into and Perform Under the Fleet Sales Agreement, and (III) Granting Related Relief* (the "**DiDonato Sale Declaration**"), filed contemporaneously herewith and incorporated herein by reference, and (b) *Declaration of John C. DiDonato as Chief Restructuring Officer of the Debtors in Support of Debtors' Chapter 11 Proceedings and First Day Pleadings* [D.I. 37] (the "**DiDonato First Day Declaration**" and, together with the DiDonato Sale Declaration, the "**DiDonato Declarations**"), incorporated herein by reference.  In further support of this Motion, the Debtors respectfully state as follows:

### Relief Requested

1.      By this Motion, and pursuant to sections 105 and 363 of title 11 of the United States Code (the "**Bankruptcy Code**") and rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), the Debtors seek entry of an order, substantially in the form attached hereto as **Exhibit A** (the "**Proposed Order**") (a) authorizing and approving the sale of the Debtors' existing fleet of vehicles that are configured for the United States and Canada and have completed production (the "**Fisker Inventory**") to American Lease LLC, free and clear of liens, claims, encumbrances, and other interests on the terms of the Proposed Order and pursuant to that certain Fleet Sales Agreement (the "**Fleet Sales Agreement**"), dated June 30, 2024 (the "**Effective Date**"), by and between Debtor Fisker Group Inc. (the "**Seller**") and American Lease LLC (the "**Buyer**"), a copy of which is attached to the Proposed Order as Exhibit 1, (b) authorizing Debtor Fisker Group Inc. to enter into and perform under the Fleet Sales Agreement, and (c) granting related relief.

### Jurisdiction, Venue, and Authority

2.      The United States Bankruptcy Court for the District of Delaware (the "**Court**") has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing*

*Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.

3.      This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b).  In addition, the Debtors confirm their consent, pursuant to rule 9013-1(f) of the Local Rules for the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**"), to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter a final order or judgment in connection herewith consistent with Article III of the United States Constitution.

4.      Venue of the Chapter 11 Cases and related proceedings is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

5.      The statutory and legal predicates for the relief requested herein are sections 105(a) and 363 of the Bankruptcy Code, Bankruptcy Rules 2002 and 6004, and Local Rule 6004-1.

<div align="center">**Background**</div>

**A.      General Background**

6.      On June 17 and 19, 2024 (collectively, the "**Petition Date**"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (the "**Chapter 11 Cases**").  The Debtors remain in possession of their property and continue to operate and manage their business as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No request has been made for the appointment of a trustee or examiner in the Chapter 11 Cases.  The Chapter 11 Cases are being jointly administered, pursuant to Bankruptcy Rule 1015(b) and Local Rule 1015-1.

7.      On July 2, 2024, the Office of the United States Trustee for the District of Delaware (the "**U.S. Trustee**") appointed an Official Committee of Unsecured Creditors pursuant to section

1102 of the Bankruptcy Code.  *See Not. of Appointment of Comm. of Unsecured Creditors* [D.I. 106].

8.     Fisker is an American automotive company that designs, develops, markets, and sells electric vehicles.  Passionately driven by a vision of a clean future for all, Fisker created the world's most sustainable and emotional electric vehicles.  Headquartered in California, Fisker operates in several countries (including the United States, Austria, Germany, China, and India), and conducts sales operations in North America and throughout Europe.

9.     Additional information about the Debtors' business and affairs, capital structure, and prepetition indebtedness, and the events leading up to the Petition Date, can be found in the DiDonato First Day Declaration.

### B.    Sale of the Fisker Inventory

10.     Historically, the Debtors exclusively utilized a direct-to-consumer ("**DTC**") sales model to market and sell their vehicles but began incorporating a dealership partner model at the beginning of 2024 (as further described in the DiDonato First Day Declaration).  In March 2024, however, to align inventory levels and to progress strategic and financing initiatives, Fisker paused production of its electric vehicles ("**EVs**")**.**  The Debtors commenced a going-concern sale process in April 2024, with the Debtors' advisors contacting more than 40 potential purchasers.  By mid-May 2024, despite the Debtors' diligent efforts, their marketing process still had not resulted in any actionable bids from a going-concern purchaser for a fulsome sale of the Debtors' assets.

11.     In light of the Debtors' disappointing marketing efforts for an enterprise sale, the Debtors and their advisors shifted their focus to, and pursued all available options toward, monetizing the Fisker Inventory—*i.e.*, the Debtors' remaining inventory of Fisker Oceans that have completed production and are ready for sale—including by selling EVs in the Fisker

#98567174v25

Inventory at discounts through DTC channels and to licensed dealerships, in auctions, or in fleet transactions.

12.     Early in these efforts, the Debtors found some success selling EVs in the Fisker Inventory – consummating two sales, each for lots of more than 100 EVs (collectively, the "**Lot Sales**").  However, as set forth in the DiDonato Sale Declaration, once it became clear to the Debtors and, in turn, disclosed to prospective purchasers, that the Debtors were unable to ensure performance of post-sale warranty obligations (or commit to any other post-sale contingencies) as part of any sale, the universe of potential purchasers of the Fisker Inventory drastically diminished.

