## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re:<br><br>FISKER INC., *et al.*,<br><br>        Debtors.[1] | Chapter 11<br><br>Case No. 24-11390 (TMH)<br><br>(Jointly Administered)<br><br>**Re: Docket No. 110** |

**DECLARATION OF JOHN C. DIDONATO AS CHIEF RESTRUCTURING OFFICER OF THE DEBTORS IN SUPPORT OF THE MOTION OF DEBTORS FOR ENTRY OF AN ORDER (I) AUTHORIZING AND APPROVING THE SALE OF CERTAIN OF THE DEBTORS' ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS, (II) AUTHORIZING THE DEBTORS TO ENTER INTO AND PERFORM UNDER THE FLEET SALES AGREEMENT, AND (III) GRANTING RELATED RELIEF**

**JOHN C. DIDONATO** declares and says:

1.      I submit this declaration (the "**DiDonato Sale Declaration**") on behalf of the Debtors in support of the *Motion of Debtors for Entry of an Order (I) Authorizing and Approving the Sale of Certain of the Debtors' Assets Free and Clear of Liens, Claims, Encumbrances, and Interests, (II) Authorizing the Debtors to Enter Into and Perform Under the Fleet Sales Agreement, and (III) Granting Related Relief* (the "**Fleet Sales Motion**"), which was filed contemporaneously herewith.

2.      I am the Chief Restructuring Officer of each of the above-captioned debtors (collectively, the "**Debtors**" and, together with their non-Debtor affiliates, "**Fisker**" or the "**Company**"). I have served as the Debtors' Chief Restructuring Officer ("**CRO**") since April 25,

---

[1] The debtors and debtors in possession in these chapter 11 cases, along with the last four digits of their respective employer identification numbers or Delaware file numbers, are as follows: Fisker Inc. (0340); Fisker Group Inc. (3342); Fisker TN LLC (6212); Blue Current Holding LLC (6668); Platinum IPR LLC (4839); and Terra Energy Inc. (0739). The address of the debtors' corporate headquarters is 14 Centerpointe Drive, La Palma, CA 90623.

2024, and am familiar with the Company's business, financial affairs, and day-to-day operations. Fisker retained Huron Consulting Services, LLC ("**Huron**") to provide interim consulting services, including, among others: (a) developing or validating forecasts and business plans and related assessments of a business's strategic position; (b) monitoring and managing cash, cash flow, and supplier relationships; (c) liquidating and winding down businesses; (d) assessing and recommending cost reduction and performance improvement strategies; (e) supporting capital raises and strategic transactions; (f) designing and negotiating financial restructuring packages; and (g) negotiating with stakeholders.

3.       I am also a Managing Director of Huron, a consulting firm that specializes in, among other things, restructuring, operational, and financial consulting, and interim management to financially troubled companies.  I have more than 30 years of experience counseling companies through operational transformations, capital raising, buy and sell side advisories, and merger integrations, primarily in special situations serving as a lead advisor in both out-of-court and court-supervised situations.  I have served more than 100 debtors, functioning for many as a chief restructuring strategist.   My expertise encompasses a wide range of industries, including automotive, logistics, distribution, transportation, automotive suppliers, aerospace suppliers, engineering and construction, metals, equipment leasing, and retail.

4.       Huron has extensive experience in restructuring services in and out of chapter 11 proceedings and has an excellent reputation for its services on behalf of debtors and creditors throughout the United States.   Among many other examples, Huron and its personnel have provided restructuring and turnaround advisory services to clients, including American Physician Partners, LLC, Invacare Corporation, Vital Pharmaceuticals, Inc., Rockdale Marcellus Holdings,

-2-

LLC, Town Sports International, LLC, Maines Food and Paper Services, Inc., Allen Systems Group, Kazi Foods, FuelCell Energy, Inc. The NORDAM Group, Inc., and Revstone Industries.