13.     Nevertheless, as part of the Debtors' efforts to maximize value and ease their liquidity strain by selling the Fisker Inventory, the Buyer emerged as a potential purchaser of a significant number of EVs in the Fisker Inventory.  Considering the potential to sell a significant portion of the Fisker Inventory, under a single agreement with a single purchaser, the Debtors opportunistically and immediately engaged with the Buyer.  For the following and other reasons, as more fully described in the DiDonato Sale Declaration, the Buyer is uniquely positioned to purchase the Debtors' EVs and the Debtors' best prospect to monetize the Fisker Inventory:

        (a)     The Buyer's initial offer was for a sizable percentage of the Fisker Inventory (which percentage would increase after further negotiations with the Buyer, as described below).  At the time the Debtors were first engaging with the Buyer, the Debtors had previously consummated the Lot Sales and were receiving a fair amount of interest from potential purchasers that intended to, shortly after transacting with the Debtors, resell the purchased EVs at auction.  Selling EVs in the Fisker Inventory at discount, and in small lots, risks de-valuing the remaining EVs in the Fisker Inventory.  Additionally, a purchaser, immediately following a sale from the Debtors, re-selling the purchased EVs at auction, likewise risks meaningful devaluation of the

#98567174v25

remaining EVs in the Fisker Inventory.  Moreover, it would take a considerable amount of time to monetize the Fisker Inventory by conducting piecemeal sales thereof (particularly in light of the public issues plaguing the Debtors in the months leading up to the Petition Date).  Consummating a sale of all or nearly all of the EVs in the Fisker Inventory avoids devaluation risk and allows the Debtors to, in short order, strengthen their liquidity position by, among other things, not incurring operating costs that would otherwise continue to be incurred.  For these and other reasons, consummating a sale with the Buyer presented a highly attractive opportunity to the Debtors;

(b)     The Buyer is well-funded, with the demonstrated economic means to fund the purchase of the entire Fisker Inventory;

(c)     The Buyer is not burdened by the same time constraints that the Debtors frequently encountered with other prospective purchasers, and, therefore, could invest time and resources repairing and/or improving the EVs purchased following the sale.  The Buyer operates a vehicle leasing company serving the ride-share community in and around New York City, which recently passed a mandate that requires the Buyer to convert its entire fleet to zero-emission vehicles by 2030.  This factor proved critical following the issuance of the June 26 Stop-Sale Hold (as defined below) and the attendant delay in the Buyer adding the purchased EVs to its operating fleet that resulted therefrom;

(d)     The weight and durability of the Fisker Ocean, which comprises the Fisker Inventory, closely align with the Buyer's needs of operating a fleet of zero-emission vehicles in the New York metropolitan area;

(e)     The Buyer has its own storage and repair facilities (another factor that proved vital following the issuance of the June 26 Stop-Sale Hold) to address repairs to the Sale Vehicles (as defined below); and

(f)     Most importantly, the Buyer is willing to transact without any post-sale contingencies, distinguishing the Buyer from any other prospective buyers the Debtors engaged with regarding the sale of the Fisker Inventory.

14.     After engaging in good faith negotiations, on May 30, 2024, Debtor Fisker Group Inc. and the Buyer executed a fleet sales agreement (the "**Initial Fleet Sales Agreement**"), pursuant to which the Buyer agreed to purchase a significant portion—2,100 EVs—of the Fisker Inventory.

15.     The Fleet Sales Agreement at issue in this Motion represents the culmination of good faith, arms-length, and extensive negotiations between the Debtors and the Buyer over broadening the scope of the Initial Fleet Sales Agreement (as described in the DiDonato Declarations).  The Buyer now proposes to purchase the entire Fisker Inventory for an increased maximum purchase price of $46.25 million.

**C.     The Fleet Sales Agreement**

16.     As of the Petition Date, the Fisker Inventory consisted of 3,321 EVs (each, a "**Sale Vehicle**").  Post-petition, negotiations between the Debtors and the Buyer continued at arms' length and, now, the Buyer proposes to purchase the entire Fisker Inventory for an aggregate purchase price up to $46.25 million (plus certain incidental costs of sale and delivery (*e.g.*, shipping, transportation, insurance, customs, taxation, titling, and registration of the Sale Vehicles)).[3]  The Fleet Sales Agreement contemplates that the sale and delivery of the Sale Vehicles to the Buyer will commence upon the satisfaction of certain conditions (including the entry of an order by the Court substantially in the form of the Proposed Order) and will continue

---

[3] For the avoidance of doubt, no customer data is being sold pursuant to the Fleet Sales Agreement.

thereafter on a rolling basis, with biweekly incremental payments to be made by the Buyer on account of each such sale.[4]

17.     In light of the Debtors' liquidity challenges (as more fully described in the DiDonato Declarations), the Debtors' success in the Chapter 11 Cases is dependent upon the parties' ability to execute and perform under the Fleet Sales Agreement.  Importantly, the holder of the Debtors' prepetition senior secured notes—CVI Investments, Inc. (through its agent, Heights Capital Management, Inc.) ("**Heights**")—consents to the sale of the Fisker Inventory, which constitutes its collateral, to the Buyer pursuant to the terms of the Fleet Sales Agreement and the Proposed Order.

18.     Pursuant to Local Rule 6004-1, certain of the key terms of the Fleet Sales Agreement are highlighted in the chart below:[5]

| Material Terms of the Fleet Sales Agreement | |
|---|---|
| No Sale to Insider | The Buyer is not an insider of the Debtors within the meaning of section 101(31) of the Bankruptcy Code. |
| Agreements with Management | None. |
| Releases | None. |
| Private Sale / No Competitive Bidding | For the reasons discussed herein, the Debtors have not conducted an auction for the Fisker Inventory, which, has already been subject to a marketing process. |

---

[4]  As of the date hereof, one hundred eighteen (118) Sale Vehicles in the Fisker Inventory were located in Austria (the "**Austrian Sale Vehicles**").  In order to export the Austrian Sale Vehicles from Austria, permitting such Austrian Sale Vehicles to be sold to the Buyer under the Fleet Sales Agreement, the Debtors may be required to transfer the net proceeds from the sale of the Austrian Sale Vehicles under the Fleet Sales Agreement to the Debtors' non-Debtor affiliate, Fisker GmbH (Austria).  The maximum amount of payments to be made to the Debtors under the Fleet Sale Agreement on account of the sale of the Austrian Sale Vehicles (the "**Austria Payments**"), which Austria Payments the Debtors may thereafter seek to pay to Fisker GmbH (Austria), would be $1,466,692, after deducting customs, duties, and logistics costs from the gross proceeds received.