5.      I believe that approval of the Fleet Sales Motion on an expedited timeline is vital to the Debtors' ability to preserve the value of their estates.  The Fleet Sales Agreement will provide the Debtors with a much-needed cash infusion (potentially within days of entry of the Proposed Order), enabling the Debtors, subject to the consent of the Debtors' prepetition secured lender to the use of its cash collateral in accordance with an agreed budget, to honor post-petition obligations (that the Debtors otherwise may not be able to honor) as part of their orderly liquidation strategy.  Moreover, I believe that approval of the Fleet Sales Motion is appropriate under the circumstances because (a) the Fleet Sales Agreement was negotiated at arm's length and in good faith, (b) the up to $46.25 million purchase price under the Fleet Sales Agreement is fair and reasonable, and represents the highest and best offer that could reasonably be obtained for the Fisker Inventory under the circumstances, (c) the Buyer has agreed not to operate Sale Vehicles until the June 26 Stop-Sale Hold has been cleared for the applicable Sale Vehicle, and (d) the Buyer has committed resources (including facilities, vehicle lifts, transportation, and manpower) to assist with effectuating the repairs required pursuant to the June 26 Stop-Sale Hold.[2]

6.      Except as otherwise indicated, the facts set forth in this DiDonato Sale Declaration are based upon my personal knowledge, my review of the relevant documents, information prepared or provided to me by employees of and professional advisors to the Company, information prepared or provided to me by employees of Huron (the Company's proposed financial advisors), or my opinion based upon experience, knowledge, and information concerning

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Fleet Sales Motion, Fleet Sales Agreement, and the DiDonato First Day Declaration.

#98595695v9

the operations of the Debtors.  I have reviewed the Fleet Sales Motion, including the Fleet Sales Agreement, or have otherwise had its contents explained to me, and it is my belief that the relief sought therein is necessary to maximize the value of the Debtors' estates.  If called upon to testify, I would testify competently to the facts set forth in this DiDonato Sale Declaration.  I am over the age of 18 years and authorized to submit this DiDonato Sale Declaration.

## Background

### A.    General Background

7.        On June 17 and 19, 2024 (collectively, the "**Petition Date**"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (the "**Chapter 11 Cases**").  The Debtors remain in possession of their property and continue to operate and manage their business as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No request has been made for the appointment of a trustee or examiner, and no official committee has been appointed in the Chapter 11 Cases.  The Chapter 11 Cases are being jointly administered, pursuant to Bankruptcy Rule 1015(b) and Local Rule 1015-1.

8.        Fisker is an American automotive company that designs, develops, markets, and sells electric vehicles.  Passionately driven by a vision of a clean future for all, Fisker created the world's most sustainable electric vehicles.  Headquartered in California, Fisker operates in several countries (including the United States, Austria, Germany, China, and India), and conducts sales operations in North America and throughout Europe.

9.        Additional information about the Debtors' business and affairs, capital structure, and prepetition indebtedness, and the events leading up to the Petition Date, can be found in my *Declaration in Support of Debtors' Chapter 11 Proceedings and First Day Pleadings* [D.I. 37] (the "**DiDonato First Day Declaration**" and together with the DiDonato Sale Declaration, the "**DiDonato Declarations**").

**B.** **Sale of the Fisker Inventory**

10.     Historically, the Debtors exclusively utilized a direct-to-customer ("**DTC**") sales model to market and sell their vehicles but began incorporating a dealership partner model at the beginning of 2024 (as further described in the DiDonato First Day Declaration).  In March 2024, however, to align inventory levels and to progress strategic and financing initiatives, Fisker paused production of its electric vehicles ("**EVs**").  The Debtors commenced a going-concern sale process in April 2024, with the Debtors' advisors contacting more than 40 potential purchasers.  By mid-May 2024, despite the Debtors' diligent efforts, their marketing process still had not resulted in any actionable bids from a going-concern purchaser for a fulsome sale of the Debtors' assets.

11.     In light of the Debtors' disappointing marketing efforts for an enterprise sale, the Debtors and their advisors shifted their focus to, and pursued all available options toward, monetizing the Fisker Inventory—*i.e.*, the Debtors' remaining inventory of Fisker Oceans that have completed production and are ready for sale—including by selling EVs in the Fisker Inventory at discounts through DTC channels and to licensed dealerships, in auctions, or in fleet transactions.