[5]  This summary is provided for the convenience of the Court and parties in interest.  To the extent there is any conflict between this summary and the Fleet Sales Agreement, the Fleet Sales Agreement will govern in all respects.

| | |
|---|---|
| Closing and Other Deadlines | After the Fleet Sales Agreement has been fully executed by the parties, the Fleet Sales Agreement shall be held in escrow. The Debtor shall promptly file this Motion seeking relief in the Chapter 11 Cases under section 363 of the Bankruptcy Code to sell the Fisker Inventory in accordance with the Fleet Sales Agreement. The Fleet Sales Agreement shall be automatically released from escrow upon entry of an order by the Bankruptcy Court in the Chapter 11 Cases approving this Motion. |
| Good Faith Deposit | Not applicable. |
| Interim Arrangement with Proposed Buyer | None. |
| Use of Proceeds | None. |
| Tax Exemption | Not applicable. |
| Record Retention | Not applicable. The purchased assets do not include any of the Debtors' books and records. |
| Sale of Avoidance Actions | Not applicable. |
| Requested Finding as to Successor Liability | The Buyer and its affiliates, successors, and assigns shall not be liable under the Fleet Sales Agreement for any special, incidental, or consequential damages, including, but not limited to, lost profits, loss of use, or loss of business, even if such party has been advised of the possibility of such damages. |
| Sale Free and Clear of Unexpired Leases | While the Debtors are seeking to sell the Fisker EVs under the Fleet Sales Agreement to the Buyer free and clear of all liens, claims, encumbrances, and interests pursuant to section 363(f) of the Bankruptcy Code, the Debtors are not seeking to sell any assets free and clear of any possessory leasehold interest, license, or other right. |
| Credit Bid | Not applicable. The Purchase Price is being paid in cash. No portion of the Purchase Price consists of a credit bid of any debt. |
| Relief from Bankruptcy Rule 6004(h) | The Debtors are requesting relief from the 14-day stay imposed by Bankruptcy Rule 6004(h). |

#98567174v25

19.     Additionally, in order to secure certain Sale Vehicles for sale to the Buyer under the Fleet Sales Agreement, by this Motion, the Debtors seek authorization, but not direction, to pay, subject to the Cash Collateral Order, certain outstanding amounts owed to certain vendors (the "**Vendors**") on account of storage, shipping, and similar services relating to such Sale Vehicles, including certain prepetition amounts owed.  As of the Petition Date, the Debtors estimate that up to $1.5 million was owed to the Vendors.

**D.  June 26 Stop-Sale Hold**

20.     The Debtors' business is regulated by the National Highway Traffic Safety Administration ("**NHTSA**").  The National Traffic and Motor Vehicle Safety Act (the "**Safety Act**") grants NHTSA the authority to issue vehicle safety standards and to require manufacturers to recall vehicles that have safety-related defects or do not meet federal safety standards.  *See* 49 U.S.C. § 30101, *et seq.*

21.     Prior to the Petition Date, the Debtors had voluntarily issued three recall-related stop-sale holds regarding cluster telltales, power modules, and outer door handles (the "**Prepetition Stop-Sale Holds**"), which affected all Fisker EVs, including the entire Fisker Inventory.  The Debtors are continuing to address the Prepetition Stop-Sale Holds on a post-petition basis.

22.     On June 26, 2024, the Debtors voluntarily issued a fourth recall-related stop-sale hold (the "**June 26 Stop-Sale Hold**" and, together with the Prepetition Stop-Sale Holds, the "**Stop-Sale Holds**") because a printed circuit board assembly attached to the cabin-electric water pump in Fisker's EVs is susceptible to failure.  Thereafter, on July 2, 2024, the Debtors notified NHTSA

of the issuance of the June 26 Stop-Sale Hold.[6]  The June 26 Stop-Sale Hold affects all or nearly all Fisker EVs, including the entire Fisker Inventory.

23. Under the Fleet Sales Agreement,

(a) clearance of any Prepetition Stop-Sale Holds is a condition to the sale of a Sale Vehicle to the Buyer and, accordingly, the Prepetition Stop-Sale Holds affecting a Sale Vehicle will be addressed and cleared by the Seller prior to the sale of such Sale Vehicle to the Buyer;

(b) the Buyer has (i) agreed that, to the extent a Sale Vehicle is sold to the Buyer prior to the June 26 Stop-Sale Hold having been cleared with respect to such Sale Vehicle (any such Sale Vehicle, a "**Stop-Sale Vehicle**"), the Buyer will not operate (or permit a third party to operate) any such Stop-Sale Vehicle until the June 26 Stop-Sale Hold has been cleared for such Stop-Sale Vehicle and (ii) consented to the Proposed Order enjoining the Buyer from operating (or permitting a third party to operate) a Stop-Sale Vehicle until the June 26 Stop-Sale Hold has been cleared for any such Stop-Sale Vehicle; and

(c) the Buyer and Seller have agreed that, while the Seller will remain obligated to coordinate and confirm clearance of the June 26 Stop-Sale Hold, the Buyer will provide resources, facilities, and manpower to effectuate the repairs required pursuant to the June 26 Stop-Sale Hold.

**E. Necessity for Expedited Sale**

24. As described in further detail in the DiDonato Declarations, the Debtors commenced the Chapter 11 Cases to facilitate an orderly, efficient, and value-maximizing (a) sale

---

[6]  In addition, on June 20, 2024, the Debtors timely notified NHTSA of the commencement of the Chapter 11 Cases, as required by section 573.16 of the Safety Act.

#98567174v25

of the Fisker Inventory and (b) liquidation of the Debtors' remaining assets.  If approved, the Fleet

Sales Agreement will provide a gross capital infusion of up to $46.25 million to the Debtors'

estates.  The Debtors will no longer incur certain expenses related to the Fisker Inventory once

they sell these assets to the Buyer.  Critically, if the Proposed Order is not timely entered such that

the Debtors are in a position to commence, and receive payment for, delivery of Sale Vehicles on

July 12, 2024 (at the latest)—as contemplated under the Fleet Sales Agreement—the Debtors will

be unable to fund vital business expenses (*e.g.*, payroll, taxes, software provider costs, etc.)

necessary to effectuate an orderly liquidation.  Under these circumstances, the Debtors believe that

the expedited sale of the Fisker Inventory to the Buyer pursuant to the terms of the Fleet Sales

Agreement is both appropriate and in the best interests of the Debtors, their estates, and their

stakeholders.  Given the Debtors' liquidity position, their dependance solely on cash collateral,

and the prepetition marketing process of the Debtors' business and assets, the Debtors submit that

a sale on an expedited timeline is appropriate.