12.     Early in these efforts, the Debtors found some success selling EVs in the Fisker Inventory – consummating two sales, each for lots of more than 100 EVs (collectively, the "**Lot Sales**").  However, once it became clear to the Debtors and, in turn, disclosed to prospective purchasers, that the Debtors were unable to ensure performance of post-sale warranty obligations (or commit to any other post-sale contingencies) as part of any sale, the universe of potential purchasers of the Fisker Inventory drastically diminished.

13.     Nevertheless, as part of the Debtors' efforts to maximize value and ease their liquidity strain by selling the Fisker Inventory, the Buyer emerged as a potential purchaser of a significant number of EVs in the Fisker Inventory.  Considering the potential to sell a significant

portion of the Fisker Inventory, under a single agreement with a single purchaser, the Debtors opportunistically and immediately engaged with the Buyer.  For the following and other reasons, the Buyer is uniquely positioned to purchase the Debtors' EVs and the Debtors' best prospect to monetize the Fisker Inventory:

(a)    The Buyer's initial offer was for a sizable percentage of the Fisker Inventory (which percentage would increase after further negotiations with the Buyer, as described below).  At the time the Debtors were first engaging with the Buyer, the Debtors had previously consummated the Lot Sales and were receiving a fair amount of interest from potential purchasers that intended to, shortly after transacting with the Debtors, resell the purchased EVs at auction.  Selling EVs in the Fisker Inventory at discount, and in small lots, risks de-valuing the remaining EVs in the Fisker Inventory.  Additionally, a purchaser, immediately following a sale from the Debtors, re-selling the purchased EVs at auction, likewise risks meaningful devaluation of the remaining EVs in the Fisker Inventory.  Moreover, it would take a considerable amount of time to monetize the Fisker Inventory by conducting piecemeal sales thereof (particularly in light of the public issues plaguing the Debtors in the months leading up to the Petition Date).  Consummating a sale of all or nearly all of the EVs in the Fisker Inventory avoids devaluation risk and allows the Debtors to, in short order, strengthen their liquidity position by, among other things, not incurring operating costs that would otherwise continue to be incurred.  For these and other reasons, consummating a sale with the Buyer presented a highly attractive opportunity to the Debtors;

(b)    The Buyer is well-funded, with the demonstrated economic means to fund the purchase of the entire Fisker Inventory;

(c)    The Buyer is not burdened by the same time constraints that the Debtors frequently encountered with other prospective purchasers, and, therefore, could invest time and

resources repairing and/or improving the EVs purchased following the sale.  The Buyer operates

a vehicle leasing company serving the ride-share community in and around New York City, which

recently passed a mandate that requires the Buyer to convert its fleet to zero-emission vehicles by

2030.  This factor proved critical following the issuance of the June 26 Stop-Sale Hold (as defined

below) and the attendant delay in the Buyer adding the purchased EVs to its operating fleet that

resulted therefrom;

> (d)    The weight and durability of the Fisker Ocean, which comprises the Fisker

Inventory, perfectly align with the Buyer's needs of operating a fleet of zero-emission vehicles in

the New York metropolitan area;

> (e)    The Buyer has its own storage and repair facilities (another factor that

proved vital following the issuance of the June 26 Stop-Sale Hold) to address repairs to the Sale

Vehicles; and

> (f)    Most importantly, the Buyer is willing to transact without any post-sale

contingencies, distinguishing the Buyer from any other prospective buyers the Debtors engaged

with regarding the sale of the Fisker Inventory.

14.    After engaging in good faith negotiations, on May 30, 2024, Debtor Fisker Group

Inc. and the Buyer executed a fleet sales agreement (the "**Initial Fleet Sales Agreement**"),

pursuant to which the Buyer agreed to purchase a significant portion—2,100 EVs—of the Fisker

Inventory.

15.    The Fleet Sales Agreement at issue in the Fleet Sales Motion represents the

culmination of good faith, arms-length, and extensive negotiations between the Debtors and the

Buyer over broadening the scope of the Initial Fleet Sales Agreement (as also described in the

DiDonato First Day Declaration).  In my capacity as CRO, I was actively involved as these

negotiations continued and evolved.  The Buyer now proposes to purchase the entire Fisker Inventory for an increased maximum purchase price of $46.25 million.