## Basis for Relief

### I.      The Debtors Have Demonstrated a Sound Business Justification for the Sale

25.      Section 363(b)(1) of the Bankruptcy Code provides that a debtor "after notice and

a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the

estate."  11 U.S.C. § 363(b)(1).

26.      The sale of a debtor's assets should be authorized pursuant to section 363 of the

Bankruptcy Code where the transaction represents an exercise of the debtors' sound business

judgment.  *See, e.g.*, *Meyers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996); *In re*

*Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999); *In re Delaware & Hudson*

*Ry. Co.*, 124 B.R. 169, 176 (D. Del. 1991).

27. Courts typically consider the following factors in determining whether a proposed sale satisfies this standard: (a) whether a sound business justification exists for the sale; (b) whether adequate and reasonable notice of the sale was given to interested parties; (c) whether the sale will produce a fair and reasonable price for the property; and (d) whether the parties have acted in good faith. *See, e.g.*, *Delaware & Hudson Ry.*, 124 B.R. at 176; *In re Phoenix Steel Corp.*, 82 B.R. 334, 335–36 (D. Del. 1987).

28. Once a debtor articulates a valid business justification, its decision to sell property out of the ordinary course of business enjoys a strong "presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in an honest belief that the action taken was in the best interests of the company." *In re Integrated Res. Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)). Therefore, any party objecting to a debtor's proposed asset sale must make a showing of "bad faith, self-interest or gross negligence," as "[c]ourts are loath to interfere with corporate decisions absent [such] a showing." *See id.* at 656 (citations omitted); *see also In re Promise Healthcare Grp., LLC*, No. 18-12491 (CSS) (Bankr. D. Del. Feb. 28, 2019) [D.I. 770] (order approving the private sale of healthcare facilities upon the debtors showing they properly exercised their business judgment and set forth sound business justifications for pursuing such a sale, having marketed the private sale and showing that the purchaser was the only bidder for the facilities that could close a sale promptly on terms favorable to the debtors); *In re Celadon Grp., Inc.*, No. 19-12606 (KBO) (Bankr. D. Del. Dec. 8, 2019) [D.I. 417, 418, and 766] (orders approving private sales of the debtors' nonresidential real property upon the debtors' showing they properly exercised their business judgment and set forth sound business justifications for pursuing such private sales, having marketed the private sales and showing that the purchasers were the only

bidders that could close a sale promptly on terms favorable to the debtors); *In re Taronis Fuels, Inc.*, No. 22-11121 (BLS) (Bankr. D. Del. Dec. 12, 2022) [D.I. 135] (order approving the private sale of one geographical region of the debtors' retail operations outside of the ordinary course of business).

29.     There is strong business justification for the sale of the Fisker Inventory without a post-petition auction process.  Proceeds from the Fleet Sales Agreement are the primary source of liquidity that can be obtained in time to preserve the Debtors' efforts to liquidate their assets in an orderly and efficient value-maximizing manner.  Moreover, the Debtors simply do not have the resources, nor is it likely that financing will be available under the Debtors' current circumstances (notwithstanding the Debtors' efforts in this regard), to finance an additional robust sale process post-petition.

30.     As discussed above, the Debtors have been evaluating potential strategic alternatives.  The Debtors engaged in a prepetition marketing process that failed to yield any other actionable offers for a going-concern sale.  As described in the DiDonato Declarations, the Debtors' industry is experiencing adversity.  Moreover, the Debtors are facing an existential liquidity crisis—despite their prepetition and post-petition restructuring efforts—as the Debtors are unable to obtain post-petition financing.  Heights, the Debtors' prepetition secured lender, has agreed, on a short-term, interim basis to date, to the consensual use by the Debtors of Heights' existing cash collateral.  However, without the Sale Transaction, such cash collateral is not sufficient to preserve, and any delay in the Debtors' receipt of proceeds from the sale of the Sale Vehicles under the Fleet Sales Agreement will jeopardize, the Debtors' ability to effectuate an orderly wind-down in the best interests of the Debtors' stakeholders.  Accordingly, the Debtors have determined, in the exercise of their sound business judgment, that entry into the Fleet Sales

#98567174v25

Agreement, without the added time, cost, and risk associated with a public auction, is in the best interests of the Debtors and their stakeholders.

31.    Here, adequate justification exists for the approval of the Fleet Sales Agreement, including that (a) the Fleet Sales Agreement was negotiated at arm's length and in good faith, (b) the up to $46.25 million purchase price under the Fleet Sales Agreement is fair and reasonable, and represents the highest and best offer that could reasonably be obtained for the Fisker Inventory under the circumstances, (c) the Buyer has agreed not to operate Sale Vehicles until the June 26 Stop-Sale Hold has been cleared for the applicable Sale Vehicle, (d) the Buyer has committed resources (including facilities, vehicle lifts, transportation, and manpower) to assist with effectuating the repairs required pursuant to the June 26 Stop-Sale Hold; and (e) adequate and reasonable notice will be provided to the relevant parties.  Accordingly, the Debtors respectfully request that the Court approve the Fleet Sales Agreement.

32.    Furthermore, section 105(a) of the Bankruptcy Code confers the Court with broad equitable powers to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a).  Accordingly, the Court has expansive equitable powers to fashion any order or decree that is in the interest of preserving or protecting the value of the Debtors' assets.  *See In re Nixon*, 404 F. App'x 575, 578 (3d Cir. 2010) ("It is well settled that the court's power under § 105(a) is broad." (citation omitted)); *In re Nortel Networks, Inc.*, 532 B.R. 494, 554 (Bankr. D. Del. 2015) ("The Third Circuit has construed [section 105 of the Bankruptcy Code] to give bankruptcy courts 'broad authority' to provide appropriate equitable relief to assure the orderly conduct of reorganization proceedings, and to 'craft flexible remedies that, while not expressly authorized by the Code, effect the result the Code was designed to obtain.'" (citations omitted)); *Patrick v. Dell Fin. Servs. (In re Patrick)*, 344 B.R. 56, 58 (Bankr.