**C.    The Fleet Sales Agreement**

16.    As of the Petition Date, the Fisker Inventory consisted of 3,321 EVs (each, a "**Sale Vehicle**").  Post-petition, negotiations between the Debtors and the Buyer continued at arms'-length and, now, the Buyer proposes to purchase the entire Fisker Inventory for an aggregate purchase price up to $46.25 million (plus certain incidental costs of sale and delivery (*e.g.*, shipping, transportation, insurance, customs, taxation, titling, and registration of the Sale Vehicles)) pursuant to that certain fleet sales agreement, dated June 30, 2024 (the "**Fleet Sales Agreement**").[3]  The Fleet Sales Agreement contemplates that the sale and delivery of the Sale Vehicles to the Buyer will commence upon the satisfaction of certain conditions (including the entry of an order by the Court substantially in the form of the Proposed Order) and will continue thereafter on a rolling basis, with biweekly incremental payments to be made by the Buyer on account of each such sale.  In my capacity as CRO, I was involved in the negotiations with the Buyer and am familiar with the terms of the Fleet Sales Agreement.

17.    At all times, the negotiations between the Debtors and the Buyer were conducted in good faith and at arms-length.  The Fleet Sales Agreement contemplates the sale of the Fisker Inventory at a time when selling EVs, particularly the Debtors' EVs (given the commencement of the Chapter 11 Cases and the events and public coverage of such events leading up to the Petition Date), has proven immensely challenging.  Indeed, the Debtors did not receive any comparable alternative proposals with respect to the quantum of vehicles or the purchase price, in each case,

---

[3]  For the avoidance of doubt, no customer data is being sold pursuant to the Fleet Sales Motion and Fleet Sales Agreement.

as contemplated under the Fleet Sales Agreement. Accordingly, I believe that entering into the Fleet Sales Agreement and approval of the Fleet Sales Motion is in the best interest of the Debtors' estates.

**D.    June 26 Stop-Sale Hold**

18.    The Debtors' business is regulated by the National Highway Traffic Safety Administration ("**NHTSA**"). I understand that the National Traffic and Motor Vehicle Safety Act (the "**Safety Act**") grants NHTSA the authority to issue vehicle safety standards and to require manufacturers to recall vehicles that have safety-related defects or do not meet federal safety standards. *See* 49 U.S.C. § 30101, *et seq.*

19.    Prior to the Petition Date, the Debtors voluntarily issued two recall-related stop-sale holds (the "**Prepetition Stop-Sale Holds**"), which affected all Fisker EVs, including the entire Fisker Inventory. The Debtors are continuing to address the Prepetition Stop-Sale Holds on a post-petition basis.

20.    On June 26, 2024, the Debtors voluntarily issued a third recall-related stop-sale hold (the "**June 26 Stop-Sale Hold**" and, together with the Prepetition Stop-Sale Holds, the "**Stop-Sale Holds**") because a circuit board attached to one of the water pumps in Fisker's EVs is susceptible to failure. Thereafter, on July 2, 2024, the Debtors notified NHTSA of the issuance of the June 26 Stop-Sale Hold.[4] The June 26 Stop-Sale Hold affects all or nearly all Fisker EVs, including the entire Fisker Inventory.

21.    Under the Fleet Sales Agreement:

---

[4] In addition, on June 20, 2024, the Debtors timely notified NHTSA of the commencement of the chapter 11 cases, as required by section 573.16 of the Safety Act.

(a)        clearance of any Prepetition Stop-Sale Holds is a condition to the sale of a Sale Vehicle to the Buyer and, accordingly, the Prepetition Stop-Sale Holds affecting a Sale Vehicle will be addressed and cleared by the Seller[5] prior to the sale of such Sale Vehicle to the Buyer;

(b)        the Buyer has (i) agreed that, to the extent a Sale Vehicle is sold to the Buyer prior to the June 26 Stop-Sale Hold having been cleared with respect to such Sale Vehicle (any such Sale Vehicle, a "**Stop-Sale Vehicle**"), the Buyer will not operate (or permit a third party to operate) any such Stop-Sale Vehicle until the June 26 Stop-Sale Hold has been cleared for such Stop-Sale Vehicle and (ii) consented to the proposed order attached to the Fleet Sales Motion enjoining the Buyer from operating (or permitting a third party to operate) a Stop-Sale Vehicle until the June 26 Stop-Sale Hold has been cleared for any such Stop-Sale Vehicle; and

(c)        the Buyer and Seller have agreed that, while the Seller will remain obligated to coordinate and confirm clearance of the June 26 Stop-Sale Hold, the Buyer will provide resources, facilities, and manpower to effectuate the recalls required pursuant to the June 26 Stop-Sale Hold.