M.D. Pa. 2005) ("There is no doubt that § 105(a) is a 'powerful [and] versatile tool' designed to empower bankruptcy courts to fashion orders in furtherance of the Bankruptcy Code." (quoting *Joubert v. ABN AMRO Mortg. Grp., Inc. (In re Joubert)*, 411 F.3d 452, 455 (3d Cir. 2005))).

33.    Finally, the Debtors submit that the relief requested herein is necessary and appropriate and, therefore, may be authorized by the Court under section 105(a) of the Bankruptcy Code, pursuant to what is referred to interchangeably as the "doctrine of necessity."  The Court's power to utilize the "doctrine of necessity" in the Chapter 11 Cases derives from the Court's inherent equity powers and its statutory authority to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a); *In re Combustion Eng'g, Inc.*, 391 F.3d 190, 235–36 (3d Cir. 2004) (noting that section 105 of the Bankruptcy Code "has been construed to give a bankruptcy court 'broad authority' to provide equitable relief appropriate to assure the orderly conduct of reorganization proceedings" (citing *United States v. Energy Res. Co.*, 495 U.S. 545, 549 (1990))).

34.    Here, approval of the Fleet Sales Agreement is vital to the Debtors' ability to effectuate an orderly liquidation process and preserve the value of their estates and, therefore, constitutes an exercise of the Debtors' sound business judgment.  At present, the Debtors lack sufficient liquidity to preserve and maximize the value of their assets during the Chapter 11 Cases. The Fleet Sales Agreement will provide the Debtors with a much-needed cash infusion (potentially within days of entry of the Proposed Order), enabling the Debtors, subject to the consent of the Debtors' prepetition secured lender to the use of its cash collateral in accordance with an agreed budget, to honor post-petition obligations (that the Debtors otherwise may not be able to honor) as part of their orderly liquidation strategy.  Absent the Court granting the relief requested herein and the Debtors' receipt of the payments contemplated under the Fleet Sales Agreement, the Debtors'

#98567174v25

ability to run an orderly wind-down for the benefit of creditors will be jeopardized. Moreover, the Fleet Sales Agreement contemplates the sale of the Fisker Inventory at a time when selling EVs, particularly the Debtors' EVs (given the commencement of the Chapter 11 Cases and the events and public coverage of such events leading up to the Petition Date), has proven immensely challenging. Indeed, the Debtors did not receive any comparable alternative proposals with respect to the quantum of vehicles or the purchase price, in each case, as contemplated under the Fleet Sales Agreement. Finally, the Debtors understand that Heights consents to the sale of the Fisker Inventory to the Buyer pursuant to the terms of the Fleet Sales Agreement and the Proposed Order. Accordingly, it is well within the Court's equitable power under section 105(a) of the Bankruptcy Code to approve the assumption of the Fleet Sales Agreement.

35.     Based on the foregoing, the Debtors submit that (a) entry into and performance under the Fleet Sales Agreement constitutes an exercise of the Debtors' sound business judgment and (b) approval of the Fleet Sales Agreement is necessary to preserve and maximize the value of the Debtors' estates and in the best interests of all of the Debtors' stakeholders. Absent this relief, the Debtors' estates would suffer, possibly precipitously and irreparably. Consequently, the Debtors' stakeholders would benefit if the requested relief is granted

## II.     Selling the Fisker Inventory by Sale Conducted Without an Auction Is Appropriate

36.     Bankruptcy Rule 6004(f)(1) permits sales conducted without an auction. Fed. R. Bankr. P. 6004(f)(1) ("All sales not in the ordinary course of business may be by private sale or by public auction."). Courts have generally held that a debtor has broad discretion in determining the manner in which assets are sold. *Berg v. Scanlon (In re Alisa P'ship)*, 15 B.R. 802, 802 (Bankr. D. Del. 1981) ("[T]he manner of sale is within the discretion of the trustee [ ].."); *In re Bakalis*, 220 B.R. 525, 531 (Bankr. E.D.N.Y. 1988) (noting that a trustee has "ample discretion to

#98567174v25

administer the estate, including authority to conduct public or private sales of estate property.")
(citing *In re WPRV-TV, Inc.*, 143 B.R. 315, 319 (D.P.R. 1991)).  So long as a debtor maximizes
the return to its estate, a court should defer to a debtor's business judgment regarding how to
structure an asset sale.  *Bakalis*, 220 B.R. at 532 (recognizing that although a trustee's business
judgment enjoys great judicial deference, a duty is imposed on the trustee to maximize the value
obtained from a sale); *In re NEPSCO, Inc.*, 36 B.R. 25, 26 (Bankr. D. Me. 1983) ("Clearly, the
thrust of th[e] statutory scheme [governing 363 sales] is to provide maximum flexibility to the
trustee, subject to the oversight of those for whose benefit he acts, *i.e.*, the creditors of the estate.").
If the Debtors conclude that conducting a sale without a public auction is in the best interests of
their estates, the Debtors should be permitted to do so.  *See Penn Mut. Life Ins. Co. v. Woodscape,
Ltd. P'ship (In re Woodscape Ltd. P'ship)*, 134 B.R. 165, 174 (Bankr. D. Md. 1991) (noting that,
with respect to sales of estate property, "[t]here is no prohibition against a private sale . . . and
there is no requirement that the sale be by public auction.").

37.     Under the circumstances, consummation of the sale of the Fisker Inventory through
the Fleet Sales Agreement is appropriate and necessary.  Without the approval of the proposed
Fleet Sales Agreement, the Debtors will not be able to effectuate a wind-down in an orderly,
efficient, and value-maximizing manner, as the payments contemplated under the Fleet Sales
Agreement represent the only available source of liquidity at this time to fund the Debtors' Chapter
11 Cases.  A sale on the expedited timeline set forth herein is necessary to preserve the value of
the Debtors' estates, and thus is in the best interests of all their stakeholders.