## E.        Necessity for Expedited Sale

22.        As further described in the DiDonato First Day Declaration, the Debtors commenced the Chapter 11 Cases to facilitate an orderly, efficient, and value-maximizing (a) sale of the Fisker Inventory and (b) liquidation of the Debtors' remaining assets.  If approved, the Fleet Sales Agreement will provide a gross capital infusion of up to $46.25 million to the Debtors' estates.[6]  The Debtors will no longer incur certain expenses related to the Fisker Inventory once

---

[5] The "**Seller**" is Debtor Fisker Group Inc.

[6] As of the date hereof, one hundred eighteen (118) Sale Vehicles in the Fisker Inventory were located in Austria (the "**Austrian Sale Vehicles**").  In order to export the Austrian Sale Vehicles from Austria, permitting such (….continued)

they sell the Fisker Inventory to the Buyer. Critically, if the Proposed Order is not timely entered such that the Debtors are in a position to commence, and receive payment for, delivery of Sale Vehicles on July 12, 2024 (at the latest)—as contemplated under the Fleet Sales Agreement—the Debtors will be unable to fund vital business expenses (e.g., payroll, taxes, software provider costs, etc.) necessary to effectuate an orderly liquidation. Under these circumstances, I believe that the expedited sale of the Fisker Inventory to the Buyer pursuant to the terms of the Fleet Sales Agreement is both appropriate and in the best interests of the Debtors, their estates, and their stakeholders and maximize the value of the Fisker Inventory. Moreover, given the Debtors' liquidity position and the prepetition marketing process of the Debtors' business and assets, I believe that a sale on an expedited timeline is appropriate.

23.     Importantly, the holder of the Debtors' prepetition senior secured notes—CVI Investments, Inc. (through its agent Heights Capital Management, Inc.) ("**Heights**")—consents to the sale of the Fisker Inventory, which constitutes its collateral, to the Buyer pursuant to terms of the Fleet Sales Agreement and the Proposed Order.

**F.     Conclusion**

24.     Based on my experience and personal knowledge of the Debtor's circumstances, I believe that the expedited sale of the Fisker Inventory to the Buyer pursuant to the terms of the Fleet Sales Agreement is both appropriate and in the best interest of the Debtors, their estates, and their creditors and maximizes the value of the Fisker Inventory. The Debtors engaged in an extensive prepetition marketing process. The Fleet Sales Agreement represents the highest and

---

Austrian Sale Vehicles to be sold to the Buyer under the Fleet Sales Agreement, the Debtors may be required to transfer the net proceeds from the sale of the Austrian Sale Vehicles under the Fleet Sales Agreement to the Debtors' non-Debtor affiliate, Fisker GmbH (Austria). The maximum amount of payments to be made to the Debtors under the Fleet Sale Agreement on account of the sale of the Austrian Sale Vehicles (the "**Austria Payments**"), which Austria Payments the Debtors may thereafter seek to pay to Fisker GmbH (Austria), would be $1,466,692, after deducting customs, duties, and logistics costs from the gross proceeds received.

#98595695v9

best offer received from a potential purchaser.  Further, the Debtors' secured creditor, Heights, consents to the approval of the Fleet Sales Motion and Fleet Sales Agreement on an expedited basis.  For all the reasons set forth in this Declaration, I believe the Fleet Sales Agreement is fair and reasonable, and represents the highest and best offer that could reasonably be obtained for the Fisker Inventory under the circumstances.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: July 2, 2024

*/s/ John C. DiDonato*
John C. DiDonato
Chief Restructuring Officer