## III.   The Fisker Inventory Assets Should Be Sold Free and Clear of Liens, Claims, Encumbrances, and Interests Under Section 363(f) of the Bankruptcy Code

38.     Section 363(f) of the Bankruptcy Code authorizes a debtor to sell assets free and
clear of liens, claims, encumbrances, and interests if:

#98567174v25

(1) applicable non-bankruptcy law permits sale of such property free and clear of such interests;

(2) such entity consents;

(3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(4) such interest is in bona fide dispute; or

(5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f). The Debtors only need to satisfy one of the five requirements to permit the Fisker Inventory to be sold "free and clear" of liens and interests. *See In re Kellstrom Indus., Inc.*, 282 B.R. 787, 793 (Bankr. D. Del. 2002) ("[I]f any of the five conditions are met, the debtor has the authority to conduct the sale free and clear of all liens."); *see also In re Wolverine Radio Co.*, 930 F.2d 1132, 1147 n.24 (6th Cir. 1991) (stating that section 363(f) of the Bankruptcy Code is written in the disjunctive; holding that the court may approve the sale "free and clear" provided at least one of the subsections of section 363(f) of the Bankruptcy Code is met); *see also In re Shary*, 152 B.R. 724, 725 (Bankr. N.D. Ohio 1993) (noting that "the five conditions enumerated under 363(f) are disjunctive and, as such, a sale thereunder can be authorized if the trustee can prove any of the five conditions").

39.    Here, Heights consents to the sale of the Fisker Inventory, which constitutes its collateral, to the Buyer as contemplated under the Fleet Sales Agreement and the Proposed Order. Accordingly, to the extent applicable, section 363(f)(2) of the Bankruptcy Code is satisfied. The Debtors request that the Court approve the Fleet Sales Agreement free and clear of any liens, claims, encumbrances, and interests in accordance with section 363(f) of the Bankruptcy Code.

40.    To the extent any other party has a prepetition security interest in and liens upon the Fisker Inventory, these creditors can be compelled to accept a monetary satisfaction of their interests or fall within one or more of the other subsections of section 363(f). Thus, section

-19-

363(f)(5) of the Bankruptcy Code is satisfied and any existing interests in the Fisker Inventory will be adequately protected through attachment to the proceeds of the sale.  *See In re AmTrust Fin. Corp.*, No. 09-21323, 2010 WL 4917557, at *2 (Bankr. N.D. Ohio Sept. 22, 2010) (finding that holders of liens against property sold free and clear of all liens are "adequately protected by having their Liens, if any, attach to the proceeds of the Sale ultimately attributable to that part of the Property against which or in which they assert a Lien"); *see also MacArthur Co. v. Johns-Manville Corp.*, 837 F.2d 89, 94 (2d Cir. 1988) ("It has long been recognized that when a debtor's assets are disposed of free and clear of third-party interests, the third party is adequately protected if his interest is assertable against the proceeds of the disposition.").  Section 363(f)(5) is satisfied. Accordingly, the Debtors request that the Fisker Inventory be transferred to the Buyer free and clear of liens, claims, and encumbrances, with any such liens, claims, and encumbrances, including Heights' liens and security interests in the Fisker Inventory, attaching to the proceeds realized from the private sale.

**IV.     The Sale Complies with the National Traffic and Motor Vehicle Safety Act**

41.     The clear and explicit purpose of the Safety Act is to "reduce traffic accidents and deaths and injuries resulting from traffic accidents."  49 U.S.C. § 30101.  The Fleet Sales Agreement and the Proposed Order are consistent with such objectives.

42.     The Fleet Sales Agreement ensures that no Sale Vehicle will be operated unless and until all Stop-Sale Holds have been cleared with respect to such Sale Vehicle:

(a)     As noted above, as a condition to sale, the Prepetition Stop-Sale Holds affecting a Sale Vehicle will be addressed and cleared by the Seller prior to the sale of such Sale Vehicle to the Buyer; and

(b)    Additionally, with respect to the June 26 Stop-Sale Hold, the Buyer has agreed that it will not operate (or permit a third party to operate) any Stop-Sale Vehicle until the June 26 Stop-Sale Hold has been cleared for such Stop-Sale Vehicle.  Moreover, the Proposed Order enjoins the Buyer from operating (or permitting a third party to operate) a Stop-Sale Vehicle until the June 26 Stop-Sale Hold has been cleared for such Stop-Sale Vehicle.[7]

43.    Taken together, the Fleet Sales Agreement and Proposed Order (if entered) would ensure that no Sale Vehicles would be on the road while any safety issues persist.  Moreover, the Buyer and Seller have agreed that, while the Seller will remain obligated to coordinate and confirm clearance of the June 26 Stop-Sale Hold, the Buyer will provide resources, including facilities, vehicle transportation, and manpower to effectuate the repairs required by the June 26 Stop-Sale Hold related to Sale Vehicles.  As such, the Fleet Sales Agreement complies with the Safety Act's intended purpose and stated policy goals.

44.    Courts in this and other jurisdictions have approved vehicle sales under similar circumstances.  *See, e.g.*, Sale Order, *In re JRV Grp. USA L.P.*, No. 19-11095 (CSS) (Bankr. D. Del. Sept. 24, 2019) [D.I. 212] (approving bulk sale of vehicles subject to a stop order where buyer

---

[7]    Pursuant to the Fleet Sales Agreement, the Proposed Order provides that, to the extent a Sale Vehicle is sold to the Buyer pursuant to the Fleet Sales Agreement prior to the June 26 Stop-Sale Hold having been cleared for any such Sale Vehicle (any such Sale Vehicle, a "**Pre-Clearance Transferred Vehicle**"), the Buyer is enjoined from operating or permitting any third-party to operate any such Pre-Clearance Transferred Vehicle (the "**Injunction**") until the June 26 Stop-Sale Hold has been cleared for the applicable Pre-Clearance Transferred Vehicle (the date upon which the June 26 Stop-Sale Hold has been cleared for a Pre-Clearance Transferred Vehicle, the "**June 26 Stop-Sale Hold Clearance Date**").  In addition, pursuant to the Fleet Sales Agreement, the Proposed Order further provides that (a) until the date upon which the June 26 Stop-Sale Hold Clearance Date has occurred for all Pre-Clearance Transferred Vehicles, the Debtors shall continue to employ the Fisker Employee (as defined in the Fleet Sales Agreement) (at their own expense, and will seek provision for such expense in the Cash Collateral Order (as defined in the Proposed Order)) to be responsible for coordinating and confirming that the June 26 Stop-Sale Hold has been cleared for each Pre-Clearance Transferred Vehicle and (b) the Injunction with respect to any Pre-Clearance Transferred Vehicle shall be automatically and fully lifted and of no further force or effect in connection with such Pre-Clearance Transferred Vehicle upon the June 26 Stop-Sale Hold Clearance Date for such Pre-Clearance Transferred Vehicle, without the requirement of any further or additional action by the Court or any other person or party.

#98567174v25

agreed that it would not sell the vehicles to the public until the vehicles were in compliance with NHTSA requirements);[8] *see also, cf.* Ltd. Obj. to Sale Mot. at 5, *In re Coda Holdings, Inc.*, No. 13-11153 (CSS) (Bankr. D. Del. 2013) [D.I. 135] ("NHTSA does not object . . . to the sale of assets to a purchaser who . . . [is] expressly assuming all Safety Act recall requirements with respect to [sedans] manufactured before Closing."); Sale Order at 25–26, *In re Gen. Motors Corp.*, No. 09-50026 (Bankr. S.D.N.Y. July 5, 2009) [D.I. 2968] (approving the sale but requiring the purchaser to "comply with the certification, reporting, and recall requirements of the National Traffic and Motor Vehicle Safety Act"); Sale Order at 21, *In re Chrysler LLC*, No. 09-50002 (Bankr. S.D.N.Y. June 2, 2009) [D.I. 3232] (approving a sale in which the purchaser expressly assumed the debtors' "notification, remedy, and other obligations under [the National Traffic and Motor Vehicle Safety Act] relating to vehicles manufactured by the Debtors prior to the Closing Date that have a defect related to motor vehicle safety or do not to [sic] comply with applicable motor vehicle safety standards prescribed under the NTMVSA").

45.     Here, given (a) that the viability of the Chapter 11 Cases depends, in large part (if not entirely), on the Debtors' ability to enter into and perform under the Fleet Sales Agreement, (b) the Injunction prohibiting the Buyer's operation of a Pre-Clearance Transferred Vehicle until

---

[8]  *See also* Confirmation Tr. 25:10–16, *In re JRV Grp. USA L.P.*, No. 19-11095 (CSS) (Bankr. D. Del. June 16, 2020) ("***In re JRV Grp.***") [D.I. 456] (noting that the case was "doomed for conversion to Chapter 7 . . . because the biggest asset, really the only asset of the debtors, were these vehicles that were overweight and they were unable to be sold [because of NHTSA regulations]"); *id.* at 25:23–26:3 (noting that, because "safety was the main concern of all the parties," the debtor initially proposed to simply disassemble the cars, sell off the parts, and convert to chapter 7 and also contemplated incurring the costs of "modifying the [cars], in order to make them compliant with NHTSA, so that they could be sold."); *id.* at 26:10–12 (noting that the parties "worked with the debtors to consummate a sale for all of the [cars] in a way that complied with NHTSA and continued to ensure safety."); Confirmation Br. at 5–6, *In re JRV Grp.* [D.I. 437] (noting that the debtor entered into an APA with a dealership purchaser that "ultimately was willing and able to purchase [the cars] subject to a NHTSA remedy and commit to sell them to the public only after they were re-modified by the Debtor in compliance with the NHTSA's requirements."). Ultimately, in *In re JRV Grp.*, after negotiations between the debtor, the buyer, and NHTSA, NHTSA did not object to any relief sought in the chapter 11 cases, including the debtor's motion for the bulk sale of vehicles to the purchaser prior to clearing the pending recall-related holds, with the commitment that the purchaser would not sell the vehicles until after the pending recall was cleared. *See* Combined Discl. Stmt. and Plan at 33, *In re JRV Grp.* [D.I. 385].

the June 26 Stop-Sale Hold has been cleared for such Pre-Clearance Transferred Vehicle, and (c) the Seller's commitment and obligation under the Fleet Sales Agreement to coordinate and confirm clearance of the June 26 Stop-Sale Hold related to the Pre-Clearance Transferred Vehicles, and, accordingly, because granting the relief requested herein complies with the goals of the Safety Act, while furthering the goals of chapter 11 (*i.e.*, maximizing the value of the estate for the benefit of all stakeholders), the Debtors respectfully submit that the relief requested herein is warranted, is within the Court's authority, is consistent with congressional policy, and should be granted.

## V.      The Buyer is a Good-Faith Purchaser under Section 363(m) of the Bankruptcy Code

46.      Pursuant to Bankruptcy Code section 363(m), a good-faith purchaser is one who purchases assets for value, in good faith, and without notice of adverse claims. *See In re Abbotts Dairies of Penn., Inc.*, 788 F.2d 143, 147 (3d Cir. 1986) (to constitute lack of good faith, a party's conduct in connection with the sale must usually amount to fraud, collusion between the purchaser and other bidders or the trustee or an attempt to take grossly unfair advantage of other bidders); *see also In re Bedford Springs Hotel, Inc.*, 99 B.R. 302, 305 (Bankr. W.D. Pa. 1989); *In re Perona Bros., Inc.*, 186 B.R. 833, 839 (D.N.J. 1995) (to constitute lack of good faith, a party's conduct in connection with the sale must usually amount to fraud, collusion between the Buyer and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders).

47.      In other words, a party would have to show fraud or collusion between the successful bidder and the debtor-in-possession or trustee or other bidders in order to demonstrate a lack of good faith. *See In re Pursuit Cap. Mgmt., LLC*, 874 F.3d 124, 135 (3d Cir. 2017) ("The good faith requirement speaks to the integrity of [the purchaser's] conduct in the course of the sale proceedings. Typically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an

#98567174v25

attempt to take grossly unfair advantage of other bidders."); *In re Dura Auto. Sys., Inc.,* No. 06-11202 (KJC), 2007 WL 7728109, at *96 (Bankr. D. Del. Aug. 15, 2007) (same).

48.     The Debtors submit that the Buyer is a "good faith" purchaser of the Fisker Inventory within the meaning of Bankruptcy Code section 363(m) and the terms of the Fleet Sales Agreement.  The Debtors and the Buyer, who is not an "insider" of the Debtors, negotiated the Fleet Sales Agreement at arm's length and in good faith without any collusion or fraud.[9] Accordingly, the Buyer is entitled to the full protections of Bankruptcy Code section 363(m).

## Debtors' Reservation of Rights

49.     Nothing contained herein or any actions taken pursuant to such relief requested is intended or should be construed as, or deemed to constitute, an agreement or admission as to the amount, priority, character, or validity of any claim against the Debtors on any grounds (whether under bankruptcy law or otherwise), a commitment or requirement to pay any claim, a waiver or impairment of the Debtors' rights to dispute any claim on any grounds, or an admission as to the amount, priority, enforceability, perfection, or validity of any lien on, security interest in, or other encumbrance on property of the Debtors' estates.  The Debtors expressly reserve their rights to contest any claims under applicable bankruptcy and non-bankruptcy law.  Likewise, if the Court grants the relief sought herein, any payment or transfer made pursuant to the Court's order is not intended, and should not be construed, as an admission as to the amount, priority, character, or

---

[9]     Bankruptcy Code section 363(m) provides that:

> [t]he reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease or property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).

#98567174v25

validity of any claim or a waiver of the Debtors' rights to subsequently dispute such claim.  For

the avoidance of doubt, nothing in this paragraph 47 is intended to or shall contravene or override

any stipulations or agreements of the Debtors, or any rights and remedies that Heights may have,

under or pursuant to the Cash Collateral Order (as defined in the Proposed Order).

### Compliance with Bankruptcy Rule 6004(a) and
### Waiver of Bankruptcy Rules 6003 and 6004(h)

50.    The Debtors have established that the relief requested herein is necessary to avoid

immediate and irreparable harm.  Bankruptcy Rule 6003(b) provides that no sale order shall be

granted in the first 21 days of a chapter 11 case, "except to the extent that relief is necessary to

avoid immediate and irreparable harm.".  Bankruptcy Rule 6003(b) should be waived because

without entry of the Order, the Debtors, their estates, and creditors will suffer immediate and

irreparable harm.

51.    To implement successfully the relief sought herein, the Debtors request that the

Court find that notice of the Motion is adequate under Bankruptcy Rule 6004(a) under the

circumstances.  The Debtors also request that, to the extent applicable to the relief requested in

this Motion, the Court waive the stay imposed by Bankruptcy Rule 6004(h), which provides that

"[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until

the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr.

P. 6004(h).  As described above and in the DiDonato Sale Declaration, the relief that the Debtors

seek in this Motion is necessary for the Debtors to preserve and maximize value for their estates

and economic stakeholders.  Accordingly, the Debtors respectfully submit that ample cause exists

to justify the (a) finding that the notice requirements under Bankruptcy Rule 6004(a) have been

satisfied and (b) waiving of the 14-day stay imposed by Bankruptcy Rule 6004(h), as the exigent nature of the relief sought herein justifies immediate relief.

### Notice

52.     Notice of this Motion will be provided to the following parties:  (a) the U.S. Trustee; (b) those creditors holding the 30 largest unsecured claims against the Debtors' estates (on a consolidated basis); (c) White & Case LLP, as counsel to Heights; (d) Riemer & Braunstein LLP, as counsel to the Buyer; (e) NHTSA, and (f) any party that has requested notice pursuant to Bankruptcy Rule 2002 (collectively, the "**Notice Parties**").

53.     A copy of this Motion and any order entered in respect thereto will also be made available on the Debtors' case information website located at https://www.veritaglobal.net/fisker. Based on the urgency of the circumstances surrounding this Motion and the nature of the relief requested herein, the Debtors respectfully submit that no other or further notice is required.

*[Remainder of page intentionally left blank]*

WHEREFORE, the Debtors respectfully request that the Court enter the Proposed Order, substantially in the form attached hereto as **<u>Exhibit A</u>**, granting the relief requested herein and such other and further relief as the Court deems just and proper.

Dated:    July 2, 2024
      Wilmington, Delaware

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Brenna A. Dolphin*
Robert J. Dehney, Sr. (No. 3578)
Andrew R. Remming (No. 5120)
Brenna A. Dolphin (No. 5604)
Sophie Rogers Churchill (No. 6905)
Evanthea Hammer (No. 7061)
1201 N. Market Street, 16th Floor
Wilmington, Delaware 19801
Tel: (302) 658-9200
rdehney@morrisnichols.com
aremming@morrisnichols.com
bdolphin@morrisnichols.com
srchurchill@morrisnichols.com
ehammer@morrisnichols.com

*-and-*

DAVIS POLK & WARDWELL LLP

Brian M. Resnick (admitted *pro hac vice*)
Darren S. Klein (admitted *pro hac vice*)
Steven Z. Szanzer (admitted *pro hac vice*)
Richard J. Steinberg (admitted *pro hac vice*)
450 Lexington Avenue
New York, New York 10017
Tel.: (212) 450-4000
brian.resnick@davispolk.com
darren.klein@davispolk.com
steven.szanzer@davispolk.com
richard.steinberg@davispolk.com

*Proposed Counsel to the Debtors and Debtors in Possession*