## **Exhibit A**

Second Amended Combined Plan and DS

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| FISKER INC., *et al.*, | Case No. 24-11390 (TMH) |
| Debtors.[1] | (Jointly Administered) |

### COMBINED DISCLOSURE STATEMENT AND CHAPTER 11 PLAN OF
### LIQUIDATION OF FISKER INC. AND ITS DEBTOR AFFILIATES

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

Robert J. Dehney, Sr. (No. 3578)
Andrew R. Remming (No. 5120)
Brenna A. Dolphin (No. 5604)
Sophie Rogers Churchill (No. 6905)
Echo Yi Qian (No. 7330)
1201 N. Market Street, 16th Floor
Wilmington, Delaware 19801
Tel.: (302) 658-9200
rdehney@morrisnichols.com
aremming@morrisnichols.com
bdolphin@morrisnichols.com
srchurchill@morrisnichols.com
eqian@morrisnichols.com

*Counsel to Debtors and Debtors in Possession*

DAVIS POLK & WARDWELL LLP

Brian M. Resnick (admitted *pro hac vice*)
James I. McClammy (admitted *pro hac vice*)
Darren S. Klein (admitted *pro hac vice*)
Richard J. Steinberg (admitted *pro hac vice*)
Amber Leary (admitted *pro hac vice*)
450 Lexington Avenue
New York, New York 10017
Tel.: (212) 450-4000
brian.resnick@davispolk.com
james.mcclammy@davispolk.com
darren.klein@davispolk.com
richard.steinberg@davispolk.com
amber.leary@davispolk.com

*Counsel to the Debtors and Debtors in Possession*

Dated: October 8, 2024

---

[1]   The debtors and debtors in possession in these chapter 11 cases, along with the last four digits of their respective employer identification numbers or Delaware file numbers, are as follows: Fisker Inc. (0340); Fisker Group Inc. (3342); Fisker TN LLC (6212); Blue Current Holding LLC (6668); Platinum IPR LLC (4839); and Terra Energy Inc. (0739). The address of the debtors' corporate headquarters is 14 Centerpointe Drive, La Palma, CA 90623.

## IMPORTANT INFORMATION REGARDING THIS COMBINED DISCLOSURE STATEMENT AND PLAN

The Debtors are soliciting votes on this Combined Disclosure Statement and Chapter 11 Plan of Liquidation of Fisker Inc. and its Debtor Affiliates from the Holders of Classes 3 and 4 General Unsecured Claims:

If you are in Class 3 or Class 4, you are receiving this document and the accompanying materials because you are entitled to vote on the Plan. Before submitting a ballot to vote on the Plan, you should review this Combined Disclosure Statement and Chapter 11 Plan of Liquidation of Fisker Inc. and its Debtor Affiliates.

ABSENT THE WRITTEN CONSENT OF THE DEBTORS, ALL BALLOTS MUST BE PROPERLY COMPLETED, EXECUTED, AND DELIVERED ACCORDING TO THE VOTING INSTRUCTIONS IN THE BALLOTS AND THE SOLICITATION AND TABULATION PROCEDURES, SO THAT THE BALLOTS ARE ACTUALLY <u>RECEIVED</u> BY THE CLAIMS AND NOTICING AGENT NO LATER THAN OCTOBER 7, 2024, 2024 AT 5:00 P.M. (PREVAILING EASTERN TIME). BALLOTS MUST BE SUBMITTED TO THE CLAIMS AND NOTICING AGENT ELECTRONICALLY (ON THE CLAIMS AND NOTICING AGENT'S ONLINE PORTAL) OR BY PHYSICAL DELIVERY BY HAND OR MAIL.

You can vote electronically by visiting the case information website maintained by the Claims and Noticing Agent, (HTTPS://WWW.VERITAGLOBAL.NET/FISKER) clicking on the "E-Ballot" tab, and following the prompts and directions. You will need your unique E-Ballot ID# to submit your electronic ballot; your E-Ballot ID# can be found on your Ballot. Each E-Ballot ID# is to be used solely for voting only those Claims described in Item 1 of your Ballot. Holders who vote electronically via the Claims and Noticing Agent's online portal should not also submit a paper Ballot. The electronic ballot portal is the only approved method to submit Ballots electronically, and Holders of Claims entitled to vote on the Plan are strongly encouraged to submit their Ballots via the electronic ballot portal. Ballots delivered by email, facsimile, or any other electronic means may not be counted.

If you choose to vote via a paper Ballot, you must deliver, prior to the Voting Deadline, an original, completed, and executed Ballot in the pre-addressed postage-paid envelope that accompanied your Ballot or as follows:

| If by First-Class Mail, Hand Delivery or Overnight Mail |
| --- |
| Fisker Inc.<br>Ballot Processing Center<br>c/o KCC dba Verita Global<br>222 N. Pacific Coast Highway, Suite 300<br>El Segundo, CA 90245 |

PLEASE READ YOUR BALLOT CAREFULLY FOR FURTHER INFORMATION AND INSTRUCTIONS. FAILURE TO ABIDE BY SUCH INSTRUCTIONS MAY RESULT IN YOUR BALLOT NOT BEING COUNTED.

*\*\**

## Preliminary Statement and Disclaimers[2]

The Bankruptcy Court has established **October 4, 2024 at 4:00 p.m. (prevailing Eastern Time)** as the deadline for filing and serving objections to the final approval of the Disclosure Statement and the confirmation of the Plan (the "**Combined DS and Plan Objection Deadline**"). *See* D.I. 545.  Any objection to the final approval of the Disclosure Statement or the confirmation of the Plan must (a) be in writing, in English, and in text-searchable format, (b) comply with the Bankruptcy Code, Bankruptcy Rules, Local Rules of Bankruptcy Practice and Procedure for the Bankruptcy Court for the District of Delaware, and the Solicitation Order, (c) state, with specificity, the legal and factual bases thereof, and (d) be filed with the Bankruptcy Court no later than the Combined DS and Plan Objection Deadline.

A hearing on the final approval of the Disclosure Statement and the confirmation of the Plan (as such hearing may be continued from time to time, the "**Joint Hearing**") will commence on **October 9, 2024 at 10:00 a.m. (prevailing Eastern Time)** in the Bankruptcy Court before the Honorable Thomas M. Horan, in courtroom 7 at 824 Market St., 3rd Floor Wilmington, DE 19801.  The Joint Hearing may be adjourned or continued from time to time by the Bankruptcy Court or the Debtors by announcement of the adjournment or continuance at a hearing before the Bankruptcy Court or by filing a notice on the docket of the Chapter 11 Cases.  In accordance with the Plan, the Plan may be modified, if necessary, before, during, or as a result of the Joint Hearing without further action by the Debtors and without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

This Combined DS and Plan contains summaries of certain provisions and certain other documents and information.  The financial information included herein is provided solely for the purpose of soliciting votes on the Combined DS and Plan and should not be relied upon for any purpose other than to determine whether and how to vote on the Combined DS and Plan.  While the summaries in the Disclosure Statement shall not constitute or be construed as an admission of fact, liability, stipulation, or waiver by the Debtors or any other party, the Debtors believe that the summaries contained in the Disclosure Statement are fair and accurate.  The summaries of the financial information in the Disclosure Statement and the documents that are attached to, or incorporated by reference in, this Combined DS and Plan are qualified in their entirety by reference to such information and documents.

Except as otherwise provided herein or in accordance with applicable law, the Debtors are under no duty to update or supplement the Combined DS and Plan.  The Bankruptcy Court's approval or confirmation of the Combined DS and Plan does not constitute a guarantee of the accuracy or completeness of the information contained herein or the Bankruptcy Court's

---

[2]     Capitalized terms used but not defined in this section shall have the meanings ascribed to them elsewhere in the *Combined Disclosure Statement and Chapter 11 Plan of Liquidation of Fisker Inc. and its Debtor Affiliates* (as it may be altered, amended, modified, or supplemented from time to time in accordance with the terms thereof (including all appendices, exhibits, schedules, and supplements (including any Plan Supplements) thereto), the "**Disclosure Statement**," the "**Combined DS and Plan**," or the "**Plan**," as applicable).

endorsement of the merits of the Combined DS and Plan. The statements and information contained herein have been made as of the date hereof unless otherwise specified. Holders of Claims reviewing the Combined DS and Plan should not assume at the time of such review that there have been no changes to the facts or information set forth herein since the date of the Combined DS and Plan. All holders of Claims entitled to vote on the Plan are advised and encouraged to read the Combined DS and Plan in its entirety before voting on the Plan. No holder of a Claim should rely on any information, representations, or inducements that are not contained in or are inconsistent with the information contained in the Combined DS and Plan (including the documents attached hereto). The Combined DS and Plan does not constitute, and shall not be deemed to constitute, legal, business, financial, tax, or other advice, including as it relates to holders of Claims against or Interests in the Debtors or any other party in interest. Any Person or Entity desiring any such advice should consult with their own advisors.

Although the Debtors have attempted to ensure the accuracy of the financial information provided herein or incorporated herein by reference, such information contained herein has not been audited, except to the extent specifically indicated otherwise herein. The financial information provided herein has been prepared by the Debtors' management and their financial advisor. Such information, while presented with numerical specificity, is necessarily based on a variety of estimates and assumptions that, although considered reasonable by management, may not be realized and are inherently subject to significant business, economic, competitive, industry, regulatory, market, financial, and other uncertainties and contingencies, many of which are beyond the Debtors' control. The Debtors caution that no representations can be made as to the accuracy of such information or the ability to achieve the projected results. Some assumptions inevitably will not materialize. Further, events and circumstances occurring subsequent to the date on which the financial information was prepared may be different from those assumed or may have been unanticipated and, thus, the occurrence of these events may affect financial results in a materially adverse or materially beneficial manner. Such information, therefore, may not be relied upon as a guarantee or other assurance of the actual results that will occur.

With respect to any contested matters, adversary proceedings, and any other pending, threatened, or potential litigation or other actions, nothing in the Combined DS and Plan, nor any action taken by a Debtor in connection herewith, shall constitute or be construed as an admission of fact, liability, stipulation, or waiver by the Debtors or any other party, but rather constitutes, and is to be construed as, a statement made in the context of settlement negotiations in accordance with rule 408 of the Federal Rules of Evidence and any applicable analogous state or foreign laws or rules.

Except as otherwise expressly set forth herein, all information, representations, or statements contained herein have been provided by the Debtors. No Person or other Entity is or has been authorized to give any information with respect hereto and the matters addressed herein, other than that which is contained herein or incorporated herein by reference. No representations concerning the Debtors or the value of their property have been authorized by the Debtors other than as set forth herein. Any information, representations, or inducements made to obtain a vote on the Plan other than, or inconsistent with, the information contained herein should not be relied upon by any holder of a Claim.

The Combined DS and Plan contains forward-looking statements within the meaning of the "safe harbor" provisions of the Private Securities Litigation Reform Act of 1995, as amended, all of which are based on various estimates and assumptions. Such forward-looking statements are subject to inherent uncertainties and to a wide variety of significant business, economic, and competitive risks, including those summarized herein. When used in the Combined DS and Plan, the words "believe," "expect," "anticipate," "estimate," "intend," "project," "plan," "likely," "may," "will," "should," "shall," or other words or phrases of similar import generally identify forward-looking statements. Although the Debtors believe that their plans, intentions, and expectations reflected in the forward-looking statements are reasonable, they cannot be sure that they will be achieved. These statements are only predictions and are not guarantees. Forward-looking statements are subject to risks and uncertainties that could cause actual results to differ materially from those contemplated by a forward-looking statement. All forward-looking statements attributable to the Debtors or Persons or Entities acting on their behalf are expressly qualified in their entirety by the cautionary statements set forth in the Combined DS and Plan. Forward-looking statements speak only as of the date on which they are made. Except as required by law, the Debtors expressly disclaim any obligation to update or revise any forward-looking statement, whether as a result of new information, subsequent events, anticipated or unanticipated circumstances, or otherwise. See Article XVI for a discussion of certain considerations and risk factors that holders entitled to vote on the Plan should consider.

This Combined DS and Plan has been prepared in accordance with section 1125 of the Bankruptcy Code and Bankruptcy Rule 3016(b) and not in accordance with federal or state securities laws or other non-applicable bankruptcy laws. This Combined DS and Plan has not been approved or disapproved by the SEC or any state or non-U.S. regulatory authority and neither the SEC nor any state or non-U.S. regulatory authority has passed upon the accuracy or adequacy of the information contained herein. Any representation to the contrary is a criminal offense. Neither the solicitation of votes on the Plan, nor this Combined DS and Plan, is intended to constitute an offer to sell or the solicitation of an offer to buy securities in any state or other jurisdiction in which such offer or solicitation is not authorized or is unlawful.

\*\*\*

# TABLE OF CONTENTS

**Page**

**ARTICLE I. DEFINITIONS AND INTERPRETATION** ............................................. 2

A.  Defined Terms ................................................................................................. 2
B.  Interpretation .................................................................................................. 18
C.  Headings ......................................................................................................... 19
D.  Application of Definitions and Rules of Construction Contained in the Bankruptcy Code. ...................................................................................................................... 19
E.  Other Terms .................................................................................................... 19
F.  Appendices to Plan Documents ..................................................................... 19
G.  Controlling Document .................................................................................... 20
H.  Computation of Time ..................................................................................... 21
I.  References to Monetary Figures ..................................................................... 21
J.  Nonconsolidated Plan ..................................................................................... 21

**ARTICLE II. THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND BUSINESS OVERVIEW** ............................................................................................... 21

A.  The Debtors' Corporate History .................................................................... 21
B.  The Company's Business Operations ............................................................. 21
C.  The Liquidating Debtors' Prepetition Capital Structure ................................ 23
    1.  Bridge Note .............................................................................................. 23
    2.  2025 Notes ................................................................................................ 24
    3.  2026 Notes ................................................................................................ 25
    4.  Common Equity ........................................................................................ 25

**ARTICLE III. EVENTS LEADING TO THE CHAPTER 11 FILING** .................... 25

A.  Macroeconomic Trends and Company-Specific Events ................................. 25
    1.  Negative Industry Trends ......................................................................... 25
    2.  Production and Delivery Delays ............................................................... 26
    3.  Sales Model Transition ............................................................................. 26
B.  Prepetition Restructuring Efforts ................................................................... 26

**ARTICLE IV. EVENTS CONCURRENT WITH AND FOLLOWING COMMENCEMENT OF THE CHAPTER 11 CASES** ............................................... 28

A.  Operational and Other Relief ......................................................................... 28
B.  Retention of Professionals ............................................................................. 29
C.  Asset Sales ..................................................................................................... 29
D.  De Minimis Asset Sales ................................................................................. 29
E.  Stop-Sale Holds and Recalls ......................................................................... 29
F.  Claims Bar Date ............................................................................................. 30
G.  The Global Settlement .................................................................................... 31
H.  Liquidating Trust and the IP/Austria Assets Trust ....................................... 31

**ARTICLE V. PROVISIONS FOR TREATMENT OF UNCLASSIFIED CLAIMS**

**UNDER THE PLAN** ........................................................................................... **31**

A.  Treatment of Administrative Claims .......................................................... 32
  1.  Time for Filing Administrative Claims .............................................. 32
  2.  Allowance of Administrative Claims .................................................. 32
  3.  Payment of Allowed Administrative Claims ...................................... 32
B.  Cash Collateral Adequate Protection Claims ............................................. 33
C.  Professional Compensation ........................................................................ 33
  1.  Professional Fee Payment .................................................................. 33
  2.  Professional Fee Escrow .................................................................... 33
  3.  Time for Filing Professional Fee Claims ........................................... 34
  4.  Post-Effective Date Fees and Expenses. ............................................ 34
D.  Treatment of Tax Claims ............................................................................ 34
E.  Statutory Fees ............................................................................................. 35
F.  Payment of 2026 Notes Indenture Trustee Fees ........................................ 35
G.  Payment of Secured Noteholder Professional Fees .................................... 35
H.  NHTSA and Owner Reimbursement Claims ............................................. 36

**ARTICLE VI. CLASSIFICATION AND TREATMENT OF CLAIMS AND
EQUITY INTERESTS** ...................................................................................... **36**

A.  Summary of Classification .......................................................................... 36
B.  Treatment of Claims and Equity Interests .................................................. 38
  1.  Class 1 – Other Priority Claims ......................................................... 38
  2.  Class 2 – Other Secured Claims ........................................................ 38
  3.  Class 3 – Secured Notes Claims ........................................................ 39
  4.  Class 4 – General Unsecured Claims ................................................. 39
  5.  Class 5 – Intercompany Claims ......................................................... 40
  6.  Class 6 – Equity Interests .................................................................. 40
  7.  Class 7 – Intercompany Interests ....................................................... 40
C.  Separate Classification of Claims Generally .............................................. 41
D.  Class Acceptance Requirement ................................................................... 41
E.  Controversy Concerning Impairment ......................................................... 41
F.  Cramdown ................................................................................................... 41
G.  Subordinated Claims .................................................................................. 42
H.  Right to Withdraw Vote and Support ......................................................... 42

**ARTICLE VII. MEANS FOR IMPLEMENTATION OF THE PLAN** ................... **42**

A.  Sources of Consideration for Plan Distributions ....................................... 42
B.  Preservation and Maintenance of Debtor Causes of Action ....................... 43
  1.  Maintenance of Causes of Action. ..................................................... 43
  2.  Preservation of All Causes of Action Not Expressly Settled or Released. ................. 43
  3.  D&O Actions and Litigation. ............................................................. 44
C.  Creation, Vesting, and Transfer of Liquidating Trust Assets to the Liquidating Trust .... 45
  1.  Creation of Liquidating Trust ............................................................ 45
  2.  Vesting of Liquidating Trust Assets .................................................. 46
  3.  Transfer of Liquidating Trust Assets ................................................. 46

D.   Creation, Vesting, and Transfer of IP/Austria Assets Trust Assets to the IP/Austria Assets
     Trust ................................................................................................................................. 46
     1.   Creation of IP/Austria Assets Trust ....................................................................... 46
     2.   Vesting of IP/Austria Assets Trust Assets ............................................................. 47
     3.   Transfer of IP/Austria Assets Trust Assets ............................................................ 47
E.   Corporate Action ............................................................................................................... 48
F.   Board Compensation and Dissolution of the Debtors......................................................... 48
G.   Cancellation of Instruments ............................................................................................... 48

     **ARTICLE VIII. THE IP/AUSTRIA ASSETS TRUST AND LIQUIDATING
     TRUST ............................................................................................................................. 49**

A.   IP/Austria Assets Trust ...................................................................................................... 49
     1.   Purpose of IP/Austria Assets Trust ........................................................................ 49
     2.   IP/Austria Assets Trust Assets .............................................................................. 50
     3.   Role of the IP/Austria Assets Trustee .................................................................... 50
     4.   Compensation of the IP/Austria Assets Trustee ..................................................... 52
     5.   Retention of Professionals by the IP/Austria Assets Trustee.................................... 52
     6.   Tax Treatment; No Successor in Interest ................................................................ 52
     7.   Disputed Claims Reserves ..................................................................................... 52
     8.   Dissolution of the IP/Austria Assets Trust ............................................................. 53
     9.   Securities Exempt ................................................................................................. 53
B.   Liquidating Trust ............................................................................................................... 53
     1.   Purpose of Liquidating Trust ................................................................................. 53
     2.   Liquidating Trust Assets ....................................................................................... 54
     3.   Role of the Liquidating Trustee ............................................................................. 54
     4.   Compensation of the Liquidating Trustee............................................................... 55
     5.   Retention of Professionals by the Liquidating Trustee............................................. 55
     6.   Tax Treatment; No Successor in Interest ................................................................ 56
     7.   Disputed Claims Reserves ..................................................................................... 56
     8.   Dissolution of the Liquidating Trust....................................................................... 56
     9.   Securities Exempt ................................................................................................. 57
C.   Coordination between Trusts .............................................................................................. 57
D.   Liquidating Trust's Open Vehicle Stop-Sale Holds Expenses ............................................. 57
     1.   Pre-Effective Date Owner Reimbursement Claims .................................................. 58
     2.   Post-Effective Date Recall-Related Repairs Related to the Door Handle Stop-Sale Hold
          and the June 26 Stop-Sale Hold ............................................................................. 59
E.   Payment of Certain Proceeds of Trust Assets ..................................................................... 59
     1.   IP/Austria Assets................................................................................................... 59
     2.   Preserved Estate Claims......................................................................................... 59
     3.   Non-IP Assets ....................................................................................................... 60

     **ARTICLE IX. PLAN DISTRIBUTION PROVISIONS............................................. 60**

A.   Plan Distributions............................................................................................................... 60
B.   Disputed Claims Reserves .................................................................................................. 60
C.   Address for Delivery of Plan Distributions ......................................................................... 61
D.   Undeliverable and Unclaimed Distributions Held by Disbursing Agent.......................... 61

|   |   | 1. | Holding of Undeliverable Distributions.................................................. 61 |
|---|---|----|----------------------------------------------------------------------------------------|
|   |   | 2. | After Distributions Become Deliverable ............................................... 61 |
|   |   | 3. | Failure to Claim Undeliverable Distributions ....................................... 62 |
| E. | Time Bar to Cash Payments........................................................................ 62 |
| F. | Manner of Payment under the Plan............................................................. 62 |
| G. | Fractional Plan Distributions ..................................................................... 62 |
| H. | De Minimis Distributions ........................................................................... 63 |
| I. | Foreign Currency Exchange Rate ............................................................... 63 |
| J. | No Postpetition Interest on Claims ............................................................ 63 |
| K. | Allocation Between Principal and Accrued Interest .................................. 63 |
| L. | Single Satisfaction .................................................................................... 63 |
| M. | Claims Paid or Payable by Third Parties ................................................... 63 |
|   |   | 1. | Claims Paid by Third Parties ................................................................ 63 |
|   |   | 2. | Applicability of Insurance Contracts .................................................... 64 |
| N. | Distributions on Account of Subordinated Claims .................................... 64 |

**ARTICLE X. PROCEDURES FOR RESOLVING AND TREATING DISPUTED CLAIMS.............................................................................................................. 65**

| A. | Allowance of Claims.................................................................................. 65 |
| B. | Prosecution of Disputed Claims................................................................. 65 |
| C. | Entitlement to Plan Distributions upon Allowance .................................. 65 |
| D. | Amendments to Claims.............................................................................. 66 |
| E. | Adjustment to Claims or Interests Without Objection............................... 66 |
| F. | Estimation of Claims.................................................................................. 66 |

**ARTICLE XI. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ......................................................................................... 66**

| A. | Assumption and Rejection of Executory Contracts and Unexpired Leases .................... 66 |
|   |   | 1. | Rejection of Executory Contracts and Unexpired Leases.......................... 66 |
|   |   | 2. | Effect of Rejection ................................................................................ 67 |
|   |   | 3. | Assumption and Assignment of Executory Contracts and Unexpired Leases............ 67 |
| B. | Cure ........................................................................................................... 68 |
| C. | Claims Arising from Rejection, Expiration, or Termination .............................. 68 |
| D. | Contracts and Leases Entered Into After the Petition Date ....................... 69 |
| E. | Insurance Contracts................................................................................... 69 |
| F. | Warranties.................................................................................................. 69 |
| G. | Reservation of Rights................................................................................. 69 |

**ARTICLE XII. EFFECTS OF CONFIRMATION ...................................... 70**

| A. | Releases by the Debtors ............................................................................. 70 |
| B. | Releases by Creditors and Equity Security Holders ................................. 71 |
| C. | Exculpation ................................................................................................ 72 |
| D. | Injunctions.................................................................................................. 73 |
| E. | Finality of Cash Collateral Orders ............................................................ 74 |
| F. | Satisfaction of Claims ................................................................................ 74 |
| G. | Compromise and Settlement of Claims and Controversies ....................... 75 |

| | | |
|---|---|---|
| H. | Setoff Rights ............................................................................................. | 75 |
| I. | Third Party Agreements; Subordination .................................................... | 75 |
| J. | Release of Liens ....................................................................................... | 76 |

**ARTICLE XIII. CONDITIONS PRECEDENT TO CONFIRMATION OF THE PLAN AND THE OCCURRENCE OF THE EFFECTIVE DATE** ........................... **76**

| | | |
|---|---|---|
| A. | Conditions Precedent to Confirmation ...................................................... | 76 |
| B. | Conditions Precedent to the Occurrence of the Effective Date ................. | 77 |
| C. | Waiver of Conditions ................................................................................ | 78 |
| D. | Effect of Non-Occurrence of the Effective Date ...................................... | 78 |
| E. | Option to Delay Occurrence of the Effective Date ................................... | 78 |
| F. | Modification of the Plan ........................................................................... | 78 |
| G. | Revocation of Plan ................................................................................... | 79 |

**ARTICLE XIV. RETENTION OF JURISDICTION** .................................................. **79**

**ARTICLE XV. MISCELLANEOUS PROVISIONS** .................................................. **81**

| | | |
|---|---|---|
| A. | Additional Documents ............................................................................... | 81 |
| B. | Substantial Consummation ........................................................................ | 81 |
| C. | Reservation of Rights ................................................................................ | 81 |
| D. | Successors and Assigns ............................................................................. | 81 |
| E. | Notices ...................................................................................................... | 82 |
| F. | Governing Law .......................................................................................... | 82 |
| G. | Exemption from Transfer Taxes ................................................................ | 82 |
| H. | Notice of Entry of Confirmation Order and Relevant Dates ..................... | 82 |
| I. | Compliance with Tax Requirements .......................................................... | 83 |
| J. | Rates .......................................................................................................... | 83 |
| K. | Immediate Binding Effect ......................................................................... | 83 |
| L. | Severability ............................................................................................... | 83 |
| M. | Closing of the Chapter 11 Cases ............................................................... | 84 |
| N. | No Admissions ........................................................................................... | 84 |
| O. | Dissolution of the Committee and Any Other Statutory Committee .......... | 84 |

**ARTICLE XVI. PLAN-RELATED RISK FACTORS** ............................................... **84**

| | | |
|---|---|---|
| A. | The Plan May Not Be Accepted ................................................................ | 85 |
| B. | The Plan May Not Be Confirmed .............................................................. | 85 |
| C. | Parties in Interest May Object to the Amount or Classification of Claims ...... | 85 |
| D. | The Debtors May Object to the Amount or Classification of a Claim ........ | 86 |
| E. | Nonconsensual Confirmation ..................................................................... | 86 |
| F. | The Chapter 11 Cases May Be Converted to Cases under Chapter 7 of the Bankruptcy Code ...................................................................................... | 86 |
| G. | Plan Releases May Not Be Approved ........................................................ | 87 |
| H. | Allowance of Claims May Substantially Dilute the Recovery to Holders of Claims under the Plan ........................................................................... | 87 |
| I. | Certain Tax and Securities Implications of the Plan .................................. | 87 |
| J. | Failure To Consummate the Plan ............................................................... | 87 |

x

K. Any Valuation of Any Assets for Plan Distributions Is Speculative and Could Potentially Be Zero......................................................................................................................... 87
L. Costs of Administrating the Estates ................................................................................ 88
M. The Retained Causes of Action May Be Pursued Against Holders that Vote To Accept or Reject the Plan ................................................................................................................ 88
N. Certain Tax Considerations............................................................................................. 88

**ARTICLE XVII. VOTING PROCEDURES AND REQUIREMENTS ................... 88**

A. Voting Instructions and Voting....................................................................................... 88
B. Parties Entitled to Vote .................................................................................................. 90
C. Agreements Upon Furnishing Ballot .............................................................................. 90
D. Change of Vote ............................................................................................................... 91
E. Waivers of Defects, Irregularities, Etc............................................................................ 91
F. Miscellaneous ................................................................................................................. 91
G. Further Information; Additional Copies .......................................................................... 92

**ARTICLE XVIII. CONFIRMATION REQUIREMENTS ........................................ 92**

A. The Joint Hearing ........................................................................................................... 92
B. Classification................................................................................................................... 93
C. Consensual Confirmation................................................................................................ 93
D. Feasibility and Best Interests of Creditors ..................................................................... 94
  1. Best Interests Test .................................................................................................. 94
  2. Liquidation Analysis .............................................................................................. 94
  3. Application of the Best Interests Test ..................................................................... 97
  4. Feasibility............................................................................................................... 98
E. Confirmation Without Necessary Acceptances; Cramdown ............................................ 98

**ARTICLE XIX. CONCLUSION AND RECOMMENDATION ............................. 100**

## INTRODUCTION

Pursuant to sections 1121(a) and 1125 of the Bankruptcy Code,[3] the Debtors propose this *Combined Disclosure Statement and Chapter 11 Plan of Liquidation of Fisker Inc. and its Debtor Affiliates*, as it may be amended, modified, or supplemented from time to time in accordance with the terms thereof (including all appendices, exhibits, schedules, and supplements (including any Plan Supplements)) thereto, to holders of Claims against and Interests in the Debtors in connection with the solicitation of votes on the Plan and the Joint Hearing to consider confirmation thereof. The Debtors are the proponents of the Plan within the meaning of section 1129 of the Bankruptcy Code. Other agreements and documents may supplement this Plan; such items have been or may be filed with the Bankruptcy Court. Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code, Bankruptcy Rule 3019, and Article VIII, the Debtors reserve the right to alter, supplement, amend, or modify (one or more times), revoke, or withdraw the Plan prior to its substantial consummation.

The purpose of the Disclosure Statement is to describe the Plan and its provisions and to provide adequate information, as required under section 1125 of the Bankruptcy Code, to holders of Claims against the Debtors who have the right to vote on the Plan so that they can make informed decisions in doing so. Holders of Claims entitled to vote to accept or reject the Plan will receive a Ballot together with this Disclosure Statement to enable them to vote on the Plan in accordance with the voting instructions and make any other elections or representations required pursuant to the Plan.

The Disclosure Statement includes information pertaining to the Debtors' prepetition business operations and financial history and the events leading up to the Chapter 11 Cases. In addition, this Combined DS and Plan includes the effects of confirmation of the Plan, certain risk factors associated with the Plan, the manner in which Plan Distributions will be made, the confirmation process, and confirmation requirements.

The Bankruptcy Court entered an order approving on an interim basis the Disclosure Statement contained in this Combined DS and Plan, as containing "adequate information" in compliance with section 1125 of the Bankruptcy Code [D.I. 545] (the "**Solicitation Order**"). Entry of the Solicitation Order does not constitute a judgment by the Bankruptcy Court as to the desirability of the Plan or as to the value or suitability of any consideration proposed thereunder. The Bankruptcy Court's interim approval of the Disclosure Statement contained herein does indicate, however, that the Bankruptcy Court has determined on an interim basis that the Disclosure Statement contains adequate information to permit a holder entitled to vote on the Plan to make an informed judgment in doing so. The adequacy of the Disclosure Statement is still subject to final approval by the Bankruptcy Court at the Joint Hearing.

**ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN ARE ENCOURAGED TO READ THIS COMBINED DS AND PLAN IN ITS ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. The Debtors believe that confirmation and consummation of the Plan are in the best interests of the Debtors, their**

---

[3] Capitalized terms used herein shall have the meanings ascribed to them in Article I unless otherwise defined elsewhere herein.

1

**Estates, and their creditors. The Plan provides for an equitable distribution to holders of Claims and the compromise and settlement of certain claims and controversies among the Debtors and their key stakeholders. The Debtors believe that any alternative to confirmation of the Plan, such as liquidation under chapter 7 of the Bankruptcy Code, could result in the loss of significant value (and a corresponding reduction in the distributions to holders of Claims in certain Classes), and the potential for delay, litigation, and additional costs. Consequently, the Debtors urge all eligible holders of Claims entitled to vote on the Plan to vote to ACCEPT the Plan and to complete and submit their Ballots so that they will be RECEIVED by the Claims and Noticing Agent on or before the Voting Deadline.**

## ARTICLE I.
## DEFINITIONS AND INTERPRETATION

A.    *Defined Terms*

Unless the context otherwise requires, capitalized terms have the meanings set forth below.

1.    "*2025 Notes*" means, collectively, the Series A-1 Senior Convertible Notes Due 2025 and the Series B-1 Senior Convertible Notes Due 2025 issued pursuant to the 2025 Notes Securities Purchase Agreement and 2025 Notes Indenture.

2.    "*2025 Notes Claims*" means all Claims against each of the Debtors arising from or based upon the 2025 Notes Documents, including Claims for outstanding principal in the amount of not less than $183,050,000, interest, fees, expenses, costs, and other liabilities and obligations under the 2025 Notes Documents.

3.    "*2025 Notes Collateral Agent*" means CVI Investments, Inc. in its capacity as collateral agent under the 2025 Notes Documents.

4.    "*2025 Notes Documents*" means the 2025 Notes Securities Purchase Agreement, 2025 Notes Indenture, the 2025 Notes, 2025 Notes Security Agreement, the 2025 Notes Guaranty Agreement, the Senior Intercreditor Agreement, each other "Transaction Document" (as defined in the 2025 Notes Securities Purchase Agreement), and all related agreements, instruments, pledges, charges, and documents executed by any Debtor or non-Debtor subsidiary in connection therewith.

5.    "*2025 Notes Guaranty Agreement*" means that certain Guaranty, dated as of December 28, 2023, by and among the Debtors and non-Debtor subsidiary Fisker Austria, as guarantors, and the 2025 Notes Collateral Agent.

6.    "*2025 Notes Indenture*" means that certain Indenture, dated as of July 11, 2023, by and between Debtor Fisker Inc., as the issuer, and the 2025 Notes Trustee, as trustee, as supplemented by a first supplemental indenture, dated as of July 11, 2023, a second supplemental indenture, dated as of September 29, 2023, and a third supplemental indenture, dated as of November 22, 2023, and as further amended, amended and restated, supplemented and/or otherwise modified from time to time.

7.    "*2025 Notes Securities Purchase Agreement*" means that certain Securities

2

Purchase Agreement, dated July 10, 2023, between Debtor Fisker Inc. and CVI Investments, Inc., as amended pursuant to that certain Amendment No.1 to Securities Purchase Agreement, dated September 29, 2023, pursuant to that certain Second Amendment and Waiver Agreement, dated January 21, 2024, and that certain Amendment Waiver, dated March 18, 2024, and as further amended, amended and restated, supplemented and/or otherwise modified from time to time.

8.     "*2025 Notes Security Agreement*" means that certain Pledge Agreement, dated November 22, 2023, by and among Debtor Fisker Inc., Debtor Fisker Group, Inc., and non-Debtor subsidiary Fisker Austria, as grantors, and the 2025 Notes Collateral Agent, as amended and restated by that certain Amended and Restated Security and Pledge Agreement, dated as of December 28, 2023, by and among the Debtors and non-Debtor subsidiary Fisker Austria, as grantors, and the 2025 Notes Collateral Agent, and as further amended, amended and restated, supplemented and/or otherwise modified from time to time.

9.     "*2025 Notes Trustee*" means Wilmington Savings Fund Society, FSB.

10.     "*2026 Notes*" means the unsecured 2.5% convertible senior notes due in September 2026 issued by Fisker Inc. pursuant to the 2026 Notes Indenture.

11.     "*2026 Notes Claims*" means all Claims arising from or based upon the 2026 Notes and 2026 Notes Indenture.

12.     "*2026 Notes Indenture*" means that certain Indenture, dated as of August 17, 2021, by and between Debtor Fisker Inc., as issuer, and U.S. Bank National Association, as trustee, as amended, amended and restated, supplemented, and/or otherwise modified from time to time.

13.     "*2026 Notes Indenture Trustee*" means U.S. Bank National Association.

14.     "*Administrative Claim*" means a Claim incurred by the Debtors (or their Estates) on or after the Petition Date and before the Effective Date for a cost or expense of administration in the Chapter 11 Cases entitled to priority under sections 503(b) and 507(a)(2) of the Bankruptcy Code.

15.     "*Administrative Claims Bar Date*" means the first Business Day that is thirty (30) days following the Effective Date.

16.     "*Affiliate*" shall have the meaning set forth in section 101(2) of the Bankruptcy Code as if the referenced entity was a debtor in a case under the Bankruptcy Code.

17.     "*Allowed*" when used: (a) with respect to any Claim, except for a Claim that is an Administrative Claim, means such Claim to the extent it is (i) expressly allowed under the Plan, or (ii) not a Disputed Claim or a Disallowed Claim; (b) with respect to an Administrative Claim, means such Administrative Claim to the extent it has become fixed in amount and priority pursuant to the procedures set forth in Article V.A of this Plan; and (c) with respect to Equity Interests in any Debtor, means the Equity Interests in such Debtor as reflected in the stock transfer ledger or similar register of such Debtor as of the Effective Date.  For the avoidance of doubt, a Proof of Claim filed after the Claims Bar Date or a request for payment of an Administrative Claim required to be filed under Article V.A filed after the Administrative Claims Bar Date, as applicable, shall

not be Allowed for any purposes whatsoever absent entry of a Final Order allowing such late-filed Claim. "Allowed," "Allow," "Allowance" and "Allowing" shall have correlative meanings.

18.    "*Assets*" means all of the Debtors' right, title and interest of any nature in property of any kind, wherever located, as specified in section 541 of the Bankruptcy Code.

19.    "*Assumed Executory Contracts and Unexpired Leases Schedule*" means the list of assumed Executory Contracts and Unexpired Leases (if any) filed as an exhibit to the Plan Supplement (if applicable), which may be supplemented or modified from time to time.

20.    "*Avoidance Actions*" means all Causes of Action of the Estates that arise under sections 542, 544, 545, 547, 548, 549, 550, 551, 552 and/or 553 of the Bankruptcy Code.

21.    "*Austria Assets*" means collectively (i) the Debtors' and Estates' Causes of Action against, and interests in, the Debtors' foreign subsidiaries, (ii) the Austria Claims, and (iii) any proceeds and other amounts realized in respect of each of the foregoing.

22.    "*Austria Claims*" means any Causes of Action against Fisker Austria held by the Secured Noteholder, in its capacity as such, and any proceeds and other amounts realized in respect thereof; *provided*, that, notwithstanding anything herein to the contrary, "Austria Claims" shall not include any Causes of Action of the Secured Noteholder against the Debtors' non-Debtor foreign subsidiaries, other than Fisker Austria, and liens upon any of their respective assets, including any amounts realized in respect of any such Causes of Action.

23.    "*Bankruptcy Code*" means title 11 of the United States Code, as amended and in effect during the pendency of the Chapter 11 Cases.

24.    "*Bankruptcy Court*" means the United States Bankruptcy Court for the District of Delaware.

25.    "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure, as applicable to the Chapter 11 Cases, promulgated under section 2075 of the Judicial Code and the general, local, and chambers rules of the Bankruptcy Court.

26.    "*Bridge Note*" means the Senior Secured Note due 2024 issued pursuant to the Bridge Note Securities Purchase Agreement.

27.    "*Bridge Note Claims*" means all Claims against each of the Debtors arising from or based upon the Bridge Note Documents, including Claims for outstanding principal in the amount of not less than $3,456,000, interest, fees, expenses, costs, and other liabilities and obligations under the Bridge Note Documents.

28.    "*Bridge Note Collateral Agent*" means CVI Investments, Inc. in its capacity as collateral agent under the Bridge Note Documents.

29.    "*Bridge Note Documents*" means the Bridge Note Securities Purchase Agreement, the Bridge Note, the Bridge Note Security Agreement, the Bridge Note Guaranty Agreement, the Senior Intercreditor Agreement, each other "Transaction Document" (as defined in the Bridge

Note Securities Purchase Agreement), and all related agreements, instruments, pledges, charges, and documents executed by any Debtor or non-Debtor subsidiary in connection therewith.

30.    "*Bridge Note Guaranty Agreement*" means that certain Guaranty, dated as of May 10, 2024, by and among the Debtors and certain non-Debtor subsidiaries, as guarantors, and the Bridge Note Collateral Agent, as supplemented on May 17, 2024, and as further amended, amended and restated, supplemented and/or otherwise modified from time to time.

31.    "*Bridge Note Securities Purchase Agreement*" means that certain Securities Purchase Agreement, dated May 10, 2024, between Debtor Fisker Inc. and CVI Investments, Inc., as amended, amended and restated, supplemented and/or otherwise modified from time to time.

32.    "*Bridge Note Security Agreement*" means that certain Security and Pledge Agreement dated as of May 10, 2024, by and between the Debtors, as grantors, and the Bridge Note Collateral Agent, as amended, amended and restated, supplemented and/or otherwise modified from time to time.

33.    "*Business Day*" means any day, other than a Saturday, Sunday, or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

34.    "*Cash*" means the legal tender of the United States of America or readily marketable direct obligations of, or obligations guaranteed by, the United States of America.

35.    "*Cash Collateral Adequate Protection Claim*" means all Claims arising from the Adequate Protection Obligations (as defined in the Cash Collateral Orders).

36.    "*Cash Collateral Orders*" means the (i) *Interim Order (I) Authorizing the Debtors to Use Cash Collateral, (II) Granting Adequate Protection, (III) Modifying the Automatic Stay, (IV) Scheduling a Further Hearing on the Motion, and (V) Granting Related Relief* [D.I. 59]; (ii) *Second Interim Order (I) Authorizing the Debtors to Use Cash Collateral, (II) Granting Adequate Protection, (III) Modifying the Automatic Stay, (IV) Scheduling a Further Hearing on the Motion, and (V) Granting Related Relief* [D.I. 98]; (iii) *Third Interim Order (I) Authorizing the Debtors to Use Cash Collateral, (II) Granting Adequate Protection, (III) Modifying the Automatic Stay, (IV) Scheduling a Further Hearing on the Motion, and (V) Granting Related Relief* [D.I. 184] (as amended, modified, or supplemented by order of the Bankruptcy Court from time to time); (iv) *Fourth Interim Order (I) Authorizing the Debtors to Use Cash Collateral, (II) Granting Adequate Protection, (III) Modifying the Automatic Stay, (IV) Scheduling a Further Hearing on the Motion, and (V) Granting Related Relief* [D.I. 260]; (vi) the Fifth Interim Cash Collateral Order; and (vii) the Sixth Interim Cash Collateral Order.

37.    "*Cash Collateral Stipulations*" means all of the stipulations, admissions, agreements, releases, and waivers of the Debtors (including those that are subject to entry of a final cash collateral order or order confirming an Acceptable Plan (as defined in the Sixth Interim Cash Collateral Order)) contained in the Cash Collateral Orders, including such stipulations, admissions, agreements, releases, and waivers contained in Paragraphs E and F of the Cash Collateral Orders.

38.    "*Causes of Action*" means any claims, Claims, interests, damages, remedies, causes of action, demands, rights, actions, suits, obligations, liabilities, accounts, defenses, offsets,

powers, privileges, licenses, liens, indemnities, guaranties, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, assertable directly or derivatively, matured or unmatured, suspected or unsuspected, whether arising before, on, or after the Petition Date, in contract or in tort, in law, or in equity or pursuant to any other theory of state, federal, or other law. For the avoidance of doubt, "Causes of Action" includes: (a) all rights of setoff, counterclaim, or recoupment and claims under contracts or for breaches of duties imposed by law or in equity; (b) the right to object to or to otherwise contest, recharacterize, reclassify, subordinate, or disallow any Claims or Equity Interests; (c) claims pursuant to sections 362, 510, 542, 543, 544 through 550, or 553 of the Bankruptcy Code; and (d) such claims and defenses as fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code.

39.    "*Chapter 11 Cases*" means the cases commenced under chapter 11 of the Bankruptcy Code pending before the Bankruptcy Court with respect to the Debtors styled as *In re Fisker Inc.*, *et al.*, Chapter 11 Case No. 24-11390 (TMH).

40.    "*Chase*" means JPMorgan Chase Bank, N.A., and its Affiliates.

41.    "*Chase Claim*" means any Claim by Chase, acting for itself or as subrogee, indemnitee, or assignee, against any of the Debtors, Magna, or an Affiliate of Magna, in connection with the assertion of any Purchaser Claim.

42.    "*Chase Note*" means a Promissory Note and Security Agreement executed with Chase in connection with the purchase of a Fisker-branded vehicle.

43.    "*Chase Purchaser*" means any purchaser or owner of a Fisker-branded vehicle who executed a Chase Note in connection with the purchase of such Fisker-branded vehicle.

44.    "*Chase Purchaser Claim*" means any Claim, whether known or unknown, at law or in equity, by a Chase Purchaser against Chase in connection with a Fisker-branded vehicle that arises, in whole or in part, based on Chase's role as the holder of a Chase Note, including, any claim for false advertising, deceptive trade practices, breach of warranty, and/or that a Fisker-branded vehicle is defective, has mechanical issues that cannot be reasonably repaired, or otherwise meets the definition of a "lemon" under applicable law.

45.    "*Claim*" shall have the meaning set forth in section 101(5) of the Bankruptcy Code.

46.    "*Claims Bar Date*" means the applicable deadline for filing Proof of Claim as set forth in the *Order (I) Establishing Certain Bar Dates for Filing Proofs of Claim Against the Debtors, and (II) Granting Related Relief, Including Notice and Filing Procedures* [D.I. 458] or another order of the Bankruptcy Court.

47.    "*Claims and Noticing Agent*" means Kurtzman Carson Consultants, LLC d/b/a Verita Global.

48.    "*Claim Objection Deadline*" means the date that is ninety (90) days after the Effective Date.

49.     "*Class*" means a category of holders of Claims or Equity Interests under section 1122(a) of the Bankruptcy Code.

50.     "*Committee*" means the Official Committee of Unsecured Creditors appointed by the U.S. Trustee in the Chapter 11 Cases [D.I. 106], pursuant to section 1102(a) of the Bankruptcy Code, as it may be reconstituted from time to time.

51.     "*Company*" means the Debtors and their non-U.S. Affiliates.

52.     "*Confirmation Date*" means the date on which the Bankruptcy Court enters the Confirmation Order on the docket of the Bankruptcy Court.

53.     "*Confirmation Hearing*" means the hearing held by the Bankruptcy Court, as it may be continued from time to time, to consider confirmation of the Plan.

54.     "*Confirmation Order*" means the order of the Bankruptcy Court confirming the Plan, which shall be in a form reasonably acceptable to the Debtors, the Secured Noteholder, and the Committee.

55.     "*CRO*" means John DiDonato, the Chief Restructuring Officer of the Debtors.

56.     "*D&Os*" means all current and former directors, managers, members, officers, and employees of (a) the Debtors, (b) the Debtors' current and former direct and indirect subsidiaries, and (c) the Debtors' current and former Affiliates; *provided*, that, notwithstanding anything herein to the contrary, for purposes of this Combined DS and Plan, the term "D&Os" shall not include the Transaction Committee Chairman and the CRO.

57.     "*D&O Actions*" means any and all Causes of Action of each Debtor and Estate against any of the D&Os, including claims for breach of fiduciary duty, knowing participation in breach of fiduciary duty or aiding and abetting breach of fiduciary duty, fraud, gross negligence and/or reckless mismanagement, and against or any recoveries from all D&O Policies, including Causes of Action against current or former insurance carriers, reinsurance carriers, insurance brokers, underwriters occurrence carriers, or surety bond insurers, relating to coverage, indemnity, contribution, reimbursement, overpayment of premiums and fees, breach of contract or any other matters relating to, arising from, or based in whole or in part on, the D&O Policies.

58.     "*D&O Policy Cap*" means the aggregate insurance proceeds available under all applicable D&O Policies.

59.     "*D&O Policies*" means all insurance policies (including any "tail policy") issued at any time to any of the Debtors for certain liabilities of the Debtors and/or their current or former directors, managers, members and officers, and all agreements, documents or instruments related thereto.

60.     "*Davis Polk*" means Davis Polk & Wardwell LLP, as counsel to the Debtors.

61.     "*Debtor in Possession*" means any Debtor, in its capacity as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

62.    "*Debtors*" means, collectively, Fisker Inc.; Fisker Group Inc.; Fisker TN LLC; Blue Current Holding LLC; Platinum IPR LLC; and Terra Energy Inc.

63.    "*Disallowed*" means, with respect to any Claim that is not otherwise expressly Allowed hereunder, a Claim or any portion thereof that (a) has been Disallowed by a Final Order, (b) is scheduled as zero or as contingent, disputed, or unliquidated and as to which no Proof of Claim or request for payment of an Administrative Claim has been timely filed or deemed timely filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court or otherwise deemed timely filed under applicable law or this Plan, (c) is not scheduled and as to which no Proof of Claim or request for payment of an Administrative Claim has been timely filed or deemed timely filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court or otherwise deemed timely filed under applicable law or this Plan, or (d) has been waived or withdrawn by agreement of the applicable Debtor and the holder thereof, or has been waived or withdrawn by the holder thereof.

64.    "*Disclosure Statement*" means the disclosure statement filed with respect to the Plan, as it may be amended, supplemented or otherwise modified from time to time, and the exhibits and schedules thereto.

65.    "*Disputed*" means, with respect to any Claim or Equity Interest, a Claim or Equity Interest that is not yet Allowed or Disallowed, including (a) any Proof of Claim that, on its face, is contingent or unliquidated; (b) any Proof of Claim or request for payment of an Administrative Claim filed after the Effective Date or the deadline for filing Proofs of Claim based on the Debtors' rejection of Executory Contracts or Unexpired Leases, as applicable, and (c) any Claim that is subject to an objection or a motion to estimate, in each case that has not been withdrawn, resolved, or ruled on by a Final Order of the Bankruptcy Court.

66.    "*Disputed Claims Reserve*" means one or more reserves for Disputed Claims established and maintained by (a) the Liquidating Trustee in accordance with the Plan and the Liquidating Trust Agreement, and (b) the IP/Austria Assets Trustee in accordance with the Plan and IP/Austria Assets Trust Agreement.

67.    "*Effective Date*" means, with respect to each Debtor, the date that the Plan becomes effective, which shall be a Business Day after all of the conditions specified in Article XIII.B have been satisfied or waived (to the extent waivable).

68.    "*Entity*" has the meaning set forth in section 101(15) of the Bankruptcy Code.

69.    "*Equity Interest*" means (i) any outstanding ownership interest in any of the Debtors, including interests evidenced by common or preferred stock, membership interests, options, stock appreciation rights, restricted stock, restricted stock units or their equivalents, or other rights to purchase or otherwise receive any ownership interest in any Debtor and any right to payment or compensation based upon any such interest, whether or not such interest is owned by the holder of such right to payment or compensation, and (ii) any Claim against the Debtors that is subordinated and has the same priority as common or preferred stock by operation of the Bankruptcy Code or any order entered by the Bankruptcy Court.

8

70.    "*Estate*" means, as to each Debtor, the estate created for the Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code.

71.    "*Exculpated Parties*" means each of the following, to the extent permitted by applicable law, in their capacity as such: (a) each Debtor; (b) each Other Director and Officer; (c) the Liquidating Trustee; (d) the IP/Austria Assets Trustee; (e) Davis Polk, as counsel to the Debtors; (f) Morris Nichols, as counsel to the Debtors; (g) Huron Consulting Services, LLC, as financial advisor and consultant to the Debtors; (h) Kurtzman Carson Consultants, LLC dba Verita Global, as administrative advisor to the Debtors; (i) the Transaction Committee Chairman; (j) the CRO; (k) the Committee and each of its members; (l) solely to the extent provided by section 1125(e) of the Bankruptcy Code, each Section 1125(e) Party; and (m) each Related Party of each Entity in clauses (c) through (k) above; *provided*, that, for the avoidance of doubt and notwithstanding anything to the contrary herein, D&Os (other than the Other Directors and Officers), the Fisker Parties, the Debtors' current or former direct or indirect non-Debtor subsidiaries, and the Debtors' current or former non-Debtor Affiliates are not and shall not be deemed hereunder to be an Exculpated Party.

72.    "*Executory Contract*" means a contract to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

73.    "*Fee Application*" means an application for allowance and payment of a Professional Fee Claim.

74.    "*Fifth Interim Cash Collateral Order*" means the *Fifth Interim Order (I) Authorizing the Debtors to Use Cash Collateral, (II) Granting Adequate Protection, (III) Modifying the Automatic Stay, (IV) Scheduling a Further Hearing on the Motion, and (V) Granting Related Relief*, including the Extended Fifth Interim Cash Collateral Budgets [D.I. 361, 467, 475].

75.    "*Final Order*" (a) an order or judgment of the Bankruptcy Court or any other court or adjudicative body as to which the time to appeal, petition for certiorari or move for reargument or rehearing has expired and as to which no appeal, petition for certiorari or other proceedings for reargument or rehearing shall then be pending, or (b) in the event that an appeal, writ of certiorari, reargument or rehearing thereof has been sought, such order of the Bankruptcy Court or any other court or adjudicative body shall have been affirmed by the highest court to which such order was appealed, or certiorari has been denied, or from which reargument or rehearing was sought, and the time to take any further appeal, petition for certiorari or move for reargument or rehearing shall have expired; *provided*, that no order shall fail to be a Final Order solely because of the possibility that a motion pursuant to section 502(j) of the Bankruptcy Code, Rule 59 or Rule 60 of the Federal Rules of Civil Procedure or Bankruptcy Rule 9024 may be filed with respect to such order.

76.    "*First Tier Claims*" means, collectively, all Allowed Administrative Claims, Other Priority Claims, Tax Claims, and Effective Date Statutory Fees.

77.    "*First Tier Claims Reserve*" means a reserve, established on the Effective Date from the Debtors' Cash and other proceeds of Non-IP Assets, sufficient to fund all First Tier Claims that are not paid on the Effective Date.

78.    "*Fisker Austria*" means Fisker GmbH (Austria).

9

79.     "*Fisker Owners Association*" means the Fisker Owners Association represented by Cooley LLP and Stevens & Lee, P.C. as counsel.

80.     "*Fisker Parties*" means Henrik Fisker, Dr. Geeta Gupta-Fisker, and each of their respective family members, related trusts, investment vehicles, Affiliates (other than the Debtors), and successors and assigns.

81.     "*Fleet Sale*" means the sale of the Debtors' fleet of vehicles to American Lease LLC approved by the Court in the Fleet Sale Order.

82.     "*Fleet Sale Order*" means the *Order (I) Authorizing and Approving the Sale of Certain of the Debtors' Assets Free and Clear of Liens, Claims, Encumbrances, and Interests, (II) Authorizing the Debtors to Enter Into and Perform Under the Fleet Sales Agreement, and (III) Granting Related Relief* [D.I. 243, as amended, D.I. 294, 555].

83.     "*General Unsecured Claim*" means any Claim against any of the Debtors other than an Administrative Claim, an Other Priority Claim, a Tax Claim, a Professional Fee Claim, a Secured Notes Claims, an Other Secured Claim, and an Intercompany Claim.

84.     "*Global Settlement*" means the settlement memorialized in the Global Settlement Term Sheet among the Debtors, the Committee, the Secured Noteholder, and Magna.

85.     "*Global Settlement Budget*" means the budget attached as Exhibit 1 to the Sixth Interim Cash Collateral Order.

86.     "*Global Settlement Term Sheet*" means the term sheet attached as Exhibit 2 to the Sixth Interim Cash Collateral Order.

87.     "*Impaired*" means a Class of Claims or Equity Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code.

88.     "*Initial Liquidating Trust Funding Amount*" means $300,000 from the Debtors' Cash on hand to operate the Liquidating Trust, including litigation expenses, which shall be paid after (a) payment (or reserving) in full for all First Tier Claims, (b) payment in full of Professional Fee Claims in accordance with Article V.C.1 of this Plan (subject to the Professional Fee Cap), (c) the Professional Fee Escrow Amount has been transferred to the Professional Fee Escrow in accordance with Article V.C.2 of this Plan, (d) payment of the Wind Down Amount to the Liquidating Trust in accordance with Article VII.C.1 of this Plan, (e) payment of the Liquidating Trust Additional Amount to the Liquidating Trust in accordance with Article VIII.D of this Plan, and (f) payment in full of the Secured Noteholder Professional Fees in accordance with Article V.G of this Plan; *provided*, that, subject in all respects to the prior written consent of the Secured Noteholder, notwithstanding whether the Secured Noteholder Professional Fees have been paid in full, a portion of the Initial Liquidating Trust Funding Amount, in an amount to be agreed to by the Secured Noteholder, the Committee, and the Debtors may be funded on the Effective Date.

89.     "*Insurance Contracts*" means all insurance policies and all surety bonds and related agreements of indemnity that have been issued at any time or provide coverage, benefits, or

proceeds to any of the Debtors and all agreements, documents, or instruments relating thereto, including the D&O Policies.

90.    "*Insurer*" means any company or other entity that issued an Insurance Contract, any third-party administrator, and any respective predecessors and/or Affiliates thereof.

91.    "*Intercompany Claim*" means a Claim held by any Debtor against any other Debtor, other than any Administrative Claim.

92.    "*Intercompany Interest*" means an Interest in a Debtor held by another Debtor.

93.    "*Interim Compensation Order*" means the *Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Retained Professionals* [D.I. 350].

94.    "*Internal Revenue Code*" means the Internal Revenue Code of 1986, as amended.

95.    "*IP/Austria Assets*" means collectively the IP Assets and the Austria Assets.

96.    "*IP/Austria Assets Trust*" means the trust established pursuant to Article VIII.A of the Plan.

97.    "*IP/Austria Assets Trust Agreement*" means the agreement, in a form reasonably acceptable to the Secured Noteholder and the Committee, governing the IP/Austria Assets Trust, dated as of the Effective Date, which shall be substantially in the form filed with the Bankruptcy Court as part of the Plan Supplement.

98.    "*IP/Austria Assets Trust Assets*" means (a) the IP/Austria Assets (subject to Article VIII.E.1), (b) the Net Proceeds of Estate Claims paid to the IP/Austria Assets Trust, and the IP/Austria Assets Trust's rights thereto, pursuant to Article VIII.E.2 and (c) the Net Proceeds of Non-IP Assets paid to the IP/Austria Assets Trust, and the IP/Austria Assets Trust's rights thereto, pursuant to Article VIII.E.3.

99.    "*IP/Austria Assets Trust Beneficiaries*" means holders of the IP/Austria Assets Trust Units.

100.    "*IP/Austria Assets Trustee*" means the Entity appointed by the Secured Noteholder to serve as trustee of the IP/Austria Assets Trust, who will be identified in the Plan Supplement.

101.    "*IP/Austria Assets Trust Expenses*" means the reasonable fees and expenses incurred by the IP/Austria Assets Trust and reimbursable pursuant to the Plan and the IP/Austria Assets Trust Agreement.

102.    "*IP/Austria Assets Trust Units*" means beneficial interests in the IP/Austria Assets Trust entitling holders thereof to their pro rata share of distributions from the IP/Austria Assets Trust in accordance with the Plan and IP/Austria Assets Trust Agreement.

103.    "*IP Assets*" means intellectual property owned, controlled, or licensable by the Debtors, any tangible assets embodying the foregoing, including all of the property listed on IP

Assets Schedule, and any Causes of Action of the Debtors and the Estates necessary to enforce ownership rights in such property or assets that are not waived, relinquished, released, compromised, or settled in the Plan or any Final Order, including all rights to and claims for damages, restitution, and injunctive and other legal and equitable relief for past, present, and future infringement, dilution, misappropriation, violation, misuse, breach, or default.

104.    "*IP Assets Schedule*" means a list of IP Assets to be provided by the Debtors to the Secured Noteholder, the Committee, and Magna.

105.    "*IRS*" means the United States Internal Revenue Service.

106.    "*Lien*" shall have the meaning set forth in section 101(37) of the Bankruptcy Code.

107.    "*Liquidating Trust*" means the trust established pursuant to Article VIII.B of the Plan.

108.    "*Liquidating Trust Agreement*" means the agreement, in a form reasonably acceptable to the Secured Noteholder and the Committee, governing the Liquidating Trust, dated as of the Effective Date, which shall be substantially in the form filed with the Bankruptcy Court as part of the Plan Supplement.

109.    "*Liquidating Trust Additional Amount*" shall have the meaning ascribed to such term in Article VIII.D of this Plan.

110.    "*Liquidating Trust Additional Funding Amount*" shall have the meaning ascribed to such term in Article VIII.D of this Plan.

111.    "*Liquidating Trust Assets*" means the (a) Non-IP Assets (subject to Article VIII.E.3), (b) the Preserved Estate Claims (subject to Article VIII.E.2), and (c) the Net Proceeds of IP/Austria Assets paid to the Liquidating Trust, and the Liquidating Trust's rights thereto, pursuant to Article VIII.E.1.

112.    "*Liquidating Trust Beneficiaries*" means holders of Liquidating Trust Units.

113.    "*Liquidating Trust Expenses*" the reasonable and documented fees and expenses incurred by the Liquidating Trust and reimbursable pursuant to the Plan and the Liquidating Trust Agreement.

114.    "*Liquidating Trust Units*" means beneficial interests in the Liquidating Trust entitling holders thereof to their pro rata share of distributions from the Liquidating Trust in accordance with the Plan and the Liquidating Trust Agreement.

115.    "*Liquidating Trustee*" means the Entity appointed by the Committee to serve as trustee of the Liquidating Trust, who will be identified in the Plan Supplement.

116.    "*Magna*" means Magna International, Inc.

12

117.    "*Magna 9019 Order*" means the *Order (A) Authorizing the Debtors to Enter Into the Austrian Settlement, (B) Approving the Claims Settlement Between the Debtors and Magna, and (C) Granting Related Relief* entered by the Bankruptcy Court on September 10, 2024 [D.I. 546].

118.    "*Morris Nichols*" means Morris, Nichols, Arsht & Tunnell LLP, as counsel to the Debtors.

119.    "*Net Proceeds of Estate Claims*" means the Proceeds of Estate Claims (including any amounts received as reimbursement for the expenditure of such proceeds under the Reimbursement Mechanics) net of (a) amounts required to be paid from such proceeds in accordance with the Plan on account of (i)  Secured Noteholder Professional Fees under Article V.G, (ii) the Wind Down Amount under Article VII.C.1, (iii) the Liquidating Trust Additional Amount under Article VIII.D, and (iv) reimbursement obligations of the Liquidating Trust under the Reimbursement Mechanics and (b) reasonable and documented Liquidating Trust Expenses incurred in connection with administering the Preserved Estate Claims.

120.    "*Net Proceeds of IP/Austria Assets*" means proceeds of IP/Austria Assets received by the IP/Austria Assets Trust (including any amounts received as reimbursement for the expenditure of such proceeds under the Reimbursement Mechanics) net of (a) amounts required to be paid from such proceeds in accordance with the Plan on account of (i) Secured Noteholder Professional Fees under Article V.G, (ii) the Wind Down Amount under Article VII.C.1, (iii) the Liquidating Trust Additional Amount under Article VIII.D, and (iv) reimbursement obligations of the IP/Austria Assets Trust under the Reimbursement Mechanics, and (b) reasonable and documented IP/Austria Assets Trust Expenses incurred in connection with administering the IP/Austria Assets Trust or the IP/Austria Assets Trust Assets.

121.    "*Net Proceeds of Non-IP Assets*" means proceeds of Non-IP Assets, including any Cash constituting Non-IP Assets, received by the Liquidating Trust net of (a) amounts required to be paid (or reserved) from such proceeds in accordance with the Plan on account of (i) First Tier Claims, (ii) Professional Fee Claims (and the Professional Fee Escrow, as applicable) in accordance with Article V.C.1 and Article V.C.2 of this Plan, (iii) the Wind Down Amount, (iv) the Secured Noteholder Professional Fees, (v) the Initial Liquidating Trust Funding Amount, (vi) the Liquidating Trust Additional Amount and, if applicable in accordance with Article VIII.D of this Plan, the Liquidating Trust Additional Funding Amount, and (vii) any reimbursement obligations of the Liquidating Trust under the Reimbursement Mechanics, and (b) reasonable and documented Liquidating Trust Expenses incurred in connection with administering the Liquidating Trust or the Non-IP Assets (but excluding any Liquidating Trust Expenses incurred in connection with administering the Preserved Estate Claims).

122.    "*Non-IP Assets*" means all of the Debtors' and the Estates' Assets other than the IP/Austria Assets and the Preserved Estate Claims.

123.    "*Other Director and Officer*" means, in their capacity as current or former directors or officers of the Debtors, each of (a) Roderick K. Randall, (b) Mark E. Hickson, (c) Nadine I. Watt, (d) Wendy J. Greuel, (e) William R. McDermott, (f) Mitchell S. Zuklie, (g) Jose Angel

Salinas, (h) John C. Finnucan IV, (i) Burkhard Huhnke, (j) David King, and (k) Corey MacGillivray.

124. "*Other Priority Claims*" means any Claim to the extent such Claim is entitled to priority in right of payment under section 507(a) of the Bankruptcy Code, other than Administrative Claims, Other Secured Claims, and Tax Claims.

125. "*Other Secured Claims*" means secured Claims, if any, that are not Other Priority Claims, 2025 Notes Claims, or Bridge Note Claims.

126. "*Petition Date"* means June 17 and 19, 2024, as applicable.

127. "*Plan*" means this chapter 11 plan, either in its present form or as it may be amended, supplemented or otherwise modified from time to time, and the exhibits and schedules hereto, as the same may be in effect at the time such reference becomes operative.

128. "*Plan Distribution*" means the payment or distribution under the Plan of Cash, Assets, securities, or instruments evidencing an obligation under the Plan to the holder of an Allowed Claim, a Liquidating Trust Beneficiary, or an IP/Austria Assets Trust Beneficiary.

129. "*Plan Distribution Date*" means with respect to any Claim (a) if such Claim is Allowed on the Effective Date, a date that is as soon as reasonably practicable on or after the Effective Date, or (b) if such Claim is not Allowed on the Effective Date, the date or dates determined by the Liquidating Trustee or IP/Austria Assets Trustee, as applicable, upon which the Liquidating Trustee or IP/Austria Assets Trustee shall make Plan Distributions.

130. "*Plan Documents*" means the compilation of documents and forms of documents, schedules and exhibits to the Plan that aid in effectuating the Plan as specifically identified as such herein and filed with the Bankruptcy Court, including the Plan, the Plan Supplement, the Disclosure Statement and the Confirmation Order.

131. "*Plan Supplement*" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan (as amended, supplemented, or modified from time to time in accordance with the terms hereof and the Bankruptcy Code and the Bankruptcy Rules), each of which shall be in form and substance (except where otherwise provided) reasonably acceptable to the Secured Noteholder and the Committee, including: (a) the Liquidating Trust Agreement; (b) the identity and compensation of the Liquidating Trustee, and the affiliations, if any, that the Liquidating Trustee has with respect to the Debtors; (c) the IP/Austria Assets Trust Agreement; (d) the identity and compensation of the IP/Austria Assets Trustee, and the affiliations, if any, that the IP/Austria Assets Trustee has with respect to the Debtors; (e) the Assumed and or Rejected Executory Contracts and Unexpired Leases Schedule (if applicable); and (f) the Professional Fee Cap schedule.

132. "*Post-Effective Date Labor Costs*" shall have the meaning ascribed to such term in Article VIII.D.2 of this Plan.

133. "*Pre-Effective Date Owner Reimbursement Claims*" means any costs directly paid by existing owners of the Debtors' vehicles on or before the Effective Date related to addressing

the recalls related to the Door Handle Stop-Sale Hold and the June 26 Stop-Sale Hold.

134.    "*Preserved Estate Claims*" means the D&O Actions and all other Causes of Action of the Debtors and the Estates, including the D&O Actions and Avoidance Actions, that are not waived, relinquished, released, compromised, or settled in the Plan or any Final Order; *provided*, that, any Causes of Action constituting IP/Austria Assets do not constitute "Preserved Estate Claims," but such Causes of Action are not waived, relinquished, released, compromised, or settled in the Plan or any Final Order and shall vest in the IP/Austria Assets Trust.

135.    "*Pro Rata Share*" means, for an Allowed Claim in a particular Class, a share proportional to the ratio of the amount of such Allowed Claim to the amount of all Allowed Claims in the same Class.

136.    "*Proceeds of Estate Claims*" means proceeds of Preserved Estate Claims received by the Liquidating Trust.

137.    "*Professional*" means an Entity employed in the Chapter 11 Cases pursuant to a Final Order in accordance with sections 327, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered prior to or on the Effective Date pursuant to sections 327, 328, 329, 330, 331 and 363 of the Bankruptcy Code.

138.    "*Professional Fee Cap*" means the amounts identified in the Plan Supplement, which shall reflect the amounts agreed by the Secured Noteholder, the Debtors, and the Committee in connection with the Global Settlement (as set forth in a schedule in the Plan Supplement).[4]

139.    "*Professional Fee Claims*" means all Claims for accrued, contingent and/or unpaid fees and expenses (including hourly, transaction, and success fees) incurred by a Professional in the Chapter 11 Cases on or after the Petition Date and through and including the Effective Date that the Bankruptcy Court has not been Disallowed by a Final Order.  To the extent that the Bankruptcy Court or any higher court of competent jurisdiction Disallows or reduces by a Final Order any amount of a Professional's fees or expenses, then those Disallowed amounts or the amount of any such reduction shall no longer constitute Professional Fee Claims.

140.    "*Professional Fee Escrow*" means an interest-bearing escrow account held by the Debtors (or their designee, but not the Liquidating Trust) to hold an amount of Cash equal to the Professional Fee Escrow Amount solely for the purpose of paying any unpaid Professional Fee Claims, in accordance with Article V.C.1, which shall be funded on the Confirmation Date or as promptly thereafter as practicable (and in no event later than the Effective Date).

141.    "*Professional Fee Escrow Amount*" means an amount equal to the Professional Fee Cap less the aggregate amount of Professional Fee Claims that have been paid as of the date that the Professional Fee Escrow is funded.

---

[4]    In accordance with the Global Settlement Budget, the Professional Fee Cap assumes an Effective Date of October 11, 2024. In the event the Effective Date occurs after October 11, 2024, the Professional Fee Cap shall be increased by an appropriate amount in connection with any cash collateral order governing the post-October 11, 2024 time period or by a further order of the Bankruptcy Court.

142.    "*Proof of Claim*" means a proof of Claim filed against any of the Debtors in the Chapter 11 Cases.

143.    "*Reimbursement Claims*" shall have the meaning ascribed to such term in Article IV.E of this Plan.

144.    "*Reimbursement Mechanics*" means in the event that (a) Cash and other proceeds of Non-IP Assets are not sufficient to (i) pay the Wind Down Amount, (ii) pay the Liquidating Trust Additional Amount, and (iii) pay the Secured Noteholder Professional Fees, in each case, by or on the Effective Date, and (b) following the Effective Date, amounts are required to be paid from proceeds of the IP/Austria Assets Trust or the Liquidating Trust (other than from any Cash or other proceeds of Non-IP Assets available on the Effective Date), to fund such payments and transfers, then fifty percent (50%) of such amounts paid from other assets of the respective trust shall be required to be reimbursed from the non-paying trust, as soon as reasonably practicable, and prior to any other distributions on account of the IP/Austria Assets Trust Units or Liquidating Trust Units, as applicable.  For the avoidance of doubt, if the Liquidating Trust receives any additional Cash or other proceeds of Non-IP Assets after the Effective Date, such amounts shall be applied first to pay (or reimburse, if applicable), on a ratable basis, all (100%) of any such amounts paid or funded into reserve or reimbursed by either trust on account of the Wind Down Amount, the Liquidating Trust Additional Amount, and the Secured Noteholder Professional Fees from such additional Cash or other proceeds of Non-IP Assets, as soon as reasonably practicable, prior to making any distributions of such additional cash or other proceeds of Non-IP Assets on account of Liquidating Trust Units and prior to paying (or reserving for) any Liquidating Trust Expenses related to the administration of the Preserved Estate Claims.

145.    "*Related Party*" means, each solely in its capacity as such, with respect to any Entity, such Entity's current and former Affiliates, and such Entity's and its current and former Affiliates' current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, managed accounts or funds, assignors, participants, successors, assigns, majority-owned subsidiaries, direct or indirect partners, limited partners, general partners, members, principals, management companies, fund advisors or managers, employees, agents, trustees, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals and advisors.

146.    "*Released Party*" means each of the following, each solely in their capacity as such: (a) each Debtor; (b) [reserved]; (c) the Liquidating Trustee; (d) the IP/Austria Assets Trustee; (e) Davis Polk, as counsel to the Debtors; (f) Morris Nichols, as counsel to the Debtors, (g) Huron Consulting Services, LLC, as financial advisor and consultant to the Debtors; (h) Kurtzman Carson Consultants, LLC dba Verita Global, as administrative advisor to the Debtors; (i) the Transaction Committee Chairman; (j) the CRO; (k) the Committee and each of its members; (l) the Secured Noteholder; (m) Heights Capital Management, Inc.; (n) the 2025 Notes Trustee and the 2026 Notes Indenture Trustee; (o) Magna; (p) each Related Party of each Entity in clauses (c) through (o) above; *provided*, that, for the avoidance of doubt and notwithstanding anything to the contrary herein, (i) the D&Os, including the Other Directors and Officers (for the avoidance of doubt, notwithstanding that the Other Directors and Officers are not and shall not be deemed hereunder to be a Released Party, the Other Directors and Officers shall be released in accordance with

16

Article XII.B of this Plan); (ii) all other professionals, advisors, and attorneys advising the Debtors prior to the Petition Date other than those specifically identified in clauses (e) through (h) of this definition of "Released Party", (iii) any entity that directly or indirectly owned, held, or controlled any equity in the Debtors prior to the Petition Date (other than those specifically identified in clauses (c) through (p) this definition of "Released Party"), (iv) the Fisker Parties, (v) the Debtors' current or former direct or indirect non-Debtor subsidiaries, and (vi) the Debtors' current or former non-Debtor Affiliates (other than the Transaction Committee Chairman, the CRO, and the Other Directors and Officers), in each case, are not and shall not be deemed hereunder to be a Released Party.

147.    "*Releasing Party*" means (a) all holders of Claims or Equity Interests who are sent a Ballot or Non-Voting Opt-Out Form and do not timely elect to opt-out of the releases provided by the Plan in accordance with the Solicitation Procedures; (b) each Related Party of each Entity in clause (a) above; and (c) each Released Party (other than the Debtors); *provided*, that, for the avoidance of doubt and notwithstanding anything to the contrary herein, (i) the D&Os (other than the Other Directors and Officers); (ii) all other professionals, advisors, and attorneys advising the Debtors prior to the Petition Date other than those specifically identified in clauses (e) through (h) of the definition of "Released Party" in Article I.A.146 of this Plan, (iii) the Fisker Parties, (iv) the Debtors' current or former direct or indirect non-Debtor subsidiaries, and (v) the Debtors' current or former non-Debtor Affiliates (other than the Transaction Committee Chairman, the CRO, and the Other Directors and Officers), in each case, are not and shall not be deemed hereunder to be a Releasing Party.

148.    "*Section 1125(e) Parties*" means (a) the Secured Noteholder; (b) Heights Capital Management, Inc.; (c) the 2025 Notes Trustee and the 2026 Notes Indenture Trustee; (d) Magna; and (e) each Related Party of each Entity in clauses (a) through (d) above.

149.    "*Senior Intercreditor Agreement*" means the Senior Intercreditor Agreement, dated May 10, 2024, by and among the Debtors, certain non-Debtor subsidiaries, the Bridge Note Collateral Agent, and the 2025 Notes Collateral Agent.

150.    "*Schedules*" means, unless otherwise stated, the schedules of assets and liabilities and list of Equity Interests and the statements of financial affairs filed by the Debtors with the Bankruptcy Court, as required by section 521 of the Bankruptcy Code and in conformity with the Official Bankruptcy Forms of the Bankruptcy Rules, as such schedules and statements have been or may be amended or supplemented by the Debtors from time to time in accordance with Bankruptcy Rule 1009.

151.    "*Secured Notes Claims*" means the 2025 Notes Claims and the Bridge Notes Claims.

152.    "*Secured Noteholder*" means CVI Investments, Inc. in its capacity as noteholder of the Bridge Note and 2025 Notes, the 2025 Notes Collateral Agent, and the Bridge Note Collateral Agent, including its successors and assigns.

153.    "*Secured Noteholder Professional Fees*" means, collectively, all reasonable and documented fees and expenses of White & Case LLP, as co-counsel to the Secured Noteholder,

Klehr Harrison Harvey Branzburg LLP, co-counsel to the Secured Noteholder, E+H Rechtsanwälte GmbH, local Austrian counsel to the Secured Noteholder, and Uzzi & Lall, as financial advisor to the Secured Noteholder, in an amount not to exceed the aggregate amount paid to (or escrowed for) the Professional Fee Claims of the Committee.

154.    "*Securities Act*" means the Securities Act of 1933, 15 U.S.C. §§ 77a, et seq.

155.    "*Sixth Interim Cash Collateral Order*" means the *Sixth Interim Order (I) Authorizing the Debtors to Use Cash Collateral, (II) Granting Adequate Protection, (III) Modifying the Automatic Stay, and (IV) Granting Related Relief* [D.I. 481].

156.    "*Tax Claim*" means a Claim against any of the Debtors that is of a kind specified in section 507(a)(8) of the Bankruptcy Code.

157.    "*Transaction Committee Chairman*" means John Dubel, in his various capacities with respect to the Debtors, including as an independent director and chairman of the transaction committee to the Debtors' board of directors.

158.    "*Unexpired Lease*" means a lease to which any of the Debtors are a party that is subject to assumption or rejection pursuant to section 365 of the Bankruptcy Code.

159.    "*Unimpaired*" means a claim that is not "impaired" pursuant to section 1124 of the Bankruptcy Code.

160.    "*U.S. Trustee*" means the office of the United States Trustee for the District of Delaware.

161.    "*Voting Deadline*" means October 7, 2024 at 12:00 p.m. (prevailing Eastern Time), or such other date and time as may be set in accordance with the Solicitation Procedures.

162.    "*Wind Down Amount*" means $750,000 (i.e., the amount contemplated in the line-item "Estate Wind Down Costs" in the Global Settlement Budget), which amount shall be transferred from the Debtors' Cash on hand to the Liquidating Trust on the Effective Date; *provided*, that, to the extent Cash on hand on the Effective Date is insufficient to fund the Wind Down Amount in full, the unfunded portion of the Wind Down Amount shall be funded first by the Liquidating Trust from Cash and other proceeds of Non-IP Assets and, thereafter, from Proceeds of Estate Claims, and solely to the extent the Liquidating Trust does not have funds to fund the Wind Down Amount, then by the IP/Austria Assets Trust from proceeds of IP/Austria Assets, in each case, subject to the Reimbursement Mechanics.

B.    *Interpretation*

Unless otherwise specified, all section, article and exhibit references in the Plan are to the respective section, article of or exhibit to the Plan, as the same may be amended, waived or modified from time to time. Words denoting the singular number shall include the plural number and vice versa, as appropriate, and words denoting one gender shall include the other gender. The Disclosure Statement may be referred to for purposes of interpretation to the extent any term or provision of the Plan is determined by the Bankruptcy Court to be ambiguous.

18

C.      *Headings*

The headings used in the Plan are inserted for convenience only, and neither constitute a portion of the Plan nor in any manner affect the construction of the provisions of the Plan.

D.      *Application of Definitions and Rules of Construction Contained in the Bankruptcy Code.*

Words and terms defined in section 101 of the Bankruptcy Code shall have the same meanings when used in the Plan, unless a different definition is given in Article I.A or elsewhere in the Plan.  Unless otherwise specified, the rules of construction contained in section 102 of the Bankruptcy Code shall apply to the construction of the Plan.  Captions and headings to Articles, Sections, schedules, and exhibits are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof.  Any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning ascribed to such term in the Bankruptcy Code or the Bankruptcy Rules, as applicable.  References to docket numbers of documents filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system.  References to "Proofs of Claim," "holders of Claims," "Disputed Claims," and the like shall include "Proofs of Interest," "holders of Interests," "Disputed Interests," and the like, as applicable.  References to "shareholders," "directors," and "officers" shall also include "members" and "managers," as applicable, as such terms are defined under the applicable state limited liability company laws or applicable foreign law.  The words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation."  Unless otherwise stated, all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time.  Any reference herein to an Entity as a holder of a Claim or interest includes that Entity's successors and assigns.  Capitalized terms defined only in the plural or singular form shall nonetheless have their defined meanings when used in the opposite form.

Any immaterial effectuating provisions may be interpreted by the Debtors, the Liquidating Trustee, or the IP/Austria Assets Trustee, as applicable, in such a manner that is consistent with the overall purpose and intent of the Plan and without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity; *provided*, that no effectuating provision shall be immaterial or deemed immaterial if it has any substantive legal or economic effect on any Entity.

E.      *Other Terms*

The words "herein," "hereof," "hereto," "hereunder," and others of similar import refer to the Plan as a whole and not to any particular section, subsection or clause contained in the Plan.

F.      *Appendices to Plan Documents*

All appendices to the Plan Documents are incorporated into the Plan by this reference and are a part of the Plan as if set forth in full herein.  Except as otherwise provided herein, the Plan Supplement shall be filed with the Bankruptcy Court not less than fourteen (14) days prior to the Voting Deadline.  Holders of Claims and Equity Interests may obtain a copy of the Plan Documents, once filed, at the Debtors' case information website located at https://www.veritaglobal.net/fisker or at www.deb.uscourts.gov, or by a written request sent to:

19

DAVIS POLK & WARDWELL LLP

Brian M. Resnick
James I. McClammy
Darren S. Klein
Richard J. Steinberg
Amber Leary
450 Lexington Avenue
New York, New York 10017
Tel.: (212) 450-4000
brian.resnick@davispolk.com
james.mcclammy@davispolk.com
darren.klein@davispolk.com
richard.steinberg@davispolk.com
amber.leary@davispolk.com

and/or

Robert J. Dehney, Sr. (No. 3578)
Andrew R. Remming (No. 5120)
Brenna A. Dolphin (No. 5604)
Sophie Rogers Churchill (No. 6905)
Echo Yi Qian (No. 7330)
1201 N. Market Street, 16th Floor
Wilmington, Delaware 19801
Tel.: (302) 658-9200
rdehney@morrisnichols.com
aremming@morrisnichols.com
bdolphin@morrisnichols.com
srchurchill@morrisnichols.com
eqian@morrisnichols.com

Unless otherwise expressly provided in the Plan, the Debtors may alter, modify, or amend any Plan Supplement document in accordance with Article XV.

G.    *Controlling Document*

In the event of an inconsistency between this Combined DS and Plan or any solicitation document, the terms of the Plan shall control in all respects. In the event of an inconsistency between the Plan and the Plan Supplement, the terms of the Plan shall control. In the event of an inconsistency between the Confirmation Order and the Plan, the Confirmation Order shall control.

In the event of an inconsistency between this Combined DS and Plan, any solicitation document, and the Confirmation Order, on the one hand, and the Magna 9019 Order, on the other hand, the terms of the Magna 9019 Order shall control in all respects. Further, notwithstanding anything to the contrary in this Combined DS and Plan, any solicitation document, and the Confirmation Order, nothing in such documents shall alter, amend or modify the Magna 9019

20

Order.

H.    *Computation of Time*

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.  Unless otherwise specified, all references herein to times of day shall be references to prevailing Eastern Time.  In the event that any payment or act hereunder is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on or as soon as reasonably practicable after the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

I.    *References to Monetary Figures*

All monetary figures referenced herein are denominated in U.S. dollars, unless otherwise expressly provided.

J.    *Nonconsolidated Plan*

For purposes of administrative convenience and efficiency, the Plan has been filed as a joint plan for each of the Debtors and presents together Classes of Claims against and Interests in the Debtors.  The Plan does not provide for the substantive consolidation of any of the Debtors.

## ARTICLE II.
## THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND BUSINESS OVERVIEW

A.    *The Debtors' Corporate History*

Debtor Fisker Inc. is a public holding company that is the ultimate parent of 23 direct or indirect subsidiaries (including the Debtors).  A chart illustrating Fisker's corporate structure is attached hereto as **Exhibit A**.  In July 2020, Fisker consummated a business combination (the "**Business Combination**") with Spartan Energy Acquisition Corp. ("**Spartan**"), a special purpose acquisition company backed by Apollo Global Management Inc., pursuant to which pre-Business Combination private company Fisker Inc. merged with Spartan Merger Sub Inc., a subsidiary of Spartan, which became Debtor Fisker Group Inc., and Spartan was renamed Fisker Inc.  Following consummation of the Business Combination, Fisker Inc.'s Class A common stock publicly traded on the New York Stock Exchange under the ticker symbol "FSR."

B.    *The Company's Business Operations*

Fisker was an American automotive company that designed, developed, marketed, and sold electric vehicles ("**EVs**").  Fisker focused on building a technology-enabled, asset-light automotive business model that would be among the first of its kind.  Fisker's business model was distinct from other EV companies by virtue of its proprietary Fisker Flexible Platform Design process that allows the design and development of a vehicle to be adapted to different EV designs.  Through this hardware agnostic process, Fisker intended to significantly reduce the capital intensity and

21

investments that are typically associated with the new car manufacturing business, accelerate the development cycle of new products, and expedite the adoption of advanced technologies. Fisker's innovative model was driven by its co-founder and CEO, Henrik Fisker, who brought unique design and development expertise—including as the acclaimed designer of the BMW Z8, Aston Martin's award winning DB9 and the V8 Vantage, Aston Martin's best-selling car of all time—to Fisker.

Fisker's first EV model, the award-winning Fisker Ocean®, is an all-electric sports utility vehicle (SUV) targeting the "premium with volume" segment of premium automakers. The Ocean was designed to be one of the world's most sustainable vehicles, made from upcycled, low-carbon, and recycled materials, featuring a vegan interior and a solar roof that can add over 1,500 miles of clean, free charging per year. With the longest battery range in its class, ranging from 250-350 miles, Fisker commenced deliveries of the Ocean in the third quarter of 2023, and by February 2024, had sold over 6,200 units globally. In addition to the Ocean, Fisker also developed designs for a compact crossover SUV (the Fisker PEAR®), a premium pick-up truck (the Fisker Alaska®), and a convertible sports car (the Fisker Rōnin®).

Fisker collaborated with several manufacturing partners to produce its vehicles, thereby enabling Fisker to lower its upfront costs by leveraging existing facilities and trained workforces. Key partners included Magna, which manufactured the Ocean at their facility in Graz, Austria, and Foxconn Technology Group, which was set to manufacture the PEAR starting in 2025. Fisker also owns certain manufacturing assets used by Magna in producing its EVs, such as assembly robots and specialized tools.

Fisker is headquartered in California and, prior to the Petition Date, had a presence in 15 countries and sales in 12 countries. Prior to the Petition Date, Fisker marketed and sold its vehicles across North America and Europe, with California and Florida as its largest markets, and, to date, has sold 6,200 Oceans globally. Historically, Fisker exclusively utilized a direct-to-consumer model to market and sell its EVs. In January 2024, however, Fisker began transitioning to a dealer partnership sales model (the "**Dealership Sales Model**") in an attempt to respond to changes in the EV market. The Dealership Sales Model was intended to enable Fisker to pursue a hybrid of direct sales and dealer arrangements that aligned with Fisker's asset-light business strategy, with the hope that the transition would deliver significant acceleration of Ocean sales (by, among other things, providing Fisker access to larger markets) and higher volume production of additional future models. In March 2024, however, in an effort to align inventory levels and to progress strategic and financing initiatives, Fisker paused production of its EVs and, since that time, Fisker and its Advisors have pursued all options to monetize the Fisker EV Inventory, including selling EVs at discounts, in auctions, or in a fleet transaction.

In addition to sales of its EVs, Fisker's vehicle platforms were designed with engineering flexibility for high content carry-over, which enabled Fisker to license its vehicle platforms and reduce the time and cost to bring multiple vehicle designs to market. Moreover, Fisker's technologies also provide for licensing opportunities, including with respect to Fisker's rotating center screen and invisible antenna designs, powertrain components, solar roof, and proprietary Blade Computer software.

Fisker's research and development activities primarily took place at its facilities located in La Palma, San Francisco, and Culver City, California. The majority of Fisker's activities were focused on research and development of its EVs and software technology platforms. Fisker undertook significant testing and validation of its products to ensure that all products will meet the demands of its customers.

As of the Petition Date, Fisker Inc. owned 60 patents issued in the U.S. and 11 patents issued in non-U.S. jurisdictions. Additionally, Fisker had 162 registered trademarks and 13 pending trademark applications. Fisker's patents and patent applications relate to, among other things, vehicle design, engineering, and battery technology.

A more detailed summary of the Debtors' business operations can be found in the *Declaration of John C. DiDonato as Chief Restructuring Officer of the Debtors in Support of Debtors' Chapter 11 Proceedings and First Day Pleadings* [D.I. 37], the *Amended Declaration of John C. DiDonato as Chief Restructuring Officer of the Debtors in Support of Debtors' Chapter 11 Proceedings and First Day Pleadings* [D.I. 289], and the Debtors' Annual Report on Form 10-K, filed on April 23, 2024.

C.    *The Liquidating Debtors' Prepetition Capital Structure*[5]

As of the Petition Date, Fisker had approximately $854.256 million in the aggregate of outstanding principal funded debt obligations, as reflected below:[6]

| Funded Debt | Approximate Outstanding Principal Amount |
| --- | --- |
| Bridge Note (Secured) | $3.456 million |
| 2025 Notes (Secured) | $183.1 million |
| 2026 Notes (Unsecured) | $667.5 million |

1.    <u>Bridge Note</u>

On May 10, 2024, Debtor Fisker Inc., as issuer, and the Secured Noteholder entered into the Bridge Note Securities Purchase Agreement, pursuant to which the Secured Noteholder purchased approximately $3.5 million of the Bridge Note. The Bridge Note bears interest at a rate equal to the three-month Secured Overnight Financing Rate plus 12.00% per annum. The Bridge Notes are secured by first-priority security interests over all of the existing and future assets of the Debtors as well as guaranties and additional security from certain non-Debtor subsidiaries.

As of the Petition Date, approximately $3.456 million of the Bridge Note remained

---

[5]    The following summary is qualified in its entirety by reference to the operative documents, agreements, schedules, and exhibits. Capitalized terms used but not defined in this Article I shall have the meanings ascribed to them in the applicable governing agreements.

[6]    The table is for illustrative and summary purposes only. The Debtors do not admit to the validity, priority, or allowance of any claim, lien, or interest in property and reserve their rights in relation to such issues.

outstanding.

2.    2025 Notes

On July 10, 2023, Debtor Fisker Inc., as issuer, and the Secured Noteholder entered into the 2025 Notes Securities Purchase Agreement, pursuant to which the Secured Noteholder purchased $340 million in the aggregate principal amount of 2025 Notes at a 12% original issue discount. The 2025 Notes have a stated maturity of July 10, 2025. On September 29, 2023, Fisker Inc. and the Secured Noteholder entered into amendment to the 2025 Notes Securities Purchase Agreement, pursuant to which, among other things, the Secured Noteholder agreed to purchase an additional $170 million of 2025 Notes.

On November 22, 2023, Fisker Inc., along with certain of its subsidiaries, including the Debtors, and the 2025 Notes Collateral Agent entered into a supplemental indenture in exchange for certain covenant waivers provided by the Secured Noteholder on account of, among other things, Fisker Inc.'s failure to timely file with the Securities and Exchange Commission its quarterly report on Form 10-Q for the third quarter of 2023. In connection with the supplemental indenture, the Debtors and non-Debtor Fisker Austria agreed to (a) grant the 2025 Collateral Agent, in favor of the Secured Noteholder, first-priority security interests on all existing and future assets of the Debtors and non-Debtor Fisker Austria and (b) reduce certain financial covenants effective immediately. In connection with the supplemental indenture, Fisker Inc. and certain of its direct and indirect wholly owned subsidiaries entered into the 2025 Notes Security Agreement, pursuant to which the 2025 Notes became secured by first-priority security interests over all of the existing and future assets of the Debtors and non-Debtor Fisker Austria, including a pledge of all of the share capital of certain subsidiaries of Fisker Inc. Also on November 22, 2023, Fisker entered into an amendment and waiver agreement (the "**Waiver**") with the Secured Noteholder. Pursuant to the Waiver, Heights agreed to waive a covenant event of default resulting from the late filing of Fisker Inc.'s quarterly report on Form 10-Q for the third quarter of 2023.

On December 28, 2023, the initial version of the 2025 Notes Security Agreement was amended and restated to amend and define the scope of the security interest created by the agreement in all of the existing and future assets of Fisker Inc. and the other grantors party thereto. In addition, on December 28, 2023, certain subsidiaries of Fisker Inc. entered into a guaranty agreement in favor of CVI. As a result, the 2025 Notes are secured by a first-priority senior lien on substantially all of the Debtors' and non-Debtor Fisker Austria's assets and properties.

The 2025 Notes bear interest at a rate equal to 0% per annum and are convertible into shares of Class A Common Stock at any time at the election of the Secured Noteholder at an initial conversion price of $7.80 and $7.60 with respect to the Series A-1 Senior Convertible Notes Due 2025 and the Series B-1 Senior Convertible Notes Due 2025, respectively, issued pursuant the 2025 Notes Securities Purchase Agreement. However, as a result of a triggering event under the 2025 Notes, the 2025 Notes became convertible using an alternative conversion price equal to the lower of (a) the conversion price in effect or (b) 80% of the average stock price of the Fisker Inc.'s Class A Common Stock preceding conversion. Since the triggering event arising out of Fisker Inc.'s failure to file timely its quarterly report on Form 10-Q for the third quarter of 2023, the Secured Noteholder exercised its conversion rights to substantially reduce the outstanding

principal amount due under 2025 Notes as of the Petition Date to $183.05 million.

3.    2026 Notes

On August 17, 2021, Debtor Fisker Inc. completed the issuance and sale of $667.5 million in the aggregate principal amount of the 2026 Notes.  The 2026 Notes are senior unsecured obligations of Fisker Inc. and memorialized in the 2026 Notes Indenture, by and between Fisker Inc. and the 2026 Notes Indenture Trustee.

The 2026 Notes bear interest at a rate equal to 2.50% and are convertible (subject to certain conditions) into shares, at the option of the holders thereof, into Fisker Inc.'s Class A Common Stock at a conversion rate of 50.7743 Class A Common Shares per $1,000 principal amount of 2026 Notes.  The 2026 Notes have a stated maturity of September 15, 2026.

As of the Petition Date, approximately $667.5 million in aggregate principal amount of 2026 Notes remained outstanding.

4.    Common Equity

As of the Petition Date, Fisker Inc. had (a) 2,000,000,000 shares of Class A Common Stock authorized and 1,250,822,032 outstanding, and (b) 150,000,000 shares of Class B Common Stock authorized and 132,354,128 shares outstanding.[7]  On March 25, 2024, the NYSE notified Fisker Inc. of the delisting of Fisker Inc.'s Class A Common Stock from the exchange due to a failure to maintain a stock price above $1.00 for the requisite period of time.

## ARTICLE III.
## EVENTS LEADING TO THE CHAPTER 11 FILING

A.    *Macroeconomic Trends and Company-Specific Events*

Over the last year, Fisker contended with a parade of significant macroeconomic and company-specific headwinds that have strained its business and resources and ultimately led the Debtors to seek chapter 11 relief.  This section describes the circumstances and the immediate catalysts motivating the filing of the Chapter 11 Cases.

1.    Negative Industry Trends

The EV market has been subject to a number of industry-wide headwinds in 2023 and the first half of 2024.  During the course of 2023 and into 2024, consumer demand for EVs decreased, driven, in part, by higher interest rates and lower fuel costs.  Decreased consumer demand had a negative impact on Fisker's business.  Moreover, the recent decrease in consumer demand is magnified by increasing competition in the EV market.  As a result, in late 2023, Fisker made to the decision to cut the price of the Ocean by approximately 11% in an effort to adapt to the competitive realities.  This, in turn, had a negative impact on Fisker's margins.  Moreover, Fisker recently experienced unprecedented liquidity challenges due to a dramatic and unexpected decline

---

[7]    This amount assumes the exchange of all exchangeable common equity shares into Common Shares in Fisker Inc.

in sales, thereby resulting in the need for additional capital investment and a restructuring of its current untenable capital structure.

    2.   <u>Production and Delivery Delays</u>

As a result of Fisker's asset-light business model, Fisker is heavily reliant on third-party partners to produce its vehicles. During the course of 2023, a number of delays prevented Fisker from delivering Oceans as quickly as projected.

Beginning as early as January 2021, development of the Ocean platform hit several delays. Fisker's management took serious measures during this time to address such issues, but, nevertheless, production delays continued.

    3.   <u>Sales Model Transition</u>

Fisker has also experienced unexpected headwinds in its efforts to establish a dealership sales model in North America and Europe. Fisker historically utilized a direct-to-consumer model to market and sell its vehicles. During the course of 2023, Fisker faced a number of challenges with this model, including rising interest rates, lack of sufficient levels of skilled labor, and an inability to identify appropriate real estate locations to make the direct-to-consumer model function effectively. These factors had a negative impact on Fisker's business. As a result, in early 2024, Fisker began transitioning to the Dealership Sales Model in an attempt to respond to changes in the EV market. The Dealership Sales Model was intended to enable Fisker to pursue a hybrid of direct sales and dealer arrangements that aligned with Fisker's asset-light business strategy, with the hope that the transition would deliver significant acceleration of Ocean sales (by, among other things, providing Fisker access to larger markets) and higher volume production of additional future models. As noted above, however, in March 2024, since the time Fisker paused production of its EVs, the Debtors and their Advisors have pursued any and all options to monetize the Fisker EV Inventory.

B.    *Prepetition Restructuring Efforts*

On August 3, 2023, the Company hosted a product vision showcase during which it displayed certain of its EVs and, thereafter, began exploring a strategic partnership with an original equipment manufacturer. The Company engaged J.P. Morgan Securities ("**JPM**") to assist with these efforts. JPM developed comprehensive investment materials and conducted outreach to select original equipment manufacturers. The efforts resulted in extensive discussions and diligence with a large original equipment manufacturer (the "**OEM**") regarding the terms of a potential partnership with, or investment from, the OEM. In December 2023, the Debtors engaged Davis Polk to provide legal advice in connection with a potential transaction with the OEM, including with respect to a conditional release of certain intellectual property that was pledged in favor of the Secured Noteholder, the Debtors' senior secured creditor, in connection therewith. In January 2024, the Company also engaged PJT Partners ("**PJT**") and TD Cowen Securities (f/k/a Cowen Inc.) ("**Cowen**") to provide advice on structuring a transaction with the OEM in light of the Company's complex capital structure, and to explore other financial investments. In addition, in February 2024, the Company engaged FTI Consulting Inc. ("**FTI**") to assist management with rendering cash flow forecasts in connection with a potential transaction with the OEM and to

advise the Company on vendor and cash management.

In an effort to stabilize its liquidity position while discussions with the OEM continued and a comprehensive restructuring transaction was being developed, Fisker implemented a number of cost-cutting measures.  These included several reductions in Fisker's employee base.[8]  Fisker also reduced the manufacturer's suggested retail price of many of its models and employed a number of other pricing enhancements, such as waiving destination and handling fees, in an effort to stimulate sales.  In addition, Fisker chose to skip a March 18, 2024 interest payment due under its Prepetition 2026 Notes as a means of preserving its liquidity.

Despite these efforts, Fisker's financial position remained strained.  In connection with Fisker's efforts to execute a strategic transaction and to buffer its liquidity, on March 18, 2024, Fisker obtained a financing commitment from the Secured Noteholder (the "**Prepetition Notes Commitment**") pursuant to which Fisker Inc. agreed to issue $166.7 million in additional senior secured convertible notes to the Secured Noteholder in four tranches.  The Prepetition Notes Commitment was intended to provide Fisker with sufficient liquidity to operate in the ordinary course of business while discussions with the OEM progressed.  Funding under the Prepetition Notes Commitment was conditioned upon ongoing discussions with the OEM.  In late March 2024, the OEM informed Fisker that it no longer wished to continue negotiations and, therefore, the conditions for additional funding under the Prepetition Notes Commitment could not be satisfied.

With the OEM investment off the table, and with limited incremental prepetition financing, Fisker determined that a sale of all or substantially all of the Debtors' assets would provide the optimal path to maximize value for the Debtors' stakeholders and undertook an extensive marketing process beginning in April 2024 (the "**Sale Process**").  In April 2024, the Debtors also retained John DiDonato as the Chief Restructuring Officer.  In order to provide the Debtors with additional time to conduct the marketing process, Fisker entered into a forbearance agreement with the Secured Noteholder pursuant to which the Secured Noteholder agreed to forbear on certain defaults arising under the 2025 Notes Securities Purchase Agreement through the end of the Third Forbearance Period.  Yet despite the extensive outreach, the marketing process did not yield any actionable proposals.

By mid-May 2024, the Debtors' marketing process had not resulted in any actionable bids for sale of the Debtors' assets outside of a bankruptcy proceeding.  As such, the Debtors engaged Morris Nichols (collectively with Huron, Davis Polk, FTI, PJT, JPM, Cowen, and DB, the "**Advisors**")[9] as their local Delaware counsel to provide advice in connection with a potential bankruptcy filing.  Beginning around this same time, the Debtors were also focused on selling their existing fleet finished vehicles.  The Debtors and American Lease, LLC engaged in discussions to execute an agreement (the "**Fleet Sales Agreement**") to provide for the purchase and sale of substantially all of the Company's existing fleet of vehicles configured for the U.S. and Canada.  The Fleet Sales Agreement, as executed and approved by the Fleet Sale Order, provided the

---

[8]    As of the Petition Date, Fisker had reduced its employee headcount by approximately 85% from the end of 2023.

[9]    The Debtors' engagements with FTI, PJT, JPM, and Cowen were terminated prior to the Petition Date.

Debtors with a substantial amount of cash proceeds.

## ARTICLE IV.
## EVENTS CONCURRENT WITH AND FOLLOWING
## COMMENCEMENT OF THE CHAPTER 11 CASES

On the Petition Date, each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtors remain in possession of their property and continue to operate and manage their business as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. The Chapter 11 Cases are being jointly administered for procedural purposes only pursuant to Bankruptcy Rule 1015(b) and Local Rule 1015-1 and the *Order Directing Joint Administration of Chapter 11 Cases* [D.I. 51] entered by the Bankruptcy Court on June 21, 2024 in each of the Chapter 11 Cases. No request has been made for the appointment of a trustee or examiner.

Capitalized terms that are used in this Article IV but not otherwise defined in this Combined DS and Plan shall have the meanings ascribed to them in the relevant motions, orders, or filings.

A.    *Operational and Other Relief*

On or shortly after the Petition Date, the Debtors filed a number of "first day" motions designed to ease the Debtors' transition into chapter 11, maximize the value of the Debtors' assets, and minimize the effects of the commencement of the Chapter 11 Cases. The relief requested in the motions has been granted in various orders entered by the Bankruptcy Court.

The orders entered by the Bankruptcy Court either on an interim or final basis enabled the Debtors to preserve value and efficiently administer the Chapter 11 Cases, including by, among other things, (1) authorizing the Debtors to maintain existing cash management system, bank accounts, and business forms, and continue to perform intercompany transactions [D.I. 76], (2) authorizing the Debtors to pay certain prepetition taxes and fees [D.I. 340], (3) authorizing the Debtors to pay their obligations under prepetition insurance policies, continue paying brokerage fees, and renew, supplement, modify, and purchase insurance coverage in the ordinary course of business [D.I. 338], (4) granting authority to pay employees' wage Claims and related obligations in the ordinary course of business and maintain certain employee benefit programs [D.I. 341], (5) approving procedures for, among other things, determining adequate assurance for utility providers, prohibiting utility providers from altering, refusing, or discontinuing services, and determining that the Debtors are not required to provide additional adequate assurance [D.I. 339], (6) approving extension of the deadline to file schedules of executory contracts and unexpired leases and statements of financial affairs [D.I. 253], and (7) authorizing the Debtors to implement restrictions and notification requirements regarding the Beneficial Ownership of, certain transfers of, and declarations of worthlessness with respect to, the Securities of Debtor Fisker Inc. and sell-down procedures for trading in claims against the Debtors' estates [D.I. 64].

B.     *Retention of Professionals*

On the Petition Date, the Debtors filed an application to retain and employ Kurtzman Carson Consultants, LLC dba Verita Global ("**Verita**") as Claims Agent in the Chapter 11 Cases.

In addition, to assist the Debtors in carrying out their duties as debtors in possession, and to otherwise represent the Debtors' interests in the Chapter 11 Cases, the Bankruptcy Court entered orders authorizing the Debtors to retain and employ the following professionals:  (1) Davis Polk, as counsel to the Debtors; (2) Morris Nichols, as Delaware counsel to the Debtors; and (3) Huron, as financial advisor, and John C. DiDonato, as Chief Restructuring Officer to the Debtors.

C.     *Asset Sales*

To maximize the value of the Debtors' estates, on July 2, 2024, the Debtors sought relief to enter into and perform under the Fleet Sales Agreement and sell a significant portion of the Fisker EV Inventory.  On July 16, 2024, the Bankruptcy Court held a hearing on the sale and, on July 17, 2024, the Bankruptcy Court entered the Fleet Sale Order approving the sale in accordance with the Fleet Sales Agreement, which order was amended on July 26, 2024 and September 13, 2024.

D.     *De Minimis Asset Sales*

To further maximize the value of the Debtors' estates, on July 24, 2024, the Debtors sought entry of an order approving procedures for selling *de minimis* assets having a sale price of $750,000 or less.  On August 15, 2024, the Bankruptcy Court entered the *Order (I) Approving (A) the Procedures for the Sale of Certain of the Debtors' De Minimis Assets Free and Clear of Liens, Claims, Encumbrances, and Interests, (B) the Form and Manner of Notice of De Minimis Sales, (II) Authorizing the Sale of Certain of Debtors' De Minimis Assets Free and Clear of Liens, Claims, Encumbrances, and Interests, and (III) Granting Relating Relief* [D.I. 428].

E.     *Stop-Sale Holds and Recalls*

The Debtors' business is regulated by the National Highway Traffic Safety Administration ("**NHTSA**") which, pursuant to the National Traffic and Motor Vehicle Safety Act, 49 U.S.C. § 30101, *et seq.* (the "**Safety Act**"), has the authority to issue vehicle safety standards and require manufacturers to recall vehicles that have safety-related defects or do not meet federal motor vehicle safety standards.  Prior to the Petition Date, the Debtors had voluntarily issued three recall-related stop-sale holds regarding cluster telltales (the "**Cluster Telltale Stop-Sale Hold**"), power modules (the "**Power Module Stop-Sale Hold**" and, together with the Cluster Telltale Stop-Sale Hold, the "**Prepetition Software-Related Stop-Sale Holds**"), and outer door handles (the "**Door Handle Stop-Sale Hold**" and, together with the Prepetition Software-Related Stop-Sale Holds, the "**Prepetition Stop-Sale Holds**"), each of which affected all of the Debtors' vehicles, including the vehicles ultimately to be sold under the Fleet Sales Agreement.  The Debtors continued to address the Prepetition Stop-Sale Holds post-petition.

The Debtors rolled-out over-the-air operating system update (the "**2.1 OS Update**") over the course of July 2024 that, once made, addresses the Prepetition Software-Related Stop-Sale Holds.  In compliance with the Safety Act, the Debtors sent out mass mailings to all existing

owners with instructions regarding the 2.1 OS Update.

On June 26, 2024, the Debtors voluntarily issued a fourth recall-related stop-sale hold (the "**June 26 Stop-Sale Hold**") because a printed circuit board assembly attached to the cabin-electric water pump in the Debtors' vehicles is susceptible to failure.  On July 2, 2024, the Debtors notified NHTSA of the issuance of the June 26 Stop-Sale Hold.  Like the Prepetition Stop-Sale Holds, the June 26 Stop-Sale Hold affects all or nearly all of the Debtors' vehicles, including the vehicles sold or to be sold in connection with the Fleet Sale.

On August 8, 2024, the Debtors voluntarily issued a fifth recall-related stop-sale hold (the "**August 8 Stop-Sale Hold**" and, together with the Prepetition Stop-Sale Holds and the June 26 Stop-Sale Hold, the "**Stop-Sale Holds**") to address a potentially faulty breaking feature affecting all or nearly all of the Debtors' vehicles, and, on August 14, 2024, promptly notified NHTSA of the issuance of the August 8 Stop-Sale Hold in compliance with the Safety Act.  The August 8 Stop-Sale Hold is addressed by a further over-the-air operating system update (the "**2.2 OS Update**"), which the Debtors had previously designed and developed, and anticipate broadly rolling-out in September 2024.

In compliance with the Safety Act, the Debtors sent out mass mailings to all existing owners regarding the Door Handle Stop-Sale Hold and the June 26 Stop-Sale Hold on August 19, 2024.

Throughout the pendency of the Chapter 11 Cases, the Debtors worked diligently to address the Stop-Sale Holds, including by securing tools from suppliers and parts (outer door handles and electric water pumps) and preparing, testing, and implementing the 2.1 OS Update and the 2.2 OS Update.

The Debtors believe that Causes of Action may be asserted by the Debtors against certain of the Debtors' parts suppliers for, among other things, reimbursement of costs related to addressing the recalls related to the Door Handle Stop-Sale Hold and the June 26 Stop-Sale Hold (such Causes of Action, collectively, the "**Reimbursement Claims**").  The proceeds of the Reimbursement Claims may be used to fund any Liquidating Trust Additional Funding Amount (if applicable in accordance with Article VIII.D of this Plan).  For the avoidance of doubt, the Reimbursement Claims shall constitute Preserved Estate Claims under this Plan.

F.      *Claims Bar Date*

On August 19, 2024, the Bankruptcy Court entered the *Order (I) Establishing Certain Bar Dates for Filing Proofs of Claim Against the Debtors, and (II) Granting Related Relief, Including Notice and Filing Procedures* [D.I. 458], establishing, among other things, (1) 5:00 p.m. (prevailing Eastern Time) on September 11, 2024 as the deadline for all non-governmental units to file Proofs of Claim in the Chapter 11 Cases, (2) December 16, 2024 as the deadline for all governmental units to file Proofs of Claim in the Chapter 11 Cases, (3) the procedures for filing Proofs of Claim, and (4) the form and manner of notice of the various Bar Dates, each subject to the terms and exceptions set forth therein.

G.      *The Global Settlement*

On July 16, 2024, the Secured Noteholder filed *the Motion of CVI Investments, Inc. to Convert the Debtors' Chapter 11 Cases to Cases Under Chapter 7 of the Bankruptcy Code* [D.I. 238] (the "**Conversion Motion**"), requesting conversion of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, which was scheduled to be heard by the Bankruptcy Court on July 29, 2024. The Debtors, CVI, and the Committee subsequently agreed to resolve the Conversion Motion pursuant to the terms of the Fifth Interim Cash Collateral Order, which included the Debtors' irrevocable consent to exercise their rights under section 1112(a) of the Bankruptcy Code to convert the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code as of August 19, 2024[10] in accordance with the terms of the Fifth Interim Cash Collateral Order absent a global settlement being reached between the parties in interest.

On August 23, 2024, the Debtors, the Committee, the Secured Noteholder, and Magna (solely to the extent any provision specifically relates to Magna in its individual capacity (and not as a member of the Committee or with respect to provisions applicable to holders of General Unsecured Claims generally)) agreed upon the Global Settlement pursuant to the terms set forth in the Global Settlement Term Sheet.

H.      *Liquidating Trust and the IP/Austria Assets Trust*

This Combined DS and Plan contemplates the establishment of the Liquidating Trust and the IP/Austria Assets Trust to administer post-Effective Date responsibilities of the Debtors and wind-down the Debtors' business under the Plan, including: (1) the Debtor's Assets being vested with the Liquidating Trust Assets and IP/Austria Assets Trust Assets, respectively, (2) making distributions to holders of Allowed Claims in accordance with the terms of this Plan and the Liquidating Trust Agreement and IP/Austria Assets Trust Agreement, respectively, (3) resolving all Disputed Claims and effectuating the Claims reconciliation process pursuant to the procedures prescribed in this Combined DS and Plan, (4) prosecuting, settling, and resolving Causes of Action, (5) recovering, through enforcement, resolution, settlement, collection, or otherwise, assets on behalf of the Liquidating Trust or the IP/Austria Assets Trust, as applicable (which assets shall become part of the Liquidating Trust Assets or the IP/Austria Assets Trust, respectively), (6) winding down the affairs of the Debtors, if and to the extent necessary, including taking any steps to dissolve, liquidate, or take other similar action with respect to each Debtors, including by terminating the corporate or organizational existence of each such Debtor, and (7) performing all actions and executing all agreements, instruments and other documents necessary to effectuate the purpose of the Liquidating Trust and IP/Austria Assets Trust.

**ARTICLE V.**
**PROVISIONS FOR TREATMENT OF UNCLASSIFIED CLAIMS UNDER THE PLAN**

Administrative Claims, Cash Collateral Adequate Protection Claims, and Tax Claims are treated in accordance with sections 1129(a)(9)(A) and 1129(a)(9)(C) of the Bankruptcy Code,

---

[10] The Debtors and the Secured Noteholder subsequently agreed to a proposed conversion date of August 23, 2024.

respectively.  Such Claims are not designated as classes of Claims for the purposes of this Plan or for the purposes of sections 1123, 1124, 1125, 1126 or 1129 of the Bankruptcy Code.

A.      *Treatment of Administrative Claims*

      1.      <u>Time for Filing Administrative Claims</u>

The holder of an Administrative Claim, other than (a) a Professional Fee Claim, (b) a Cash Collateral Adequate Protection Claim, (c) an Administrative Claim that has been Allowed or paid on or before the Administrative Bar Date, or (d) any Administrative Claim held by the Secured Noteholder, must file with the Bankruptcy Court and serve on the Debtors and the Office of the United States Trustee, notice of such Administrative Claim by no later than the Administrative Claims Bar Date.  Such notice must include, at a minimum, (x) the name of the holder of the Claim, (y) the amount of the Claim, and (z) the basis of the Claim.  Failure to file and serve such notice timely and properly shall result in the Administrative Claim being forever barred.

**HOLDERS OF ADMINISTRATIVE CLAIMS THAT ARE REQUIRED TO, BUT DO NOT, FILE AND SERVE A REQUEST FOR PAYMENT OF SUCH ADMINISTRATIVE CLAIMS BY THE ADMINISTRATIVE CLAIMS BAR DATE SET FORTH HEREIN SHALL BE FOREVER BARRED, ESTOPPED, AND ENJOINED FROM ASSERTING SUCH ADMINISTRATIVE CLAIMS AGAINST THE DEBTORS, THE ESTATES, THE LIQUIDATING TRUST, THE IP/AUSTRIA ASSETS TRUST, OR THEIR PROPERTY, AND SUCH ADMINISTRATIVE CLAIMS SHALL BE DEEMED DISCHARGED AS OF THE EFFECTIVE DATE.**

      2.      <u>Allowance of Administrative Claims</u>

An Administrative Claim (other than a Professional Fee Claim) (i) with respect to which, in the case of Administrative Claims that must be filed and noticed pursuant to Article V.A.1, notice has been timely and properly filed and served pursuant to Article V.A.1 or (ii) with respect to which, in the case of Claims under section 503(b)(9) of the Bankruptcy Code, a valid Proof of Claim has been filed prior to the applicable Claims Bar Date, shall become an Allowed Administrative Claim if no objection is filed within thirty (30) days after the later of (i) the Effective Date, (ii) the date of service of the applicable notice of Administrative Claim, or (iii) such later date as may be (A) agreed to by the holder of such Administrative Claim or (B) approved by the Bankruptcy Court on motion of a party in interest, without notice or a hearing.  If an objection is filed within such 30-day period (or any extension thereof), the Administrative Claim shall become an Allowed Administrative Claim only to the extent allowed by Final Order.

      3.      <u>Payment of Allowed Administrative Claims</u>

On the later of (a) the Effective Date or (b) the date such Allowed Administrative Claim becomes due in the ordinary course, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Claim, each holder of an Allowed Administrative Claim (other than holders of Professional Fee Claims) shall receive (i) the amount of such holder's Allowed Administrative Claim in one Cash payment, or (ii) such other treatment as may be to by such holder of an Allowed Administrative Claim and the Debtors (prior to the Effective Date, with the consent of the Secured Noteholder and the Committee) or the Liquidating Trust (on or after

the Effective Date); *provided*, that such treatment shall not provide a return to such holder having a present value as of the Effective Date in excess of such holder's Allowed Administrative Claim; *provided*, *further*, that an Administrative Claim representing a liability incurred in the ordinary course of business of the Debtors may be paid at the Debtors' election in the ordinary course of business at any time prior to the occurrence of the Effective Date. Any Allowed Administrative Claim (other than a Professional Fee Claim) that becomes due after the Effective Date shall be paid by the Liquidating Trust from the First Tier Claims Reserve.

B.    *Cash Collateral Adequate Protection Claims*

Pursuant to this Plan, subject to the occurrence of the Effective Date, the Secured Noteholder shall be deemed to have waived all Cash Collateral Adequate Protection Claims and no Plan Distributions shall be made on account of such Claims.

C.    *Professional Compensation*

1.    Professional Fee Payment.

No Professional Fee Claim shall be paid prior to the Confirmation Date. On the Confirmation Date or as promptly thereafter as practicable (and in no event later than the Effective Date without the consent of the applicable Professional), the Debtors shall use all Cash available to pay (subject to the Professional Fee Cap) (a) Allowed Professional Fee Claims, (b) Professional Fee Claims invoiced by Huron Consulting Services, LLC, and (c) Professional Fee Claims for which a Monthly Fee Statement has been filed and the Objection Deadline has expired (in each case, as defined in the Interim Compensation Order) in accordance with the Interim Compensation Order; *provided*, that, notwithstanding anything to the contrary herein or in the Interim Compensation Order, Professionals shall not be required to file a certificate of no objection after expiration of the Objection Deadline (as defined in the Interim Compensation Order).

To the extent any Professional has incurred Professional Fee Claims in excess of the applicable Professional Fee Cap, such Professional shall be deemed to consent under section 1129(a)(9) of the Bankruptcy Code to payment of only those Professional Fee Claims that do not exceed the applicable Professional Fee Cap and any Professional Fee Claims in excess of the applicable Professional Fee Cap shall be deemed Disallowed, released, waived, and barred.

To the extent of any inconsistency between the Confirmation Order, on the one hand, and any order approving a Fee Application (whether entered before or after the Confirmation Order), on the other, the Confirmation Order shall control.

2.    Professional Fee Escrow

As soon as reasonably practicable on or after the Confirmation Date (and in no event later than the Effective Date without the consent of the applicable Professional), the Debtors shall establish the Professional Fee Escrow and fund the Professional Fee Escrow with Cash equal to the Professional Fee Escrow Amount. The Professional Fee Escrow shall be maintained in trust for the Professionals and shall not be considered property of the Debtors' Estates, the Liquidating Trust, or the IP/Austria Assets Trust; *provided*, that after all Allowed Professional Fee Claims have been paid in full (subject to the Professional Fee Cap), Fee Applications in connection with all

Professional Fee Claims have been Filed, there are no Fee Applications pending before the Bankruptcy Court, and there are no Disputed Professional Fee Claims, any remaining Cash in such reserve shall be distributed to the Liquidating Trust and shall constitute Non-IP Assets. No Liens, Claims, or interests shall encumber the Professional Fee Escrow in any way.

After the Effective Date, amounts owing to the applicable holder of a Professional Fee Claim shall be paid in Cash to such holder (subject to the Professional Fee Cap) from funds held in the Professional Fee Escrow when such Professional Fee Claims are Allowed by an order of the Bankruptcy Court or authorized to be paid pursuant to the Interim Compensation Order or other order of the Bankruptcy Court.

3.    Time for Filing Professional Fee Claims

Each Professional who holds or asserts a Professional Fee Claim shall be required to file with the Bankruptcy Court, and serve on all parties required to receive notice, a Fee Application within forty-five (45) days after the Effective Date, for final Allowances of compensation for services rendered and reimbursement of expenses incurred. The failure to timely file and serve such Fee Application shall result in the Professional Fee Claim being forever barred. Objections to the Allowance of Professional Fee Claims must be filed and served no later than 4:00 p.m. (prevailing Eastern Time) on the date that is twenty-one (21) days after the filing of the applicable Fee Application. None of the Debtors, the Secured Noteholder, the Committee, the Liquidating Trustee, or the IP Austria Assets Trustee shall be entitled to object to the allowance of a Professional Fee Claim filed by a Professional of the Debtors or Committee. Any provision in the Interim Compensation Order requiring Professionals to file an Interim Fee Application shall be waived.

4.    Post-Effective Date Fees and Expenses.

Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code or the Interim Compensation Order in seeking retention or compensation for services rendered after such date shall terminate, and, the Liquidating Trust and the IP/Austria Assets Trust, as applicable, may employ and pay any professional for services rendered or expenses incurred after the Effective Date in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court in accordance with the Plan and, as applicable, the Liquidating Trust Agreement and IP/Austria Assets Trust Agreement.

D.    *Treatment of Tax Claims*

On the Plan Distribution Date, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Claim, each holder of an Allowed Tax Claim, at the election of the Debtors (prior to the Effective Date, with the consent of the Secured Noteholder and the Committee) or the Liquidating Trust (on or after the Effective Date), will receive: (a) payment in Cash of the Allowed amount of such Claim over five (5) years, pursuant to section 1129(a)(9)(c)(ii) of the Bankruptcy Code; (b) a one-time payment in Cash of the Allowed amount of such Claim; or (c) such other treatment as may be agreed to by such holder of an Allowed Tax Claim and the Debtors (prior to the Effective Date, with the consent of the Secured

Noteholder and the Committee) or the Liquidating Trust (on or after the Effective Date); *provided*, that such agreed upon treatment may not provide such holder with a return having a present value as of the Effective Date that is greater than the amount of such holder's Allowed Tax Claim. After the Effective Date, Allowed Tax Claims shall be satisfied by the Liquidating Trust from the First Tier Claims Reserve.

E.     *Statutory Fees*

All fees due and payable pursuant to section 1930 of Title 28 of the United States Code (the "**Statutory Fees**") prior to the Effective Date shall be paid by the Debtors on or before the Effective Date. Any Statutory Fees due and payable after the Effective Date for the calendar quarter that includes the Effective Date (the "**Effective Date Statutory Fees**") shall be paid by the Liquidating Trust from the First Tier Claims Reserve. All Statutory Fees (other than Effective Date Statutory Fees) that become due and payable after the Effective Date (a) for distributions by the Liquidating Trust, shall be paid by the Liquidating Trust from the Liquidating Trust Assets, and (b) for distributions by the IP/Austria Assets Trust, shall be paid by the IP/Austria Assets Trust from the IP/Austria Assets Trust Assets. Notwithstanding anything to the contrary herein, after the Effective Date, the Debtors, the Liquidating Trust, and the IP/Austria Assets Trust shall be jointly and severally liable to pay any and all Statutory Fees when due and payable. The Debtors shall file all monthly operating reports due prior to the Effective Date when they become due, using UST Form 11-MOR. After the Effective Date, if applicable, the Liquidating Trustee, the IP/Austria Assets Trustee, and the Debtors shall file with the Bankruptcy Court separate UST Form 11-PCR reports when they become due. Each and every one of the Debtors, the Liquidating Trustee, and the IP/Austria Assets Trustee shall remain obligated to pay Statutory Fees to the U.S. Trustee until the earliest of that particular Debtor's case being closed, dismissed, or converted to a case under chapter 7 of the Bankruptcy Code. The U.S. Trustee shall not be required to file any Administrative Claim in the Chapter 11 Cases and shall not be treated as providing any release under the Plan.

F.     *Payment of 2026 Notes Indenture Trustee Fees*

After the Effective Date, and prior to making any distributions to Liquidating Trust Beneficiaries, the Liquidating Trust shall pay all reasonable and documented fees and expenses of the 2026 Notes Indenture Trustee, in an aggregate amount not to exceed $175,000, solely from the proceeds of Liquidating Trust Assets that would otherwise be available for distribution to Liquidating Trust Beneficiaries, and without the requirement to file a fee application with the Bankruptcy Court or comply with any guidelines of the U.S. Trustee.

G.     *Payment of Secured Noteholder Professional Fees*

Pursuant to this Plan, on the Effective Date, to the extent Cash is available after (a) paying (or reserving for) all First Tier Claims, and (b) paying Professional Fee Claims in accordance with Article V.C.1 of this Plan, funding the Professional Fee Escrow in the Professional Fee Escrow Amount, funding the Wind Down Amount, and funding the Liquidating Trust Additional Amount, the Debtors shall pay all Secured Noteholder Professional Fees (or the portion thereof equal to all such available Cash, to the extent such Cash is insufficient to pay the Secured Noteholder Professional Fees in full) without the requirement to file a fee application with the Bankruptcy

Court or comply with any guidelines of the U.S. Trustee; *provided*, that, to the extent Cash is not available to pay the Secured Noteholder Professional Fees in full in accordance with the foregoing sentence, the IP/Austria Assets Trust and the Liquidating Trust shall pay the outstanding Secured Noteholder Professional Fees from time to time and as soon as reasonably practicable, prior to making any distributions to the Liquidating Trust Beneficiaries or the IP/Austria Assets Trust Beneficiaries, in each case, subject to the Reimbursement Mechanics.  None of the Debtors or the Committee shall be entitled to object to the payment of the Secured Noteholder Professional Fees in accordance with the terms of this Plan.

H.    *NHTSA and Owner Reimbursement Claims*

The Debtors are obligated to comply with the Safety Act "to ensure that consumers are adequately protected from any safety defect or noncompliance determined to exist in the manufacturer's products." 49 U.S.C. § 30120A.  Following the Effective Date, to facilitate compliance with the Safety Act, the Liquidating Trustee shall, solely to the extent provided in Article XIII.D of this Plan, take all actions reasonably practicable, to address or facilitate the remediation of the Stop-Sale Holds, including payment of the Pre-Effective Date Owner Reimbursement Claims and Post-Effective Date Labor Costs.  Section 30120A of the Safety Act further provides that "[i]n any bankruptcy proceeding, [a] manufacturer's obligations under [sections 30112 and 30115 through 30120 of the Safety Act] shall be treated as a claim of the United States Government against such manufacturer, subject to subchapter II of chapter 37 of title 31, United States Code, and given priority pursuant to section 3713(a)(1)(A) of such chapter, notwithstanding section 3713(a)(2) . . .." 49 U.S.C. § 30120A.

## ARTICLE VI.
## CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS

For the purposes of organization, voting and all confirmation matters, <u>except</u> as otherwise provided herein, all Claims against and all Equity Interests in the Debtors shall be classified as set forth in this Article VI.

A.    *Summary of Classification*

The Plan groups the Debtors together solely for the purposes of describing treatment under the Plan, confirmation of the Plan, and making distributions in accordance with the Plan in respect of Claims against, and Equity Interests in, the Debtors under the Plan.  Each creditor will be entitled to recovery on account of a single claim against the Debtors regardless of the Debtor entity against which the creditor asserts claims.  Notwithstanding such groupings, the Plan constitutes a separate chapter 11 plan for each Debtor.  The Plan is not premised upon, and will not cause, the substantive consolidation of any of the Debtors.  For brevity and convenience, the classification and treatment of Claims and Equity Interests have been arranged into one chart.  Such classification shall not affect any Debtor's status as a separate legal entity, change the organizational structure of the Debtors' business enterprise, constitute a change of control of any Debtor for any purpose, cause a merger or consolidation of any legal entities, or cause the transfer of any assets.

The following chart includes a summary of anticipated recovery to holders of Claims and Interests under the Plan.  Any estimates of Claims or Interests in this Combined DS and Plan may

vary from the final amounts Allowed by the Bankruptcy Court.  The following summary is based solely on the Schedules of Assets and Liabilities filed by each of the Debtors [D.I. 430, 432, 434, 436, 438, 440, 442, 443].  The actual recoveries under the Plan may vary based on final amounts Allowed by the Bankruptcy Court.  Distributions under the Plan are subject to the Plan being confirmed and satisfaction of all conditions to the Effective Date.

The Classes of Claims against and the Equity Interests in the Debtors shall be classified under the Plan as follows:

| Class | Claim | Status | Voting Rights | Projected Amount of Claims (in millions) | Projected Recovery Under the Plan |
|-------|-------|--------|---------------|------------------------------------------|-----------------------------------|
| 1 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) | $0.01 | 100% |
| 2 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) | N/A | N/A |
| 3 | Secured Notes Claims | Impaired | Entitled to Vote | $186.1[11] | Undetermined[12] |
| 4 | General Unsecured Claims | Impaired | Entitled to Vote | $1,246.2 – $1,315.0 | Undetermined[13] |
| 5 | Intercompany Claims | Impaired | Not Entitled to Vote (Deemed to Reject) | N/A | N/A |
| 6 | Equity Interests | Impaired | Not Entitled to Vote | N/A | N/A |

[11]    In particular, the Secured Notes Claims shall be deemed Allowed against the Debtors in the aggregate amount of $186,050,000 plus all accrued and accruing unpaid interest, fees, expenses (including fees and expenses of professionals), and all other liabilities, obligations and amounts under the Prepetition Note Documents (as defined in the Cash Collateral Orders).

[12]    The projected recovery for holders of Secured Claims depends on the ultimate amount of distribution proceeds, of which the amount is undetermined at this time due to uncertainties, contingencies, and difficulty in assessing the likelihood of success in connection with the potential future proceeds from the sale of intellectual property and other intangible assets and estate claims and any recoveries associated therewith are speculative at this time.

[13]    The projected recovery for holders of General Unsecured Claims depends on the ultimate amount of distribution proceeds, of which the amount is undetermined at this time due to uncertainties, contingencies, and difficulty in assessing the likelihood of success in connection with the potential future proceeds from the sale of intellectual property and other intangible assets and estate claims and any recoveries associated therewith are speculative at this time.

| Class | Claim | Status | Voting Rights | Projected Amount of Claims (in millions) | Projected Recovery Under the Plan |
|-------|-------|--------|---------------|------------------------------------------|-----------------------------------|
|       |       |        | (Deemed to Reject) |   |   |
| 7 | Intercompany Interests | Impaired | Not Entitled to Vote (Deemed to Reject) | N/A | N/A |

B.    *Treatment of Claims and Equity Interests*

The classes of Claims against the Debtors and Equity Interests in the Debtors shall be treated under the Plan as follows:

1.    Class 1 – Other Priority Claims

a.    *Classification*:  Class 1 shall consist of all Other Priority Claims against the Debtors.

b.    *Treatment*:  On the Plan Distribution Date, except to the extent that less favorable treatment is agreed to by holder of an Allowed Tax Claim and the Debtors (prior to the Effective Date, with the consent of the Secured Noteholder and the Committee) or the Liquidating Trust (on or after the Effective Date), in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Claim, each holder of an Allowed Other Priority Claim shall be paid in full and in Cash or provided such other treatment rendering such holder's Allowed Other Priority Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code.  After the Effective Date, Allowed Other Priority Claims shall be satisfied from the First Tier Claims Reserve.

c.    *Voting*:  Claims in Class 1 are Unimpaired.  Holders of Other Priority Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code.  Holders of Other Priority Claims are not entitled to vote to accept or reject the Plan.

2.    Class 2 – Other Secured Claims

a.    *Classification*:  Class 2 shall consist of all Other Secured Claims against the Debtors.

b.    *Treatment*:  On the Plan Distribution Date, except to the extent that less favorable treatment is agreed to by holder of an Allowed Other Secured Claim and the Debtors (prior to the Effective Date, with the consent of the Secured Noteholder and the Committee) or the Liquidating Trust (on or after the Effective Date), in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Claim, each

38

holder of an Allowed Other Secured Claim shall, at the option of the Liquidating Trust, (i) be paid in full and in Cash, (ii) receive its collateral in full satisfaction of its Claim, or (iii) such other treatment rendering such holder's Allowed Other Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code.

c.    *Voting*:  Claims in Class 2 are Unimpaired.  Holders of Other Secured Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code.  Holders of Other Secured Claims are not entitled to vote to accept or reject the Plan.

3.    Class 3 – Secured Notes Claims

a.    *Classification:*  Class 3 shall consist of all Secured Notes Claims.

b.    *Allowance*:  The Secured Notes Claims shall be deemed Allowed against the Debtors in the aggregate amount of $186,050,000 plus all accrued and accruing unpaid interest, fees, expenses (including fees and expenses of professionals), and all other liabilities, obligations and amounts under the Prepetition Note Documents (as defined in the Cash Collateral Orders). Pursuant to the terms of the Plan, subject to the occurrence of the Effective Date, the Secured Noteholder shall be deemed to have waived all other Claims against the Debtors' Estates (but not, for the avoidance of doubt, the Debtors' non-Debtor subsidiaries and Affiliates), including any deficiency claim and any Cash Collateral Adequate Protection Claim against the Debtors' Estates.

c.    *Treatment:*  On the Plan Distribution Date, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Claim, each holder of an Allowed Secured Notes Claim (or its designee) shall receive its Pro Rata Share of the IP/Austria Assets Trust Units and all proceeds thereof.

d.    *Voting*:  Claims in Class 3 are Impaired.  Holders of Allowed Secured Notes Claims are entitled to vote to accept or reject the Plan.

4.    Class 4 – General Unsecured Claims

a.    *Classification*:  Class 4 shall consist of all General Unsecured Claims.

b.    *Treatment:* On the Plan Distribution Date, except to the extent that a holder of an Allowed General Unsecured Claim and the Debtors (prior to the Effective Date, with the consent of the Secured Noteholder and the Committee) or the Liquidating Trust (after the Effective Date) agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Claim, each holder of an Allowed General Unsecured Claim shall receive its Pro Rata Share of the Liquidating Trust Units.

39

c.      *Voting:*  Claims in Class 4 are Impaired.  Holders of Allowed General Unsecured Claims are entitled to vote to accept or reject the Plan.

5.      Class 5 – Intercompany Claims

a.      *Classification*:  Class 5 shall consist of all Intercompany Claims among Debtors.

b.      *Treatment*:  On the Effective Date, all Intercompany Claims shall be deemed automatically cancelled, released, and extinguished and shall be of no further force or effect.  No holder of an Intercompany Claim will receive any Plan Distribution on account thereof.  For the avoidance of doubt, any Claims held by the Debtors against their non-Debtor subsidiaries or Affiliates shall not be affected or otherwise modified by the Plan.

c.      *Voting:*  Claims in Class 5 are Impaired.  Holders of Intercompany Claims are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Holders of Intercompany Claims are not entitled to vote to accept or reject the Plan.

6.      Class 6 – Equity Interests

a.      *Classification*:  Class 6 shall consist of all Equity Interests in the Debtors.

b.      *Treatment*:  On the Effective Date, all Equity Interests in the Debtors shall be deemed automatically canceled, released, and extinguished and shall be of no further force or effect; *provided*, that, one or more of the Debtors may continue to exist after the Effective Date as and to the extent provided in Article VII.F. No holder of an Equity Interest will receive any Plan Distribution on account thereof.

c.      *Voting*: Equity Interests in Class 6 are Impaired.  Holders of Equity Interests are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Holders of Equity Interests are not entitled to vote to accept or reject the Plan.

7.      Class 7 – Intercompany Interests

a.      *Classification*: Class 7 consists of all Intercompany Interests.

b.      *Treatment*: On the Effective Date, all Intercompany Interests shall be deemed automatically cancelled, released, and extinguished and shall be of no further force or effect; *provided*, that, one or more of the Debtors may continue to exist after the Effective Date as and to the extent provided in Article VII.F.  No holder of an Intercompany Interest will receive any Plan Distribution on account thereof.

      c.     *Voting*: Intercompany Interests in Class 7 are Impaired. Holders of Intercompany Interests are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Holders of Intercompany Interests are not entitled to vote to accept or reject the Plan.

C.     *Separate Classification of Claims Generally*

The Plan constitutes a separate Plan for each Debtor, and the classification of Claims and Equity Interests set forth herein shall apply separately to each of the Debtors.  Any Class of Claims or Equity Interests that does not have a holder of an Allowed Claim or Allowed Interests shall be deemed eliminated from the Plan solely for purposes of (i) voting to accept or reject the Plan and (ii) determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code. For all purposes under the Plan, each Class will contain sub-Classes for each Debtor.  Tabulation of votes accepting or rejecting the Plan shall be conducted on a Debtor-by-Debtor basis.

Each Other Secured Claim, to the extent secured by a Lien on collateral different from the collateral securing another Other Secured Claim, shall be treated as being in a separate sub-Class for purposes of receiving distributions under this Plan.

D.     *Class Acceptance Requirement*

A Class of Claims shall have accepted the Plan if it is accepted by at least two-thirds (2/3) in amount and more than one-half (1/2) in number of the Allowed Claims in such class that have voted on the Plan.  A class of Equity Interests shall have accepted the Plan if it is accepted by holders of at least two-thirds (2/3) of the Equity Interests in such class that actually vote on the Plan.

With respect to each Debtor, if a Class contains Claims eligible to vote and no holder of Claims eligible to vote in such Class votes to accept or reject this Plan, this Plan shall be presumed accepted by the holders of such Claims in such Class; *provided*, that if the Secured Noteholder withdraws its vote in accordance with Article VI.H, Class 3 shall not be deemed to have accepted the Plan.

E.     *Controversy Concerning Impairment*If a controversy arises as to whether any Claims or Equity Interests, or any Class of Claims or Equity Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

F.     *Cramdown*

If all applicable requirements for confirmation of the Plan are met as set forth in section 1129(a)(1) through (16) of the Bankruptcy Code, *except* subsection (8) thereof, then the Plan shall be treated as a request that the Bankruptcy Court confirm the Plan in accordance with section 1129(b) of the Bankruptcy Code on the basis that the Plan is fair and equitable and does not discriminate unfairly with respect to each class of Claims and Equity Interests that is impaired under, and has not accepted, the Plan.

G.      *Subordinated Claims*

The classification and manner of satisfying all Claims and Interests under the Plan take into consideration all subordination rights, whether arising under general principles of equitable subordination, contract, section 510(c) of the Bankruptcy Code, any of the prepetition intercreditor agreements with respect to the prepetition debt documents or otherwise, that a holder of a Claim or Equity Interest may have against other Claim or Equity Interest holders with respect to any distribution made pursuant to the Plan.  Nothing in the Plan shall release or impair any creditor's rights to enforce any subordination agreement against any other creditor pursuant to Bankruptcy Code section 510 or any subordination agreement and the rights and defenses of any creditor related to such enforcement.  Pursuant to section 510 of the Bankruptcy Code, the Debtors reserve the right to re-classify any Allowed Claim or Allowed Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

H.      *Right to Withdraw Vote and Support*

Notwithstanding anything herein to the contrary, in the event there are Administrative Claims that in the aggregate exceed the Global Settlement Budget, or the aggregate Tax Claims and Other Priority Claims exceed those estimated by the recovery analysis provided by the Debtors to the Secured Noteholder and the Committee prior to the date of entry of the Sixth Interim Cash Collateral Order, in each case by more than a reasonable variance agreed to by the Debtors, the Secured Noteholder, and the Committee, (i) the Secured Noteholder shall have the right to withdraw their votes in favor the Plan, subject to filing a motion under Bankruptcy Rule 3018(a) on an emergency basis and Bankruptcy Court approval, and (ii) the Committee shall have the right to withdraw its support for the Plan.

## ARTICLE VII.
## MEANS FOR IMPLEMENTATION OF THE PLAN

A.      *Sources of Consideration for Plan Distributions*

On the Effective Date, the Debtors shall make Plan Distributions in accordance with the Plan to holders of Allowed Administrative Claims, Allowed Tax Claims, Allowed Other Priority Claims, and Allowed Other Secured Claims that are due and payable as of the Effective Date using Cash on hand.  Upon completion of such Plan Distributions, on the Effective Date, the Debtors shall transfer all Liquidating Trust Assets to the Liquidating Trust and all IP/Austria Assets Trust Assets to the IP/Austria Assets Trust.  After the Effective Date, the Liquidating Trustee and IP/Austria Assets Trustee shall make Plan Distributions from the Liquidating Trust Assets and IP/Austria Assets Trust Assets, respectively, on account of Allowed Claims in accordance with the Plan and, as applicable, the Liquidating Trust Agreement and IP/Austria Assets Trust Agreement.

On the Effective Date, the Secured Noteholder shall be deemed to contribute the Austria Claims to the IP/Austria Assets Trust.  Notwithstanding anything herein to the contrary, any Causes of Action against any of the Debtors' non-Debtor foreign subsidiaries other than Fisker Austria and liens upon any of their respective assets, including any amounts realized in respect of any such Causes of Action, held by the Secured Noteholder are not assets of the Estates and shall not be contributed to the Estates, the IP/Austria Assets Trust, or the Liquidating Trust.

42

B.     *Preservation and Maintenance of Debtor Causes of Action*

1.     <u>Maintenance of Causes of Action</u>.

Except as otherwise provided in this Plan or the Confirmation Order, after the Effective Date, the Liquidating Trust shall automatically be deemed to have been vested with any and all rights to commence, pursue, litigate or settle, as appropriate, any and all Preserved Estate Claims, whether existing as of the Petition Date or thereafter arising, in any court or other tribunal including in an adversary proceeding filed in the Bankruptcy Court in connection with the Chapter 11 Cases. The Liquidating Trust as the successor in interest to the Debtors and the Estates, may, in its sole and absolute discretion, and will have the exclusive right to, investigate, enforce, sue on, settle, compromise, transfer or assign (or decline to do any of the foregoing) any Preserved Estate Claims that have not been released pursuant to the terms of this Plan without notice to or approval from the Bankruptcy Court or the Debtors. The Liquidating Trust or its successor(s) may pursue such Preserved Estate Claims as appropriate in accordance with the best interests of the Liquidating Trust, or its successor(s) who hold such rights.

After the Effective Date, the IP/Austria Assets Trust shall be automatically be deemed to have been vested with any and all rights to commence, pursue, litigate or settle, as appropriate, any and all Causes of Action constituting IP/Austria Assets, whether existing as of the Petition Date or thereafter arising, in any court or other tribunal including in an adversary proceeding filed in the Bankruptcy Court in connection with the Chapter 11 Cases. The IP/Austria Assets Trust as the successor in interest to the Debtors and the Estates, may, in its sole and absolute discretion, and will have the exclusive right to, investigate, enforce, sue on, settle, compromise, transfer or assign (or decline to do any of the foregoing) any Causes of Action constituting IP/Austria Assets that have not been released pursuant to the terms of this Plan without notice to or approval from the Bankruptcy Court or the Debtors. The IP/Austria Assets Trust or its successor(s) may pursue such Causes of Action as appropriate in accordance with the best interests of the IP/Austria Assets Trust, or its successor(s) who hold such rights.

2.     <u>Preservation of All Causes of Action Not Expressly Settled or Released</u>.

Unless a Cause of Action against a holder of a Claim or an Equity Interest or other Entity is expressly waived, relinquished, released, compromised or settled in the Plan or any Final Order (including the Confirmation Order or by virtue of the allowance of such Claim hereunder), such Cause of Action is expressly preserved for later adjudication by the Liquidating Trust (including Causes of Action not specifically identified or of which the Debtors or their creditors who shall receive beneficial interests in the Liquidating Trust may presently be unaware or which may arise or exist by reason of additional facts or circumstances unknown to the Debtors at this time or facts or circumstances that may change or be different from those the Debtors now believe to exist and all Preserved Estate Claims, to the extent such claims are not released by this Plan) or the IP/Austria Assets Trust, as applicable. Therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches will apply to such Preserved Estate Claims or the IP/Austria Assets upon or after the entry of the Confirmation Order or the Effective Date of the Plan based on the Plan or the Confirmation Order, except where such Causes of Action have been expressly

released in the Plan (including, and for the avoidance of doubt, the releases contained in the Confirmation Order).

Any Preserved Estate Claims shall be automatically deemed to have vested in and been transferred to the Liquidating Trust on the Effective Date for investigation and potential prosecution and adjudication by the Liquidating Trust.  In addition, the Liquidating Trust shall have the exclusive right to pursue or adopt any Preserved Estate Claims in any lawsuit in which any Debtor is a plaintiff, defendant or an interested party, against any Entity, including the plaintiffs or co-defendants in such lawsuits.  The Debtors and the Liquidating Trustee, as applicable, expressly reserve all rights to prosecute any and all Preserved Estate Claims.

Any Causes of Action constituting IP/Austria Assets shall be automatically deemed to have vested in and been transferred to the IP/Austria Assets Trust on the Effective Date for investigation and potential prosecution and adjudication by the IP/Austria Assets Trust.  In addition, the IP/Austria Assets Trust shall have the exclusive right to pursue or adopt any Causes of Action constituting IP/Austria Assets in any lawsuit in which any Debtor is a plaintiff, defendant or an interested party, against any Entity, including the plaintiffs or co-defendants in such lawsuits.  The Debtors and the IP/Austria Assets Trustee, as applicable, expressly reserve all rights to prosecute any and all Causes of Action constituting IP/Austria Assets.

3.    D&O Actions and Litigation.

Notwithstanding anything to the contrary in this Plan (including in this Article VII and/or in Article XII of this Plan) or otherwise, any recovery (including by way of settlement or judgment) from the D&O Actions against any Other Director and Officer shall be limited to the applicable D&O Policy Cap; *provided*, that there shall be no such limitation on recoveries with respect to any Other Director and Officer that is found by Final Order (a) to have intentionally and materially impaired or impeded insurance coverage, (b) to have intentionally attempted to cause or caused a material delay of any insurance coverage or the payment thereof, or (c) not to be entitled to insurance coverage on account of such Other Director and Officer's failure to make a timely claim under the applicable D&O Policies or as a result of such Other Director and Officer's failure to cooperate with the insurers or otherwise comply in all material respects with its obligations under the D&O Policies, including any obligation to assist in the defense of claims as required by such D&O Policies.

Nothing in this Plan shall, or shall be construed to, limit, diminish, or otherwise impair, waive, or release any objections, defenses, or counterclaims of the Debtors, the IP/Austria Assets Trust, or the Liquidating Trust to any Proof of Claim or Administrative Claim filed by a D&O.  Except as otherwise provided in this Plan, nothing herein shall limit, diminish, or otherwise impair, waive, or release any claims, defenses, counterclaims, or rights of any of the D&Os arising from, related to, or in connection with the D&O Actions.

On November 27, 2023, a putative class action lawsuit, captioned *Zahabi v. Fisker Inc., et al.*, No. 2:23-cv-09976-FLA (KSx) (C.D. Cal.) (the "**Class Action**"), was filed in the United States District Court for the Central District of California, asserting claims under federal securities laws and naming Debtor Fisker Inc., Henrik Fisker, Geeta Gupta-Fisker, and John Finnucan as defendants.  The plaintiff in the Class Action asserts claims under section 10(b) and 20(a) of the

Securities Exchange Act on behalf of a putative class of persons and entities who purchased or otherwise acquired the Company's securities during the period between August 4, 2023 and November 20, 2023 (the "**Class Period**"). The plaintiff alleges that, as a result of the defendants' allegedly false and/or misleading statements and/or omissions concerning the Company's business, including statements and/or omissions concerning the Company's operations, prospects, and internal controls over financial reporting, the Company's securities traded at artificially inflated prices during the Class Period (the "**Class Action Claims**"). On June 24, 2024, following the commencement of these Chapter 11 Cases, the named plaintiff voluntarily dismissed the claims asserted against the Company, leaving Henrik Fisker, Geeta Gupta-Fisker, and John Finnucan as defendants (collectively, the "**Class Action Defendants**").

In addition, prior to the Petition Date, the following shareholder derivative actions were each commenced in federal district court, purportedly on behalf of the Company:

(a) *Hanna v. Fisker, et al.*, No. 2:23-cv-10713-FLA (KSx) (C.D. Cal.), commenced on December 21, 2023;

(b) *Uvaydov v. Fisker, et al.*, No. 1:24-cv-00133-JLH (D. Del.), commenced on February 1, 2024;

(c) *Roy v. Fisker, et al.*, No. 2:24-cv-01551-FLA (KSx) (C.D. Cal.), commenced on February 24, 2024;

(d) *Azizi v. Fisker, et al.*, No. 2:24-cv-01619-FLA (KSx) (C.D. Cal.), commenced on February 27, 2024; and

(e) *Karamian v. Fisker, et al.*, No. 2:24-cv-01867-FLA (KSx) (C.D. Cal.), commenced on March 7, 2024.

C.   *Creation, Vesting, and Transfer of Liquidating Trust Assets to the Liquidating Trust*

1.   Creation of Liquidating Trust

On the Effective Date, in furtherance of the liquidation of the Debtors, the Liquidating Trust shall be established for the benefit of the Liquidating Trust Beneficiaries. The Liquidating Trustee shall execute the Liquidating Trust Agreement and shall take all other steps necessary to establish the Liquidating Trust pursuant to the Liquidating Trust Agreement and consistent with the Plan. The form of the Liquidating Trust Agreement shall be included in the Plan Supplement and approved pursuant to the Plan. The powers, authority, responsibilities, and duties of the Liquidating Trust and the Liquidating Trustee are set forth in and shall be governed by the Plan and the Liquidating Trust Agreement.

On the Effective Date, the Wind Down Amount, the Liquidating Trust Additional Amount, and the First Tier Claims Reserve shall be transferred by the Debtors to the Liquidating Trust. In addition, subject in all respects to the prior written consent of the Secured Noteholder, notwithstanding whether the Secured Noteholder Professional Fees have been paid in full, a portion of the Initial Liquidating Trust Funding Amount in an amount to be agreed to by the

Secured Noteholder, the Committee, and the Debtors may be funded from the Debtors' Cash on hand on the Effective Date.

2.     Vesting of Liquidating Trust Assets

Except as otherwise provided in the Plan or in any contract, instrument, release, or other agreement or document created pursuant to the Plan (including Article VIII.B.3) or in the Confirmation Order, upon the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, all Liquidating Trust Assets (including all interests, and rights related thereto) of each of the Debtors, shall immediately vest in the Liquidating Trust free and clear of all Claims, Liens, encumbrances, charges, and other interests.  All Claims, Liens, encumbrances, charges, and other interests in or on the Liquidating Trust Assets shall be deemed fully released as of the Effective Date, except as otherwise provided in the Plan (including Article VIII.B.3) or the Confirmation Order.

3.     Transfer of Liquidating Trust Assets

On the Effective Date, other than as set forth in this Plan (including Article VIII.B.3) or the Confirmation Order, the Debtors are authorized and directed to and shall be deemed to have irrevocably transferred, granted, assigned, conveyed, and delivered to the Liquidating Trust, for the benefit of the Liquidating Trust Beneficiaries, in the form thereof existing on such date, all of the Debtors' and Estates' right, title and interest in and to all of the Liquidating Trust Assets free and clear of any and all Liens, Claims, encumbrances and interests (legal, beneficial or otherwise) of all other Entities.  The Debtors, the Liquidating Trustee, the Liquidating Trust Beneficiaries, and any party under the control of such parties will execute any documents or other instruments and shall take all other steps as necessary to cause title to the Liquidating Trust Assets to be transferred to the Liquidating Trust.  Upon the transfer of the Liquidating Trust Assets to the Liquidating Trust, the Debtors shall have no interest in or with respect to the Liquidating Trust Assets or the Liquidating Trust.  Upon delivery of the Liquidating Trust Assets to the Liquidating Trust, the Debtors and their predecessors, successors, and assigns shall be released from all liability with respect to the delivery thereof and shall have no reversionary or further interest in, or with respect to, the Liquidating Trust Assets or the Liquidating Trust in accordance with this Article VII.F of the Plan (including Article VIII.B.3).  Notwithstanding the foregoing, for purposes of section 553 of the Bankruptcy Code, the transfer of the Liquidating Trust Assets to the Liquidating Trust shall not affect the mutuality of obligations that otherwise may have existed prior to the effectuation of such transfer.  Such transfer shall be exempt from any stamp, real estate transfer, mortgage reporting, sales, use, or other similar tax, pursuant to section 1146(a) of the Bankruptcy Code.

D.     *Creation, Vesting, and Transfer of IP/Austria Assets Trust Assets to the IP/Austria Assets Trust*

1.     Creation of IP/Austria Assets Trust

On the Effective Date, in furtherance of the liquidation of the Debtors, the IP/Austria Assets Trust shall be established for the benefit of the IP/Austria Assets Trust Beneficiaries.  The IP/Austria Assets Trustee shall execute the IP/Austria Assets Trust Agreement and shall take all

46

other steps necessary to establish the IP/Austria Assets Trust pursuant to the IP/Austria Assets Trust Agreement and consistent with the Plan. The form of the IP/Austria Assets Trust Agreement shall be included in the Plan Supplement and approved pursuant to the Plan. The powers, authority, responsibilities, and duties of the IP/Austria Assets Trust and the IP/Austria Assets Trustee are set forth in and shall be governed by the Plan and the IP/Austria Assets Trust Agreement, which shall include any rights the Debtors have to direct the chief restructuring officer (or the Austrian equivalent) of Fisker Austria with respect to Fisker Austria's insolvency proceeding.

> 2. _Vesting of IP/Austria Assets Trust Assets_

Except as otherwise provided in the Plan (including Article VIII.A.3) or in any contract, instrument, release, or other agreement or document created pursuant to the Plan or in the Confirmation Order, upon the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, all IP/Austria Assets Trust Assets (including all interests, and rights related thereto) of each of the Debtors, shall immediately vest in the IP/Austria Assets Trust free and clear of all Claims, Liens, encumbrances, charges, and other interests. All Claims, Liens, encumbrances, charges, and other interests in or on the IP/Austria Assets Trust Assets shall be deemed fully released as of the Effective Date, except as otherwise provided in the Plan (including Article VIII.A.3) or the Confirmation Order.

> 3. _Transfer of IP/Austria Assets Trust Assets_

On the Effective Date, other than as set forth in this Plan (including Article VIII.A.3) or the Confirmation Order, the Debtors are authorized and directed to and shall be deemed to have irrevocably transferred, granted, assigned, conveyed, and delivered to the IP/Austria Assets Trust, for the benefit of the IP/Austria Assets Trust Beneficiaries, in the form thereof existing on such date, all of the Secured Noteholder's (if applicable), Debtors' and Estates' right, title and interest in and to all of the IP/Austria Assets Trust Assets free and clear of any and all Liens, Claims, encumbrances and interests (legal, beneficial or otherwise) of all other Entities. The Debtors, the IP/Austria Assets Trustee, the IP/Austria Assets Trust Beneficiaries, and any party under the control of such parties will execute any documents or other instruments and shall take all other steps as necessary to cause the Debtors' title to the IP/Austria Assets Trust Assets to be transferred to the IP/Austria Assets Trust. Upon the transfer of the IP/Austria Assets Trust Assets to the IP/Austria Assets Trust, the Debtors shall have no interest in or with respect to the IP/Austria Assets Trust Assets or the IP/Austria Assets Trust. Upon delivery of the IP/Austria Assets Trust Assets to the IP/Austria Assets Trust, the Debtors and their predecessors, successors, and assigns shall be released from all liability with respect to the delivery thereof and shall have no reversionary or further interest in, or with respect to, the IP/Austria Assets Trust Assets or the IP/Austria Assets Trust in accordance with this Article VII.D of the Plan (except as set forth in this Plan (including Article VIII.A.3)). Notwithstanding the foregoing, for purposes of section 553 of the Bankruptcy Code, the transfer of the IP/Austria Assets Trust Assets to the IP/Austria Assets Trust shall not affect the mutuality of obligations that otherwise may have existed prior to the effectuation of such transfer. Such transfer shall be exempt from any stamp, real estate transfer, mortgage reporting, sales, use, or other similar tax, pursuant to section 1146(a) of the Bankruptcy Code.

E.    *Corporate Action*

The entry of the Confirmation Order shall constitute authorization for the Debtors, the IP/Austria Assets Trustee, and the Liquidating Trustee, as applicable, to take or cause to be taken all corporate actions necessary or appropriate to implement all provisions of, and to consummate, the Plan Documents prior to, on and after the Effective Date and all such actions taken or caused to be taken shall be deemed to have been authorized and approved by the Bankruptcy Court without further approval, act or action under any applicable law, order, rule or regulation, including, (i) the incurrence of all obligations contemplated by the Plan and the making of Plan Distributions, (ii) the implementation of all settlements and compromises as set forth in or contemplated by the Plan and (iii) the execution, delivery, filing and/or recording of any contracts, agreements, instruments or other documents contemplated by the Plan Documents (or necessary or desirable to effectuate the transactions contemplated by the Plan Documents).  On the Effective Date, the officers of the Debtors, the Liquidating Trust, or the IP/Austria Assets Trust, as applicable, are authorized to do all things and to execute and deliver all agreements, documents, instruments, notices and certificates as are contemplated by the Plan and to take all necessary actions required in connection therewith, in the name of and on behalf of the Debtor, the Liquidating Trust, and the IP/Austria Assets Trust, as applicable.

F.    *Board Compensation and Dissolution of the Debtors*

All rights of the Debtors' board of directors to compensation for the third and fourth quarters of calendar year 2024 are hereby waived; *provided*, that, notwithstanding the foregoing, the Transaction Committee Chairman shall continue to be compensated.  On the Effective Date, the respective boards of directors of each of the Debtors shall be terminated and the members of each of the boards of directors of the Debtors shall be deemed to have resigned.

Each Debtor shall be deemed dissolved without further order of the Bankruptcy Court or action by the Debtors or the Liquidating Trustee; *provided*, that the Liquidating Trustee is authorized to file certificates of cancellation and any other documents with the secretary of state in which such dissolved Debtor was formed or in any other jurisdiction; *provided*, *further*, that, one or more of the Debtors may continue to exist after the Effective Date in accordance with the respective laws of the state under which any such Debtor was formed and pursuant to any such Debtor's certificates of incorporation, bylaws, articles of formation, operating agreements, and other organizational documents in effect prior to the Effective Date, to the extent necessary to comply with the Debtors' obligations hereunder, to comply with the Debtors' express obligations under the Fleet Sales Agreement and Fleet Sale Order (solely as and to the extent required thereunder), to address or facilitate the remediation of open Stop-Sale Holds (subject to Article VIII.D), or otherwise until such date as reasonably mutually determined by the Liquidating Trustee and the IP/Austria Assets Trustee, subject in all respects to Article VIII.D.

G.    *Cancellation of Instruments*

Except as otherwise provided herein (including in Article VI.B), the Debtors' obligations under any other note, bond, indenture or other instrument or document evidencing or creating any indebtedness or obligation of the Debtors shall be deemed released, settled, and compromised on the Effective Date; *provided*, that (i) the 2025 Notes Documents and the Bridge Note Documents

shall continue in effect for purposes of preserving all rights and obligations not released under the Plan as between the Secured Noteholder, on the one hand, and any non-Debtor Entities, on the other; and (ii) the 2026 Notes Indenture and the 2026 Notes shall continue in effect solely for the purposes of (a) allowing the holders of the 2026 Notes to receive their Plan Distribution, (b) preserving the 2026 Notes Indenture Trustee's right to pay the 2026 Notes Indenture Trustee's fees, subject to Article V.F herein, (c) permitting the 2026 Notes Indenture Trustee to exercise its charging lien as set forth in the 2026 Notes Indenture, (d) allowing the 2026 Notes Indenture Trustee to enforce its rights, claims and interests vis-à-vis any other parties other than the Debtors and the Released Parties and to appear in the Chapter 11 Cases, and (e) maintaining the right to indemnification, contribution or subrogation or any other claim or entitlement they may have from the Debtors pursuant to and subject to the respective terms of the 2026 Notes Indenture. Except for the foregoing with respect to such other rights of the 2026 Notes Indenture Trustee that survive the 2026 Notes Indenture, the 2026 Notes Indenture Trustee and their respective agents shall be relieved of all further duties and responsibilities related to the 2026 Notes Indenture and the Plan.

## ARTICLE VIII.
## THE IP/AUSTRIA ASSETS TRUST AND LIQUIDATING TRUST

This Article VIII sets forth certain of the rights, duties and obligations of the IP/Austria Assets Trustee and the Liquidating Trustee.  In the event of any conflict between the terms of Article VIII.A and Article VIII.B, on the one hand, and the terms of the IP/Austria Assets Trust Agreement or Liquidating Trust Agreement, on the other, the terms of the applicable trust agreement shall govern.

A.    *IP/Austria Assets Trust*

1.    Purpose of IP/Austria Assets Trust

The IP/Austria Assets Trust shall be established for the sole purpose of liquidating and distributing the IP/Austria Assets Trust Assets, in accordance with Treasury Regulation section 301.7701-4(d) and as a "grantor trust" for U.S. federal income tax purposes, pursuant to sections 671 through 679 of the Internal Revenue Code (excluding any Disputed Claims Reserve), with no objective to continue or engage in the conduct of a trade or business except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the IP/Austria Assets Trust, and without effect to its status as a "liquidating trust" for U.S. federal income tax purposes.  The IP/Austria Assets Trust shall be governed by the Plan and the IP/Austria Assets Trust Agreement. The IP/Austria Assets Trust Agreement shall contain provisions customary to trust agreements utilized in comparable circumstances, including any and all provisions necessary to ensure the continued treatment of the IP/Austria Assets Trust (excluding any Disputed Claims Reserve) as a grantor trust and the IP/Austria Assets Trust Beneficiaries as the grantors and owners thereof for U.S. federal income tax purposes.  The IP/Austria Assets Trust Agreement may provide powers, duties, and authorities in addition to those explicitly stated herein, but only to the extent that such powers, duties, and authorities are for the primary purpose of receiving all IP/Austria Assets Trust Assets and distributing any such assets pursuant to the Plan.

2.      IP/Austria Assets Trust Assets

On the Effective Date, the Debtors and the IP/Austria Assets Trustee shall execute the IP/Austria Assets Trust Agreement and shall take all steps necessary to establish the IP/Austria Assets Trust in accordance with the Plan and for the benefit of the IP/Austria Assets Trust Beneficiaries. Additionally, on the Effective Date, the Debtors shall irrevocably transfer and shall be deemed to have irrevocably transferred to the IP/Austria Assets Trust all of the Debtors' Estates' rights, title, and interest in and to all of the IP/Austria Assets Trust Assets and, in accordance with section 1141 of the Bankruptcy Code, the IP/Austria Assets Trust Assets shall automatically vest in the IP/Austria Assets Trust free and clear of all claims, liens, encumbrances, or interests, subject to the terms of this Plan (including Article VIII.A.3) and the IP/Austria Assets Trust Agreement.

3.      Role of the IP/Austria Assets Trustee

In furtherance of and consistent with the purpose of the IP/Austria Assets Trust and the Plan, the IP/Austria Assets Trustee shall: (i) hold the assets of the IP/Austria Assets Trust for the benefit of the IP/Austria Assets Trust Beneficiaries; (ii) have the power and authority to hold, manage, sell and distribute Cash or non-Cash assets of the IP/Austria Assets Trust obtained through the exercise of its power and authority in accordance with the Plan; (iii) have the power and authority to investigate, prosecute and resolve, in the name of the Debtors and/or the name of the IP/Austria Assets Trustee, any IP/Austria Assets and to enter into arrangements to fund such litigation with third parties and/or certain holders of beneficial interests in such IP/Austria Assets Trust on such terms as are determined to be reasonable and in the interest of the IP/Austria Assets Trust; and (iv) have the power and authority to perform such other functions as are provided in the Plan.  The IP/Austria Assets Trustee shall be responsible for all decisions and duties with respect to the IP/Austria Assets Trust and the IP/Austria Assets Trust Assets.  In all circumstances, the IP/Austria Assets Trustee shall act in the best interests of all beneficiaries of the IP/Austria Assets Trust and in furtherance of the purpose of the IP/Austria Assets Trust.

Notwithstanding anything to the contrary herein, the IP/Austria Assets Trustee shall have standing to object to (i) any Administrative Claim, Tax Claim, or Other Priority Claim that is not Allowed on or prior to the Effective Date and (ii) any proposed settlement of such Claims by the Liquidating Trustee.

The IP/Austria Assets Trustee shall file tax returns for the IP/Austria Assets Trust (excluding any Disputed Claims Reserve) as a grantor trust pursuant to Treasury Regulations Section 1.671-4(a) and in accordance with this Plan and comply with any other applicable tax reporting obligations imposed on the IP/Austria Assets Trust.  The IP/Austria Assets Trust's taxable income, gain, loss, deduction, or credit (other than such items attributable to any Disputed Claims Reserve) will be allocated to each of the IP/Austria Assets Trust Beneficiaries in accordance with their relative beneficial interest in the IP/Austria Assets Trust.

As soon as possible after the Effective Date, the IP/Austria Assets Trustee shall make (or cause to be made) a good faith valuation of the assets of the IP/Austria Assets Trust, and such valuation shall be used consistently by all parties for U.S. federal income tax purposes.

The IP/Austria Assets Trustee shall be given access by the Debtors and their professionals (at the expense of the IP/Austria Assets Trust with respect to any expenditure of resources that is more than de minimis) to all information that the IP/Austria Assets Trustee determines is necessary to prosecute, investigate, sell, transfer, or convey any of the IP/Austria Assets, and to benefit from any relevant privileges. The IP/Austria Assets Trustee shall use commercially reasonable efforts to provide prior notice to and shall make itself or its professionals reasonably available for discussion with Magna and counsel to the Fisker Owners Association regarding any proposed sale, transfer, or conveyance of any IP Assets. As set forth in the IP/Austria Trust Agreement, all attorney-client privileges, work product protections and other privileges, immunities or protections from disclosure (the "**IP/Austria Privileges**") held by any one or more of the Debtors (including any prepetition or post-petition committee or subcommittee of the board of directors or equivalent governing body of any of the Debtors and their predecessors) and the Committee (collectively, the "**IP/Austria Privilege Transfer Parties**") related in any way to the IP/Austria Assets and the purpose of the IP/Austria Trust (the "**IP/Austria Transferred Privileged Information**") are hereby transferred and assigned to the IP/Austria Trust. The IP/Austria Transferred Privileged Information shall include documents and information of all manner, whether oral, written, or digital, and whether or not previously disclosed or discussed. For the avoidance of doubt, the IP/Austria Privileges shall include any right to preserve or enforce a privilege that arises from any joint defense, common interest, or similar agreement involving any of the IP/Austria Privilege Transfer Parties related in any way to the IP/Austria Assets and the purpose of the IP/Austria Trust.

No sale, transfer, or other conveyance of any of the IP Assets, in whole or in part, shall be effected in favor of the IP/Austria Assets Trust or any other or subsequent entity or person, which amends, impairs, modifies, or limits the rights in and to the intellectual property of the Debtors that was licensed to American Lease LLC pursuant to and in accordance with the terms of the Fleet Sales Agreement, any other Transaction Documents (in each case, as defined in the Fleet Sale Order), and the Fleet Sale Order. The validity and effectiveness of the Fleet Sales Agreement and any other Transaction Documents (in each case, as defined in the Fleet Sale Order), including the licensed rights thereunder, are and shall be expressly acknowledged by the terms of any agreement, documents, instruments, and orders with respect to any sale, transfer, or other conveyance of any of the IP Assets, such that the sale, transfer, or other conveyance shall be subject in all respects to such rights of American Lease LLC.

Except as otherwise set forth in this Plan and to the extent permitted by applicable law, the IP/Austria Assets Trustee, in the performance of his or her duties hereunder, shall be defended, held harmless and indemnified from time to time by the IP/Austria Assets Trust (and not any other person) against any and all losses, claims, costs, expenses and liabilities to which the IP/Austria Assets Trustee may be subject by reason of his or her execution of duties pursuant to the discretion, power and authority conferred on the IP/Austria Assets Trustee by the Plan or the Confirmation Order; *provided*, *however*, that the indemnification obligations arising pursuant to this Section shall not indemnify the IP/Austria Assets Trustee for any actions taken by such members which constitute fraud, gross negligence, willful misconduct, criminal conduct or intentional breach of the Plan or the Confirmation Order. Satisfaction of any obligation of the IP/Austria Assets Trust arising pursuant to the terms of this Section shall be payable only from the assets of the IP/Austria Assets Trust, including, if available, any insurance maintained by the IP/Austria Assets Trust. The indemnification provisions contained in this Section shall remain available to and be binding upon any future IP/Austria Assets Trustee or the estate of any decedent.

51

4.      Compensation of the IP/Austria Assets Trustee

The IP/Austria Assets Trustee shall be entitled to reasonable compensation in an amount consistent with that of similar functionaries in similar types of bankruptcy proceedings and as disclosed in the Plan Supplement.

5.      Retention of Professionals by the IP/Austria Assets Trustee

The IP/Austria Assets Trustee may retain and reasonably compensate counsel and other professionals to assist in its duties as IP/Austria Assets Trustee on such terms as the IP/Austria Assets Trustee deems appropriate without Bankruptcy Court approval.  The IP/Austria Assets Trustee may retain any professional who represented parties in interest in the Chapter 11 Cases.

6.      Tax Treatment; No Successor in Interest

The IP/Austria Assets Trust (excluding any Disputed Claims Reserve) is intended to be treated for U.S. federal income tax purposes as a liquidating trust described in Treasury Regulation section 301.7701-4(d).  Pursuant to the IP/Austria Assets Trust Agreement, all relevant parties shall treat, for U.S. federal income tax purposes, the transfer of the IP/Austria Assets Trust Assets (which, for the avoidance of doubt, includes the Net Proceeds of Estate Claims and Non-IP Assets paid to the IP/Austria Assets Trust, and the IP/Austria Assets Trust's right thereto, pursuant to Article VIII.E.2 and Article VIII.E.3) by the Debtors to the IP/Austria Assets Trust (a) in part as the transfer of Assets, subject to any liabilities of the Debtors or the IP/Austria Assets Trust payable from the proceeds of such Assets, by the Debtors to the holders of Allowed Secured Notes Claims, followed by the transfer of such Assets (subject to such liabilities) by such holders to the IP/Austria Assets Trust in exchange for the IP/Austria Assets Trust Units, and (b) in part as the transfer of such Assets by the Debtors to one or more Disputed Claims Reserves, and to the extent permitted by applicable law, all relevant parties shall report consistently for state and local income tax purposes. Notwithstanding the foregoing, in the event of a final determination under section 1313(a) of the Internal Revenue Code that the IP/Austria Assets Trust does not qualify as a grantor trust, the IP/Austria Assets Trust Beneficiaries and the IP/Austria Assets Trustee intend that the IP/Austria Assets Trust (excluding any Disputed Claims Reserve) be treated as a partnership for U.S. federal income tax purposes and will take all actions reasonably necessary to cause the IP/Austria Assets Trust (excluding any Disputed Claims Reserve) to be treated as such a partnership.

7.      Disputed Claims Reserves

The IP/Austria Assets Trustee shall treat each Disputed Claims Reserve as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9 (and make any appropriate elections consistent with such tax treatment).  The IP/Austria Assets Trustee shall be the administrator of the Disputed Claims Reserves within the meaning of Treasury Regulation section 1.468B-9(b)(2) and shall be responsible for all tax reporting and withholding required by the Disputed Claims Reserves. Pursuant to Treasury Regulation section 1.468B-9, no holder of a Claim will be treated as the grantor or deemed owner of any asset reserved for Disputed Claims until such holder receives or is allocated an interest in such asset. The IP/Austria Assets Trustee will file all Tax returns on a basis consistent with the treatment of the IP/Austria Assets Trust in

part as a liquidating trust described in Treasury Regulation section 301.7701-4(d) (and grantor trust pursuant to Treasury Regulation section 1.671-l(a)) and in part as one or more Disputed Claims Reserves taxed as disputed ownership funds, and will pay all taxes imposed on the IP/Austria Assets Trust (including any taxes imposed on any Disputed Claims Reserve) from IP/Austria Assets Trust Assets (although any taxes imposed on any Disputed Claims Reserve will be paid out of such Disputed Claims Reserve and not out of general assets held by the IP/Austria Assets Trust).

8.    Dissolution of the IP/Austria Assets Trust

The IP/Austria Assets Trustee and the IP/Austria Assets Trust shall be discharged or dissolved, as the case may be, at such time as (i) all IP/Austria Assets Trust Assets have been liquidated and (ii) all distributions required to be made by the IP/Austria Assets Trustee under the Plan have been made, but in no event shall the IP/Austria Assets Trust be dissolved later than five (5) years from the Effective Date unless the Bankruptcy Court, upon motion within the six (6) month period prior to the fifth (5th) anniversary of the Effective Date (and, in the case of any extension, within six (6) months prior to the end of such extension), determines that a fixed period extension (not to exceed three (3) years, together with any prior extensions, absent a favorable letter ruling from the IRS providing that any further extension would not adversely affect the status of the IP/Austria Assets Trust as a liquidating trust for U.S. federal income tax purposes) is necessary to facilitate or complete the recovery and liquidation of the assets of the IP/Austria Assets Trust.

9.    Securities Exempt

The issuance of any beneficial interests of the IP/Austria Assets Trust satisfies the requirements of section 1145 of the Bankruptcy Code and, therefore, such issuance is exempt from registration under the Securities Act, as amended, and any state or local law requiring registration.

B.    *Liquidating Trust*

1.    Purpose of Liquidating Trust

The Liquidating Trust shall be established for the sole purpose of liquidating and distributing the Liquidating Trust Assets, in accordance with Treasury Regulation section 301.7701-4(d) and as a "grantor trust" for U.S. federal income tax purposes, pursuant to sections 671 through 679 of the Internal Revenue Code (excluding any Disputed Claims Reserve), with no objective to continue or engage in the conduct of a trade or business except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Liquidating Trust, and without effect to its status as a "liquidating trust" for U. S. federal income tax purposes. The Liquidating Trust shall be governed by the Plan and the Liquidating Trust Agreement. The Liquidating Trust Agreement shall contain provisions customary to trust agreements utilized in comparable circumstances, including any and all provisions necessary to ensure the continued treatment of the Liquidating Trust (excluding any Disputed Claims Reserve) as a grantor trust and the Liquidating Trust Beneficiaries as the grantors and owners thereof for U.S. federal income tax purposes. The Liquidating Trust Agreement may provide powers, duties, and authorities in addition to those explicitly stated herein, but only to the extent that such powers, duties, and authorities are for the

primary purpose of receiving all Liquidating Trust Assets and distributing any such assets pursuant to the Plan.

    2.    <u>Liquidating Trust Assets</u>

On the Effective Date, the Debtors and the Liquidating Trustee shall execute the Liquidating Trust Agreement and shall take all steps necessary to establish the Liquidating Trust in accordance with the Plan and for the benefit of the Liquidating Trust Beneficiaries. Additionally, on the Effective Date, the Debtors shall irrevocably transfer and shall be deemed to have irrevocably transferred to the Liquidating Trust all of the Debtors' Estates' rights, title, and interest in and to all of the Liquidating Trust Assets and, in accordance with section 1141 of the Bankruptcy Code, the Liquidating Trust Assets shall automatically vest in the Liquidating Trust free and clear of all claims, liens, encumbrances, or interests, subject to the terms of this Plan (including Article VIII.B.3) and the Liquidating Trust Agreement. The act of transferring the Liquidating Trust Assets to the Liquidating Trust shall not be construed to destroy or limit any such assets or rights or be construed as a waiver of any right, and such rights may be asserted by the Liquidating Trust as if the asset or right was still held by the Debtors.

    3.    <u>Role of the Liquidating Trustee</u>

In furtherance of and consistent with the purpose of the Liquidating Trust and the Plan, the Liquidating Trustee shall: (i) hold the assets of the Liquidating Trust for the benefit of the Liquidating Trust Beneficiaries; (ii) have the power and authority to hold, manage, sell and distribute Cash or non-Cash assets of the Liquidating Trust obtained through the exercise of its power and authority in accordance with the Plan; (iii) have the power and authority to investigate, prosecute and resolve, in the name of the Debtors and/or the name of the Liquidating Trustee, any Preserved Estate Claims or Non-IP Assets and to enter into arrangements to fund such litigation with third parties and/or certain holders of beneficial interests in such Liquidating Trust on such terms as are determined to be reasonable and in the interest of the Liquidating Trust (*provided*, that any such funding with respect to the Preserved Estate Claims shall have recourse solely to the proceeds of the Preserved Estate Claims); (iv) have the power and authority to perform such other functions as are provided in the Plan; and (v) have the power and authority to administer the closure of the Chapter 11 Cases. The Liquidating Trustee shall be responsible for all decisions and duties with respect to the Liquidating Trust and the Liquidating Trust Assets. In all circumstances, the Liquidating Trustee shall act in the best interests of all beneficiaries of the Liquidating Trust and in furtherance of the purpose of the Liquidating Trust.

The Liquidating Trustee shall file tax returns for the Liquidating Trust (excluding any Disputed Claims Reserve) as a grantor trust pursuant to Treasury Regulations Section 1.671-4(a) and in accordance with this Plan and comply with any other applicable tax reporting obligations imposed on the Liquidating Trust. The Liquidating Trust's taxable income, gain, loss, deduction, or credit (other than such items attributable to any Disputed Claims Reserve) will be allocated to each of the Liquidating Trust Beneficiaries in accordance with their relative beneficial interest in the Liquidating Trust.

The Liquidating Trust shall be given access by the Debtors and their professionals (at the expense of the Liquidating Trust with respect to any expenditure of resources that is more than de

minimis) to all information the Liquidating Trustee determines is necessary to prosecute, investigate, sell, transfer, or convey any of the Preserved Estate Claims or the Non-IP Assets and to benefit from any relevant privileges.  As set forth in the Liquidating Trust Agreement, all attorney-client privileges, work product protections and other privileges, immunities or protections from disclosure (the "**LT Privileges**") held by any one or more of the Debtors (including any prepetition or post-petition committee or subcommittee of the board of directors or equivalent governing body of any of the Debtors and their predecessors) and the Committee (collectively, the "**LT Privilege Transfer Parties**") related in any way to the Liquidating Trust Assets and the purpose of the Liquidating Trust (the "**LT Transferred Privileged Information**") are hereby transferred and assigned to the Liquidating Trust.  The LT Transferred Privileged Information shall include documents and information of all manner, whether oral, written, or digital, and whether or not previously disclosed or discussed.  For the avoidance of doubt, the LT Privileges shall include any right to preserve or enforce a privilege that arises from any joint defense, common interest, or similar agreement involving any of the LT Privilege Transfer Parties related in any way to the Liquidating Trust Assets and the purpose of the Liquidating Trust.

As soon as possible after the Effective Date, the Liquidating Trustee shall make (or cause to be made) a good faith valuation of the assets of the Liquidating Trust, and such valuation shall be used consistently by all parties for U.S. federal income tax purposes.

Except as otherwise set forth in this Plan and to the extent permitted by applicable law, the Liquidating Trustee, in the performance of his or her duties hereunder, shall be defended, held harmless and indemnified from time to time by the Liquidating Trust (and not any other person) against any and all losses, claims, costs, expenses and liabilities to which the Liquidating Trustee may be subject by reason of his or her execution of duties pursuant to the discretion, power and authority conferred on the Liquidating Trustee by the Plan or the Confirmation Order; *provided*, *however*, that the indemnification obligations arising pursuant to this Section shall not indemnify the Liquidating Trustee for any actions taken by such members which constitute fraud, gross negligence, willful misconduct, criminal conduct or intentional breach of the Plan or the Confirmation Order.  Satisfaction of any obligation of the Liquidating Trust arising pursuant to the terms of this Section shall be payable only from the assets of the Liquidating Trust, including, if available, any insurance maintained by the Liquidating Trust.  The indemnification provisions contained in this Section shall remain available to and be binding upon any future Liquidating Trustee or the estate of any decedent.

4.      Compensation of the Liquidating Trustee

The Liquidating Trustee shall be entitled to reasonable compensation in an amount consistent with that of similar functionaries in similar types of bankruptcy proceedings and as disclosed in the Plan Supplement.

5.      Retention of Professionals by the Liquidating Trustee

The Liquidating Trustee may retain and reasonably compensate counsel and other professionals to assist in its duties as Liquidating Trustee on such terms as the Liquidating Trustee deems appropriate without Bankruptcy Court approval.  The Liquidating Trustee may retain any professional who represented parties in interest in the Chapter 11 Cases.

6.      Tax Treatment; No Successor in Interest

The Liquidating Trust (excluding any Disputed Claims Reserve) is intended to be treated for U.S. federal income tax purposes as a liquidating trust described in Treasury Regulation section 301.7701-4(d).  Pursuant to the Liquidating Trust Agreement, all relevant parties shall treat, for U.S. federal income tax purposes, the transfer of the Liquidating Trust Assets (which, for the avoidance of doubt, includes the Net Proceeds of the IP/Austria Assets paid to the Liquidating Trust, and the Liquidating Trust's rights thereto, pursuant to Article VIII.E.1) by the Debtors to the Liquidating Trust (a) in part as the transfer of Assets, subject to any liabilities of the Debtors or the Liquidating Trust payable from the proceeds of such Assets, by the Debtors to the holders of Allowed General Unsecured Claims, followed by the transfer of such Assets (subject to such liabilities) by such holders to the Liquidating Trust in exchange for the Liquidating Trust Units, and (b) in part as the transfer of such Assets by the Debtors to one or more Disputed Claims Reserves, and to the extent permitted by applicable law, all relevant parties shall report consistently for state and local income tax purposes. Notwithstanding the foregoing, in the event of a final determination under section 1313(a) of the Internal Revenue Code that the Liquidating Trust does not qualify as a grantor trust, the Liquidating Trust Beneficiaries and the Liquidating Trustee intend that the Liquidating Trust (excluding any Disputed Claims Reserve) be treated as a partnership for U.S. federal income tax purposes and will take all actions reasonably necessary to cause the Liquidating Trust (excluding any Disputed Claims Reserve) to be treated as such a partnership.

7.      Disputed Claims Reserves

The Liquidating Trustee shall treat each Disputed Claims Reserve as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9 (and make any appropriate elections consistent with such tax treatment).  The Liquidating Trustee shall be the administrator of the Disputed Claims Reserves within the meaning of Treasury Regulation section 1.468B-9(b)(2) and shall be responsible for all tax reporting and withholding required by the Disputed Claims Reserves. Pursuant to Treasury Regulation section 1.468B-9, no holder of a Claim will be treated as the grantor or deemed owner of any asset reserved for Disputed Claims until such holder receives or is allocated an interest in such asset. The Liquidating Trustee will file all Tax returns on a basis consistent with the treatment of the Liquidating Trust in part as a liquidating trust described in Treasury Regulation section 301.7701-4(d) (and grantor trust pursuant to Treasury Regulation section 1.671-l(a)) and in part as one or more Disputed Claims Reserves taxed as disputed ownership funds, and will pay all taxes imposed on the Liquidating Trust (including any taxes imposed on any Disputed Claims Reserve) from Liquidating Trust Assets (although any taxes imposed on any Disputed Claims Reserve will be paid out of such Disputed Claims Reserve and not out of general assets held by the Liquidating Trust).

8.      Dissolution of the Liquidating Trust

The Liquidating Trustee and the Liquidating Trust shall be discharged or dissolved, as the case may be, at such time as (i) all Liquidating Trust Assets have been liquidated and (ii) all distributions required to be made by the Liquidating Trustee under the Plan have been made, but in no event shall the Liquidating Trust be dissolved later than five (5) years from the Effective Date unless the Bankruptcy Court, upon motion within the six (6) month period prior to the fifth

(5th) anniversary of the Effective Date (and, in the case of any extension, within six (6) months prior to the end of such extension), determines that a fixed period extension (not to exceed three (3) years, together with any prior extensions, absent a favorable letter ruling from the IRS providing that any further extension would not adversely affect the status of the Liquidating Trust as a liquidating trust for U.S. federal income tax purposes) is necessary to facilitate or complete the recovery and liquidation of the assets of the Liquidating Trust.

9.      Securities Exempt

The issuance of any beneficial interests of the Liquidating Trust satisfies the requirements of section 1145 of the Bankruptcy Code and, therefore, such issuance is exempt from registration under the Securities Act, as amended, and any state or local law requiring registration.

C.      *Coordination between Trusts*

The Liquidating Trustee and the IP/Austria Assets Trustee shall consult with each other regarding (a) key decisions to be made with respect to the IP/Austria Assets and the Liquidating Trust Assets and (b) the Liquidating Trustee's administration of Administrative Claims, Tax Claims, and Other Priority Claims, including any analysis and decision with respect to potential objections to, or the potential Allowance or settlement of, any such Claims that are not Allowed as of the Effective Date.  The Liquidating Trustee and the IP/Austria Assets Trustee shall provide information and reasonable assistance to each other in the performance of their respective duties, including reasonable periodic reporting. The Liquidating Trustee and IP/Austria Assets Trustee shall provide to the other (as applicable) advanced written notice prior to entering any material sale of trust assets or entering into any agreement to settle Preserved Estate Claims or Austria Assets or First Tier Claims.

The IP/Austria Assets Trustee's decision to pursue, not pursue, release, abandon, and/or settle the Austria Assets shall be made in good faith.

The Liquidating Trustee and the IP/Austria Assets Trustee shall not make distributions to Liquidating Trust Beneficiaries or the IP/Austria Assets Trust Beneficiaries, respectively, until the earlier of (a) six (6) months after the Effective Date, or (b) such earlier date as may be agreed to by the Liquidating Trustee and the IP/Austria Assets Trustee.

D.      *Liquidating Trust's Open Vehicle Stop-Sale Holds Expenses*

The Liquidating Trustee shall take all actions reasonably practicable to address or facilitate the remediation of the Stop-Sale Holds (other than in connection with vehicles sold pursuant to the Fleet Sale) as of the Effective Date, including payment of Pre-Effective Date Owner Reimbursement Claims and Post-Effective Date Labor Costs, and to comply with the Debtors' express obligations under the Fleet Sales Agreement and Fleet Sale Order (solely as and to the extent required thereunder).  In each case, the Liquidating Trustee shall not be required to take any such action or make any payment (notwithstanding anything to the contrary herein) to the extent that (a) taking such action would be expected, in the reasonable discretion of the Liquidating Trustee, to cause the Liquidation Trustee or the Liquidation Trustee to incur liability to vehicle owners or under any applicable regulation or statute (including due to the Liquidating Trust's inability to obtain sufficient insurance coverage, as determined by the Liquidating Trustee in its

57

discretion) or (b) there are insufficient funds in the Liquidating Trustee's possession from the Liquidating Trust Additional Amount and/or the Liquidating Trust Additional Funding Amount to pay for any such action.

The cost of the foregoing (including, for the avoidance of doubt, payment of Pre-Effective Date Owner Reimbursement Claims and Post-Effective Date Labor Costs and compliance with the Debtors' express obligations under the Fleet Sales Agreement and Fleet Sale Order (solely as and to the extent required thereunder)) to the Liquidating Trust shall not initially exceed $750,000 (the "**Liquidating Trust Additional Amount**"). Notwithstanding whether the Secured Noteholder Professional Fees have been paid in full or anything to the contrary herein, the Liquidating Trust Additional Amount shall be funded on the Effective Date; *provided*, that, to the extent Cash on hand on the Effective Date is insufficient to fund the Liquidating Trust Additional Amount in full, the unfunded portion of the Liquidating Trust Additional Amount shall be funded first by the Liquidating Trust from Cash and other proceeds of Non-IP Assets and, thereafter, from Proceeds of Estate Claims and, solely to the extent the Liquidating Trust does not have funds to fund the Wind Down Amount, then by the IP/Austria Assets Trust from proceeds of IP/Austria Assets, in each case, subject to the Reimbursement Mechanics. Following the Effective Date, any increase to the Liquidating Trust Additional Amount to continue addressing or facilitating the remediation of the Stop-Sale Holds in compliance with the Safety Act shall be agreed to by the IP/Austria Assets Trustee and the Liquidating Trustee (for the avoidance of doubt, each in its sole discretion) (any such increase(s), the "**Liquidating Trust Additional Funding Amount**").

To the extent any Stop-Sale Holds exist as of the Effective Date, the IP/Austria Assets Trustee hereby grants the Liquidating Trustee and/or its designee a right to use the IP Assets on a non-exclusive, irrevocable, fully sublicensable, fully paid up, and royalty free basis (other than with respect to any costs associated with the Liquidating Trustee's and/or its designee's use of such IP Assets) to the extent necessary (i) to provide updates to the Debtors' vehicles and (ii) address or facilitate the remediation of any Stop-Sale Holds that exist as of the Effective Date, and otherwise ensure vehicles sold by the Debtors remain safe and operable, in each case, until such Stop-Sale Holds have been reasonably addressed.

1.   Pre-Effective Date Owner Reimbursement Claims

On and following the Effective Date, holders of Pre-Effective Date Owner Reimbursement Claims may submit to the Liquidating Trustee satisfactory proof of the reasonable costs directly paid by such holder prior to the Effective Date that gave rise to the holder's Pre-Effective Date Owner Reimbursement Claim ("**Pre-Effective Date Owner Reimbursement Claim Notice**"). Detailed instructions for submitting a Pre-Effective Date Owner Reimbursement Claim Notice will promptly be issued by the Liquidating Trustee following the Effective Date. Promptly following the Liquidating Trustee's receipt and verification of any Pre-Effective Date Owner Reimbursement Claim Notice, the Liquidating Trustee shall issue payment to the claimant that submitted such Notice of Pre-Effective Date Owner Reimbursement Claim in satisfaction of such claimant's Pre-Effective Date Owner Reimbursement Claim to the extent there are sufficient funds in the Liquidating Trustee's possession from the Liquidating Trust Additional Amount and/or the

Liquidating Trust Additional Funding Amount to satisfy such amounts.

    2.    <u>Post-Effective Date Recall-Related Repairs Related to the Door Handle Stop-Sale Hold and the June 26 Stop-Sale Hold</u>

On and following the Effective Date, owners of the Debtors' vehicles (other than American Lease LLC and holders of Pre-Effective Date Owner Reimbursement Claims) may contact an authorized dealer or other service provider (collectively, a "**Service Provider**") to schedule repairs in connection with the Door Handle Stop-Sale Hold and/or the June 26 Stop-Sale Hold. Thereafter, the Service Provider may submit a service request (a "**Service Request**") to the Liquidating Trustee informing the Liquidating Trustee of such owner's desire to receive repairs. Detailed instructions for submitting a Service Request will promptly be issued to the Service Providers by the Liquidating Trustee following the Effective Date. Within seven (7) days of the Liquidating Trustee's receipt and verification of a Service Request, the Liquidating Trustee shall issue payment to the applicable Service Provider for the reasonable cost of the repair(s) sought in the Service Request (the "**Post-Effective Date Labor Costs**") to the extent there are sufficient funds in the Liquidating Trustee's possession from the Liquidating Trust Additional Amount and/or the Liquidating Trust Additional Funding Amount to satisfy such amounts.

E.    *Payment of Certain Proceeds of Trust Assets*

    1.    <u>IP/Austria Assets</u>

The IP/Austria Assets Trustee, on behalf of the IP/Austria Assets Trust, shall pay to the Liquidating Trust (a) 15% of all Net Proceeds of IP/Austria Assets until the total Net Proceeds of IP/Austria Assets equals $40 million, and (b) 50% of all Net Proceeds of IP/Austria Assets to the extent the total Net Proceeds of IP/Austria Assets exceeds $40 million, in each case as soon as reasonably practicable after receipt of Net Proceeds of IP/Austria Assets (and in no event later than each date on which Net Proceeds of IP/Austria Assets are distributed to IP/Austria Assets Trust Beneficiaries). The portion of Net Proceeds of IP/Austria Assets due to the Liquidating Trust under this Article VIII.E.1 shall be deemed to be held by the IP/Austria Assets Trust in trust for the benefit of the Liquidating Trust until such time as such amounts are paid to the Liquidating Trust.

    2.    <u>Preserved Estate Claims</u>

The Liquidating Trustee, on behalf of the Liquidating Trust, shall pay to the IP/Austria Assets Trust (a) 15% of all Net Proceeds of Estate Claims until the total Net Proceeds of Estate Claims equals $40 million, and (b) 50% of all Net Proceeds of Estate Claims to the extent the total Net Proceeds of Estate Claims exceeds $40 million, in each case as soon as reasonably practicable after receipt of Net Proceeds of Estate Claims (and in no event later than each date on which Net Proceeds of Estate Claims are distributed to Liquidating Trust Beneficiaries). The portion of Net Proceeds of Estate Claims due to the IP/Austria Assets Trust under this Article VIII.E.2 shall be deemed to be held by the Liquidating Trust in trust for the benefit of the IP/Austria Assets Trust until such time as such amounts are paid to the IP/Austria Assets Trust.

3.      Non-IP Assets

The Liquidating Trustee, on behalf of the Liquidating Trust, shall pay to the IP/Austria Assets Trust 50% of all Net Proceeds of Non-IP Assets as soon as reasonably practicable after receipt of Net Proceeds of Non-IP Assets (and in no event later than each date on which Net Proceeds of Non-IP Assets are distributed to Liquidating Trust Beneficiaries). The portion of Net Proceeds of Non-IP Assets due to the IP/Austria Assets Trust under this Article VIII.E.3 shall be deemed to be held by the Liquidating Trust in trust for the benefit of the IP/Austria Assets Trust until such time as such amounts are paid to the IP/Austria Assets Trust; *provided*, in the event that any amount escrowed for Committee's Professionals is unused or not otherwise applied to satisfy the Professional Fee Claims of the Committee's Professionals, such amount shall be transferred to the Liquidating Trust and deemed Liquidating Trust Assets (and shall not be shared with the IP/Austria Assets Trust).

# ARTICLE IX.
# PLAN DISTRIBUTION PROVISIONS

A.      *Plan Distributions*

The Debtors, the Liquidating Trustee or a designated agent (which agent must be reasonably acceptable to the Committee and the Secured Noteholder) shall make all Plan Distributions to the Liquidating Trust Beneficiaries and holders of Allowed Administrative Claims, Allowed Tax Claims, Allowed Other Priority Claims, and Allowed Other Secured Claims in accordance with the Plan and the Liquidating Trust Agreement. The IP/Austria Assets Trustee or its designated agent (which agent must be reasonably acceptable to the Committee) shall make all Plan Distributions to the IP/Austria Assets Trust Beneficiaries in accordance with the Plan and the IP/Austria Assets Trust Agreement. In the event a Plan Distribution shall be payable on a day other than a Business Day, such Plan Distribution shall instead be paid on the immediately succeeding Business Day but shall be deemed to have been made on the date otherwise due. Except as otherwise provided herein, Plan Distributions shall be made to the holders of Allowed Claims as reflected in the registry of Claims maintained by the Claims and Noticing Agent, on the Effective Date. On the Effective Date, the Liquidating Trustee shall also distribute Liquidating Trust Units to the holders of any General Unsecured Claims that constitute Allowed Claims as of such date and shall make further distributions of such beneficial interests to holders of any other General Unsecured Claims that have not become Allowed Claims as of the Effective Date, promptly after any of such General Unsecured Claims have been Allowed. On the Effective Date, the IP/Austria Assets Trustee shall also distribute IP/Austria Assets Trust Units to the Secured Noteholder on account of its Allowed Secured Notes Claims.

B.      *Disputed Claims Reserves*

On the Effective Date or as soon thereafter as is practicable, the Liquidating Trustee and the IP/Austria Assets Trustee may establish and administer Disputed Claims Reserves for each Class or category, in the case of unclassified Claims, of Disputed Claims in accordance with the Liquidating Trust Agreement or the IP/Austria Assets Trust Agreement, as applicable. The Liquidating Trustee or IP/Austria Assets Trustee may reserve, in Cash, Liquidating Trust Units, or IP/Austria Assets Trust Units, as applicable, the expected recovery that such Disputed Claim

would receive if it were ultimately determined to be an Allowed Claim (or such lesser amount as may be determined or estimated by the Bankruptcy Court after notice and a hearing) with respect to each such Disputed Claim. For the avoidance of doubt, the Liquidating Trustee and IP/Austria Assets Trustee may administer the Disputed Claims Reserves by book entry.

The Cash, Liquidating Trust Units or IP/Austria Assets Trust Units in the Disputed Claims Reserves shall be held in trust for the benefit of the holders of Claims ultimately determined to be Allowed in each applicable Class or category, in the case of unclassified Claims. Each Disputed Claims Reserve shall be closed by the Liquidating Trustee and IP/Austria Assets Trustee, as applicable, when all Plan Distributions required to be made under this Plan to the holders of Disputed Claims that subsequently become Allowed have been made in accordance with the terms of this Plan and no Disputed Claims relating to such Disputed Claims Reserve remain. Upon closure of a Disputed Claims Reserve, all Cash and other property held in that Disputed Claims Reserve shall be transferred to the Liquidating Trust or the IP/Austria Assets Trust in accordance with the Plan, the IP/Austria Assets Trust Agreement, and the Liquidating Trust Agreement.

Notwithstanding any provision otherwise in the Plan and except as otherwise agreed by the relevant parties, no partial payments and no partial Distributions shall be made with respect to a Disputed Claim until all disputes in connection with such Disputed Claim have been resolved by settlement or Final Order. When a Disputed Claim becomes an Allowed Claim, the holder of such Allowed Claim shall thereupon become entitled to receive the Distributions in respect of such Claim, the same as though such Claim had been an Allowed Claim on the Effective Date.

C.     *Address for Delivery of Plan Distributions*

Subject to Bankruptcy Rule 9010, any Plan Distribution or delivery to a holder of an Allowed Claim shall be made at the last known address of such holder as set forth (i) in the Schedules, (ii) on the Proof of Claim filed by such holder, (iii) in any notice of assignment filed with the Bankruptcy Court with respect to such Claim pursuant to Bankruptcy Rule 3001(e), or (iv) in any notice served by such holder giving details of a change of address; *provided*, *however*, that with respect to syndicated bank debt or other similarly situated creditor groups, if requested by the agent bank, Plan Distributions may be made to the agent bank to forward to the participating banks in accordance with the applicable credit documents.

D.     *Undeliverable and Unclaimed Distributions Held by Disbursing Agent*

   1.     Holding of Undeliverable Distributions

If any Plan Distribution to a holder of an Allowed Claim is returned to the Liquidating Trust or IP/Austria Assets Trust as undeliverable, no further distributions will be made to such holder unless and until the Liquidating Trust or IP/Austria Assets Trust is notified by written certification of such holder's then-current address. Nothing contained in the Plan shall require the Liquidating Trust or IP/Austria Assets Trust to attempt to locate any holder of an Allowed Claim.

   2.     After Distributions Become Deliverable

On each Plan Distribution Date, the Liquidating Trustee and IP/Austria Assets Trustee will make all Plan Distributions that became deliverable to holders of Allowed Claims after the most

recent Plan Distribution Date; *provided*, *however,* that the Liquidating Trustee and the IP/Austria Assets Trustee may each establish a record date prior to each Plan Distribution Date, such that only Claims Allowed as of the record date will participate in such periodic Plan Distribution. Notwithstanding the foregoing, the Liquidating Trustee and the IP/Austria Assets Trustee reserves the right to postpone a Plan Distribution Date, if it determines a Plan Distribution on any Plan Distribution Date is uneconomical or unfeasible, or is otherwise unadvisable.

3.     Failure to Claim Undeliverable Distributions

Any holder of an Allowed Claim that does not assert its right to an undeliverable Plan Distribution prior to the date that is six months after the applicable Plan Distribution Date will be forever barred from asserting any such Claim against the Debtors, the Estates, the Liquidating Trust or IP/Austria Assets Trust, as applicable, and their respective property. In such cases, (a) the undeliverable Plan Distributions shall be deemed to be unclaimed property under section 347(b) of the Bankruptcy Code and vest in the Liquidating Trust or IP/Austria Assets Trust, as applicable, (b) the Allowed Claims with respect to such Plan Distributions shall be automatically cancelled, (c) the right of the holders entitled to those Plan Distributions shall be discharged and forever barred, and (d) the undeliverable Plan Distributions shall be reserved or distributed in accordance with the Plan and the Liquidating Trust Agreement or IP/Austria Assets Trust Agreement, as applicable.

E.     *Time Bar to Cash Payments*

Checks issued in respect of Allowed Claims shall be null and void if not presented within ninety (90) days after the date of issuance thereof.  Requests for reissuance of any voided check shall be made directly to the Liquidating Trustee or IP/Austria Assets Trustee, as applicable, by the holder of the Allowed Claim to whom such check was originally issued.  Any claim in respect of such a voided check shall be made within ninety (90) days after the date of issuance of such check.  If no request is made as provided in the preceding sentence, any claim in respect of such voided check shall be forever barred and any Cash held for payment on account of such voided check shall be deemed to be unclaimed property and shall vest in the Liquidating Trust or IP/Austria Assets Trust, as applicable, and deemed to be Liquidating Trust Assets or IP/Austria Assets Trust Assets, as applicable.

F.     *Manner of Payment under the Plan*

Unless the Entity receiving a Plan Distribution agrees otherwise, any Plan Distribution to be made in Cash under the Plan shall be made by check drawn on a domestic bank or by wire transfer from a domestic bank.  Cash payments to foreign creditors may, in addition to the foregoing, be made in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

G.     *Fractional Plan Distributions*

Notwithstanding anything to the contrary contained herein, no Plan Distributions of fractions of dollars will be made.  Fractions of dollars shall be rounded to the nearest whole unit (with any amount equal to or less than one-half dollar to be rounded down).

H.    *De Minimis Distributions*

Notwithstanding anything contrary contained herein, no Plan Distribution of less than one hundred dollars ($100.00) shall be made to the holder of any Claim unless a request therefor is made in writing to the Liquidating Trustee or IP/Austria Assets Trustee.  If no request is made as provided in the preceding sentence within ninety (90) days of the Effective Date, all such Plan Distributions shall be added to and constitute a portion of the Liquidating Trust Assets or IP/Austria Assets Trust Assets, as applicable.

I.    *Foreign Currency Exchange Rate*

Except as otherwise provided in a Bankruptcy Court order, as of the Effective Date, any Claim asserted in currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate for the applicable currency as published in *The Wall Street Journal, National Edition,* on the Petition Date.

J.    *No Postpetition Interest on Claims*

Unless otherwise specifically provided for in the Plan or the Confirmation Order, or required by applicable bankruptcy and non-bankruptcy law, post-petition interest shall not accrue or be paid on any Claims, including any Disputed Claims, against the Debtors, and no holder of a Claim against the Debtors shall be entitled to interest accruing on or after the Petition Date on any such Claim.  Plan Distributions made after the Effective Date to holders of Allowed Claims shall be deemed to have been made on the Effective Date and no interest shall accrue or be payable with respect to such Claims or any distribution related thereto.

K.    *Allocation Between Principal and Accrued Interest*

To the extent that any Allowed Claim entitled to a Plan Distribution from the Liquidating Trust or IP/Austria Assets Trust consists of indebtedness for U.S. federal income tax purposes and other amounts (such as accrued but unpaid interest thereon), such Plan Distribution shall be allocated first to the principal amount of the Claim (as determined for U.S. federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claim, to such other amounts, if any.

L.    *Single Satisfaction*

In no case shall the aggregate value of all property received or retained under the Plan on account of any Allowed Claim exceed 100 percent of the underlying Allowed Claim plus applicable interest, if any.

M.    *Claims Paid or Payable by Third Parties*

1.    Claims Paid by Third Parties

The Debtors, the IP/Austria Assets Trust or the Liquidating Trust, as applicable, shall reduce in full a Claim, and such Claim shall be hereby Disallowed without a Claim objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy

Court, to the extent that the holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor, the IP/Austria Assets Trust or the Liquidating Trust; *provided*, that the Debtors, IP/Austria Assets Trustee or the Liquidating Trustee, as applicable, shall provide twenty-one (21) days' notice to the holder prior to any disallowance of such Claim during which period the holder may object to such disallowance, and if the parties cannot reach an agreed resolution, the matter shall be decided by the Bankruptcy Court.  Subject to the last sentence of this paragraph, to the extent a holder of a Claim receives a Plan Distribution on account of such Claim and receives payment from a party that is not a Debtor, the IP/Austria Assets Trust, or the Liquidating Trust on account of such Claim, such holder shall, within fourteen (14) days of receipt thereof, repay or return the Plan Distribution to the extent the holder's total recovery on account of such Claim from the third party and under the Plan exceeds the total amount of such Claim. The failure of such holder to timely repay or return such Plan Distribution shall result in the holder owing the IP/Austria Assets Trust or the Liquidating Trust, as applicable, annualized interest at the federal judgment rate on such amount owed for each Business Day after the 14-day grace period specified above until the amount is repaid.

    2.    <u>Applicability of Insurance Contracts</u>

No Plan Distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' Insurance Contracts until the holder of such Allowed Claim has exhausted all remedies with respect to such Insurance Contract.  To the extent that one or more of the Debtors' Insurers agrees to satisfy in full or in part a Claim, then immediately upon such Insurers' agreement, the applicable portion of such Claim may be expunged without a Claim objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court; *provided*, that the Liquidating Trustee or the IP/Austria Assets Trustee, as applicable, shall provide twenty-one (21) days' notice to the holder of such Claim prior to any disallowance of such Claim during which period the holder may object to such disallowance, and if the parties cannot reach an agreed resolution, the matter shall be decided by the Bankruptcy Court.

Except as otherwise provided in the Plan, Plan Distributions to holders of Allowed Claims shall be in accordance with the provisions of any applicable Insurance Contract.  Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action under any Insurance Contract that the Debtors or any entity may hold against any other entity, including Insurers, nor shall anything contained herein constitute or be deemed a waiver by such Insurers of any defenses, including coverage defenses, held by such Insurers.

N.    *Distributions on Account of Subordinated Claims*

The allowance, classification, and treatment of all Allowed Claims and Allowed Equity Interests and the respective distributions on account thereof take into account and conform to the relative priority and rights of the Claims and Equity Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, the Debtors reserve the right to re-classify any Allowed Claim in accordance with any contractual, legal, or equitable subordination relating thereto.  Notwithstanding the foregoing, the Plan shall be without prejudice to the contractual,

legal, or equitable subordination rights (if any) in favor of any holder of any Allowed Claim, and any holder of any Allowed Claim (if any) subject to any such contractual, legal, or equitable subordination shall remit any distribution on account of such Claim to which such holder's Claim is subordinated in accordance with and to the extent required under any applicable contractual, legal, or equitable subordination obligation.

## ARTICLE X.
## PROCEDURES FOR RESOLVING AND TREATING DISPUTED CLAIMS

A.    *Allowance of Claims*

After the Effective Date, the Liquidating Trustee shall have any and all rights and defenses that the Debtors had with respect to any Claim immediately before the Effective Date, except with respect to any Claim deemed Allowed or satisfied, settled, released, and discharged under this Plan. All settled Claims approved prior to the Effective Date pursuant to a Final Order of the Bankruptcy Court pursuant to Bankruptcy Rule 9019 or otherwise shall be binding on all parties.

Any Claim that has been listed in the Schedules as disputed, contingent or unliquidated, and for which no proof of Claim has been timely filed by the applicable Claims Bar Date, is not considered Allowed and shall be expunged without further action and without any further notice to or action, order or approval of the Bankruptcy Court.

B.    *Prosecution of Disputed Claims*

Except as otherwise specifically provided in this Plan, the Debtors (in consultation with the Secured Noteholder and the Committee), before the Effective Date, and the Liquidating Trustee, after the Effective Date, subject to the Liquidating Trust Agreement, shall have the sole authority to: (a) file, withdraw or litigate to judgment, objections to Claims; (b) settle or compromise any Disputed Claim without any further notice to or action, order or approval of the Bankruptcy Court (other than a Professional Fee Claim); and (c) direct the Claims and Noticing Agent to adjust the claims register to reflect any such resolutions without any further notice to or action, order, or approval by the Bankruptcy Court.

Objections to Claims and Interests must be filed and served by no later than the Claims Objection Deadline (subject to such being extended by an order of the Bankruptcy Court). For the avoidance of doubt, the Claims Objection Deadline may be extended on multiple occasions.

C.    *Entitlement to Plan Distributions upon Allowance*

Notwithstanding any other provision of the Plan, no Plan Distribution shall be made with respect to any Claim to the extent it is a Disputed Claim, unless and until such Disputed Claim becomes an Allowed Claim, subject to the setoff rights as provided in Article XII.H.  When a Claim that is not an Allowed Claim as of the Effective Date becomes an Allowed Claim (regardless of when) the holder of such Allowed Claim shall thereupon become entitled to receive the Plan Distributions in respect of such Claim, the same as though such Claim had been an Allowed Claim on the Effective Date.

D.      *Amendments to Claims*

Except as provided herein, on or after the Effective Date, without the prior authorization of the Bankruptcy Court or the Liquidating Trustee, a Claim may not be Filed or amended and any such new or amended Claim Filed shall be hereby deemed Disallowed in full and expunged without any further notice to or action, order, or approval of the Bankruptcy Court.

E.      *Adjustment to Claims or Interests Without Objection*

Any Claim that has been paid, satisfied, or assumed, or any Claim that has been amended or superseded, may be adjusted or expunged on the claims register by the Debtors or the Liquidating Trustee (as applicable) without an objection to such Claim having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

F.      *Estimation of Claims*

The Debtors or the Liquidating Trustee, as applicable, may, at any time, request that the Bankruptcy Court estimate any respective Disputed Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether the Liquidating Trustee or the Debtors previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection.  In the event that the Bankruptcy Court estimates any Disputed Claim, that estimated amount will constitute the Allowed amount of such Claim for all purposes under the Plan.  All of the objection, estimation, settlement and resolution procedures set forth in the Plan are cumulative and not necessarily exclusive of one another.  Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.

## ARTICLE XI.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.      *Assumption and Rejection of Executory Contracts and Unexpired Leases*

    1.      Rejection of Executory Contracts and Unexpired Leases

On the Effective Date, all Executory Contracts and Unexpired Leases of the Debtors shall be rejected pursuant to the provisions of section 365 of the Bankruptcy Code, except: (i) any Executory Contracts and Unexpired Leases that are the subject of separate motions to reject, assume, or assume and assign filed pursuant to section 365 of the Bankruptcy Code by the Debtors before the entry of the Confirmation Order; (ii) contracts and leases (if any) listed in the Assumed Executory Contracts and Unexpired Leases Schedule, filed as an exhibit to the Plan Supplement (if applicable), and any supplements thereto; (iii) all Executory Contracts and Unexpired Leases (if any) assumed or assumed and assigned by order of the Bankruptcy Court entered before the Effective Date and not subsequently rejected pursuant to an order of the Bankruptcy Court; (iv) any Executory Contract or Unexpired Lease that is the subject of a dispute over the amount or manner of cure pursuant to the next section hereof and for which the Debtors make a motion to reject such contract or lease based upon the existence of such dispute filed at any time; (v) any

guaranty or similar agreement executed by a third party which guarantees repayment or performance of an obligation owed to the Debtors or to indemnify the Debtors; (vi) agreements with third parties regarding preservation of the confidentiality of documents produced by the Debtors; and (vii) the Insurance Contracts.  Any order entered post-confirmation by the Bankruptcy Court, after notice and a hearing, authorizing the rejection of an Executory Contract or Unexpired Lease shall cause such rejection to be a prepetition breach under sections 365(g) and 502(g) of the Bankruptcy Code, as if such relief was granted and such order was entered pre-confirmation.  The Debtors reserve the right to amend the Plan Supplement prior to the entry of the Confirmation Order.

2.    Effect of Rejection

Exclusion of a contract, lease, or other agreement from the exceptions from Article XI.A.1 shall constitute adequate and sufficient notice of (i) any Claims arising thereunder or related thereto shall be treated as General Unsecured Claims under the Plan and (ii) the Debtors are no longer bound by, or otherwise obligated to perform, any such obligations, transactions, or undertakings relating thereto or arising thereunder.  The Plan shall constitute a motion to reject such Executory Contracts and Unexpired Leases rejected pursuant to this section, and the Debtors shall have no liability thereunder except as is specifically provided in the Plan.  Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such rejections pursuant to section 365(a) of the Bankruptcy Code and a finding by the Bankruptcy Court that each such rejected agreement, Executory Contract or Unexpired Lease is burdensome, and that the rejection thereof is in the best interests of the Debtors and their Estates.

3.    Assumption and Assignment of Executory Contracts and Unexpired Leases

The Plan shall constitute a motion to assume or assume and assign such Executory Contracts and Unexpired Leases (if any) set forth in the Assumed Executory Contracts and Unexpired Leases Schedule filed as an exhibit to the Plan Supplement (if applicable) or as otherwise designated as being assumed or assumed and assigned in Article XI.A.1 and the Debtors shall have no liability thereunder for any breach of any such assumed and assigned Executory Contract or lease occurring after such assignment pursuant to section 365(k) of the Bankruptcy Code, except as is specifically provided in the Plan.  Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of any such assumption and assignment pursuant to sections 365(a), (b) and (f) of the Bankruptcy Code, and a finding by the Bankruptcy Court that the requirements of section 365(f) of the Bankruptcy Code have been satisfied.  Any non-Debtor counterparty to an agreement listed on the Assumed Executory Contracts and Unexpired Leases Schedule (if any) or otherwise designated as being assumed or assumed and assigned in Article XI.A.1 who disputes the assumption or assignment of an Executory Contract or Unexpired Lease must file with the Bankruptcy Court, and serve upon the Debtors and the Liquidating Trustee or IP/Austria Assets Trustee, as applicable, a written objection to the assumption or assumption and assignment, which objection shall set forth the basis for the dispute by the date that is fourteen (14) days following the filing of the Assumed Executory Contracts and Unexpired Leases Schedule. The failure to timely object shall be deemed a waiver of any and all objections to the assumption or assumption and assignment of Executory Contracts and Unexpired Leases (if any) as set forth in the Assumed Executory Contracts and Unexpired Leases Schedule filed as an exhibit to the as

set forth in the Plan Supplement (if applicable) or as otherwise designated as being assumed or assumed and assigned in Article XI.A.1.

B.      *Cure*

At the election of the Debtors, any monetary defaults under each Executory Contract and Unexpired Lease to be assumed under this Plan (if any) shall be satisfied pursuant to section 365(b)(1) of the Bankruptcy Code: (i) by payment of the default amount in Cash on the Effective Date or as soon thereafter as practicable; or (ii) on such other terms as agreed to by the parties to such Executory Contract or Unexpired Lease.  In the event of a dispute regarding: (x) the amount of any cure payments; (y) the ability to provide adequate assurance of future performance under the contract or lease to be assumed or assumed and assigned; or (z) any other matter pertaining to assumption or assignment, the cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order resolving the dispute and approving assumption or assignment, as applicable.  The Assumed Executory Contracts and Unexpired Leases Schedule filed as an exhibit to the Plan Supplement (if applicable) sets forth the Debtors' cure obligations for each agreement (if any) for which a cure obligation must be satisfied as a condition to the assumption or assumption and assignment of such agreement.  Any non-Debtor counterparty to an agreement listed in the Assumed Executory Contracts and Unexpired Leases Schedule (if any) who disputes the scheduled cure obligation must file with the Bankruptcy Court, and serve upon the Debtors, a written objection to the cure obligation, which objection shall set forth the basis for the dispute, the alleged correct cure obligation, and any other objection related to the assumption or assumption and assignment of the relevant agreement by the date that is fourteen (14) days following the filing of the Assumed Executory Contracts and Unexpired Leases Schedule.  If a non-Debtor counterparty fails to file and serve an objection that complies with the foregoing, the cure obligation (if any) set forth in the Plan Supplement shall be binding on the non-Debtor counterparty, and the non-Debtor counterparty shall be deemed to have waived any and all objections to the assumption or assumption and assignment of the relevant agreement as proposed by the Debtors.

C.      *Claims Arising from Rejection, Expiration, or Termination*

Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, if any, must be filed with the Bankruptcy Court by the later of thirty (30) days from (i) the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection and (ii) the effective date of the rejection of such Executory Contract or Unexpired Lease.  Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not filed within such time shall be Disallowed pursuant to the Confirmation Order, forever barred from assertion, and shall not be enforceable against, as applicable, the Debtors, the Estates, the Liquidating Trust or property of the foregoing parties, without the need for any objection by the Debtors or the Liquidating Trustee, as applicable, or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Schedules, if any, or a Proof of Claim to the contrary.  Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases shall be classified as General Unsecured Claims and shall be treated in accordance with Article VI.B.4, and such claims may be objected to in accordance with this Plan.

D.    *Contracts and Leases Entered Into After the Petition Date*

Executory Contracts and Unexpired Leases entered into or assumed by the Debtors after the Petition Date that are not assigned to a non-Debtor third-party, the Liquidating Trust, or the IP/Austria Assets Trust (or have not otherwise previously been assigned pursuant to a Final Order prior to the Effective Date) shall be considered repudiated by the Debtors as of the Effective Date, and the counterparties to such contracts, if they believe that such repudiation constitutes a breach of such contract or lease, must file a Proof of Claim within thirty (30) days of the Effective Date in accordance with this Plan or have their rights forever satisfied, settled, released, and discharged.

E.    *Insurance Contracts*

All Insurance Contracts to which any Debtor is a party as of the Effective Date shall be deemed to be and treated as Executory Contracts and shall be assumed by the applicable Debtor and assigned to the Liquidating Trust effective as of the Effective Date, and such Insurance Contracts shall continue in full force and effect after the Effective Date in accordance with their respective terms. Nothing in the Plan (including the assignment of any Insurance Contract to the Liquidating Trust pursuant to the Plan) shall impair, diminish, or otherwise adversely modify the enforceability of, or any coverage under, any Insurance Contracts.

F.    *Warranties*

Notwithstanding the rejection of any of the Debtors' Executory Contracts under this Plan or by separate motion, the Debtors and the Liquidating Trust, as applicable, shall retain and be entitled to enforce any warranties provided to, or for the benefit of, the Debtors under applicable federal or state law; *provided*, for the avoidance of doubt, that the foregoing does not include any warranties provided to, or for the benefit of, the Debtors pursuant to any contract that has been assumed and assigned (other than to the Liquidating Trust or IP/Austria Assets Trust) by order entered by the Bankruptcy Court on or before the Effective Date. For the avoidance of doubt, the Debtors are not assuming any warranty obligations of the Debtors or otherwise provided by the Debtors under any Executory Contract that is rejected pursuant to this Plan or otherwise rejected in the Chapter 11 Cases.

G.    *Reservation of Rights*

Nothing contained in the Plan or the Plan Supplement shall constitute an admission by the Debtors or any other party that any contract or lease is in fact an Executory Contract or Unexpired Lease or that any Debtor, the Liquidating Trust, or the IP/Austria Assets Trust has any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Liquidating Trustee shall have forty-five (45) days following entry of a Final Order resolving such dispute to alter the treatment of such contract or lease.

## ARTICLE XII.
## EFFECTS OF CONFIRMATION

A.    *Releases by the Debtors*

Except as otherwise provided herein, as of the Effective Date, for good and valuable consideration, including the obligations of the Debtors under this Plan and the contributions of the Released Parties to facilitate and implement this Plan, on and after the Effective Date, each Released Party is, and is deemed to be, hereby conclusively, absolutely, unconditionally, generally, individually, collectively, irrevocably, and forever released and discharged by the Debtors and their Estates, including any of their successors and assigns, and any and all other Entities who may purport to assert any Causes of Action, directly or derivatively, by, through, for, or because of the Debtors or their Estates from any and all Causes of Action whatsoever, including any derivative claims, asserted or assertable on behalf of the Debtors or their Estates, as applicable, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, contingent or noncontingent, in law, equity, contract, tort or otherwise, that the Debtors or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim against, or Equity Interest in, a Debtor, the Estates, or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' in- and out-of-court restructuring efforts, the Chapter 11 Cases, the Global Settlement, the Cash Collateral Orders, the Plan Documents, the 2025 Notes Documents, the Bridge Note Documents, the 2026 Notes, or any other instrument, contract, or document related to the foregoing, the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in this Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Equity Interests before or during the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, filing, pursuit, performance, administration, implementation, or consummation of the Chapter 11 Cases (including any payments, distributions or transfers in connection therewith), the Global Settlement, the Cash Collateral Orders, the Plan Documents, the 2025 Notes Documents, the Bridge Note Documents, or any other instrument, contract, or document related to the foregoing, or any other act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date.

For the avoidance of doubt and notwithstanding anything to the contrary in this Plan, the Confirmation Order, or any prior order of the Bankruptcy Court, the releases set forth in this Article XII.A and Article XII.B do NOT release: (a) Claims or Causes of Action of the Debtors against (i) the D&Os (including the Other Directors and Officers), (ii) all professionals, advisors, and attorneys advising the Debtors prior to the Petition Date other than those specifically identified in (e) through (h) of the definition of "Released Party" in Article I.A.146 of this Plan, (iii) any entity that directly or indirectly owned, held, or controlled any equity in the Debtors prior to the Petition Date (other than those specifically identified in clauses (c) through (p) the definition of "Released Party" in Article I.A.146 of this Plan), (iv) the Fisker Parties, (v) the Debtors' current or former direct or indirect non-Debtor subsidiaries, and (vi) the Debtors' current or former non-Debtor Affiliates (other than the Transaction Committee Chairman, and the CRO); and (b) (i) any Released Party from any Causes of Action arising from or related to any act or omission by such Released

70

Party that is determined in a Final Order to have constituted intentional fraud, willful misconduct, or gross negligence; (ii) any obligations of any party or Entity under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan; (iii) any rights or obligations under the Fleet Sales Agreement and Fleet Sale Order; (iv) any Causes of Action against any Entity that is not a Released Party; or (v) any Causes of Action against any Entity solely to the extent (1) such Causes of Action are asserted as defenses to affirmative prepetition Claims asserted by such Entity against the Debtors' Estates, and (2) such Claims have not been Allowed pursuant to a Final Order or expressly Allowed pursuant to this Plan.

For the avoidance of doubt, the releases of the holders of the Secured Notes Claims and its Related Parties (as defined in the Cash Collateral Orders) by the Cash Collateral Orders are reaffirmed and not affected or disturbed by the Plan.

B.    *Releases by Creditors and Equity Security Holders*

Except as otherwise provided in the Plan, as of the Effective Date and to the fullest extent authorized by applicable law, for good and valuable consideration, including the obligations of the Debtors under this Plan and the contributions of the Released Parties and the Other Directors and Officers to facilitate and implement this Plan, each (a) Releasing Party and (b) Other Director and Officer, conclusively, absolutely, unconditionally, generally, individually, collectively, irrevocably, and forever releases and discharges the (y) Released Parties and (z) Other Directors and Officers from any and all Causes of Action whatsoever, including any derivative claims, asserted or assertable on behalf of the Debtors or their Estates, as applicable, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, contingent or noncontingent, in law, equity, contract, tort or otherwise, that such Releasing Party would have been legally entitled to assert in its own right (whether individually or collectively) or on behalf of the holder of any Claim against, or Equity Interest in, a Debtor, the Estates, or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' in- and out-of-court restructuring efforts, the Chapter 11 Cases, the Global Settlement, the Cash Collateral Orders, the Plan Documents, the 2025 Notes Documents, the 2026 Notes, the Bridge Note Documents, or any other instrument, contract, or document related to the foregoing, the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in this Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Equity Interests before or during the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, filing, pursuit, performance, administration, implementation, or consummation of the Chapter 11 Cases (including any payments, distributions or transfers in connection therewith), the Global Settlement, the Cash Collateral Orders, the Plan Documents, the 2025 Notes Documents, the 2026 Notes, the Bridge Note Documents, or any other instrument, contract, or document related to the foregoing.

For the avoidance of doubt and notwithstanding anything to the contrary in this Plan, the Confirmation Order, or any prior order of the Bankruptcy Court, the releases set forth in this Article XII.B do NOT release: (a) (i) any Released Party from any Causes of Action arising from or related to any act or omission by such Released Party that is determined in

71

a Final Order to have constituted intentional fraud, willful misconduct, or gross negligence, (ii) any obligations of any party or Entity under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, (iii) any rights or obligations under the Fleet Sales Agreement and Fleet Sale Order, (iv) any Causes of Action against any Entity that is not a Released Party, (v) any Released Party that is a Class Action Defendant, solely with respect to the Class Action Claims asserted in the Class Action, and (vi) any Released Party from any Causes of Action asserted by (1) the Fisker Parties, (2) any D&O that is not an Other Director and Officer, (3) the Debtors' current or former direct or indirect non-Debtor subsidiaries, and/or (4) the Debtors' current or former non-Debtor Affiliates (other than the Other Directors and Officers, the Transaction Committee Chairman, and the CRO); (b) Magna or any Affiliate of Magna from any Chase Claim, *provided*, that, the foregoing release shall include releases by any Chase Purchaser in favor of Magna and any Affiliate of Magna to the extent such Chase Purchaser is a Releasing Party hereunder and Magna and any Affiliate of Magna shall be entitled to assert (and Chase shall be entitled to oppose) in any forum in which a Chase Claim is brought that the release given to Magna and any Affiliate of Magna by a Chase Purchaser hereunder is a defense to liability of such Chase Claim; or (c) Chase for any Claim of Magna or any Affiliate of Magna. Nothing in this Plan or the Confirmation Order shall affect or impair any defense (or counterclaim) that Magna or its Affiliates may have in connection with a Chase Claim.

C.    *Exculpation*

No Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from any Claim, obligation, Cause of Action or liability for any Claim related to any act or omission occurring between the Petition Date and the Effective Date in connection with or arising out of, the administration of the Chapter 11 Cases, the entry into the Cash Collateral Orders, the entry into the Liquidating Trust Agreement, the entry into IP/Austria Assets Trust Agreement, the negotiation and pursuit of this Plan, or the solicitation of votes for, or confirmation of, this Plan, the funding of this Plan, the consummation of this Plan, or the administration of this Plan or the property to be distributed under this Plan, and the issuance of securities or beneficial interests under or in connection with this Plan or the transactions contemplated by the foregoing, except for willful misconduct, gross negligence, or intentional fraud as finally determined by a Final Order, but in all respects such Exculpated Party shall be entitled to reasonably rely upon the advice of counsel with respect to its duties and responsibilities pursuant to this Plan. The Exculpated Parties have participated in compliance with the applicable provisions of the Bankruptcy Code with regard to the solicitation and distribution of the securities pursuant to the Plan, and are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule or regulation governing the solicitation of acceptances or rejections of this Plan or such distributions made pursuant to this Plan. Notwithstanding anything to the contrary in the foregoing or any other provision of the Plan, the foregoing provisions of this exculpation provision shall not operate to waive or release the rights of the Debtors or other parties in interest to enforce the Plan and the contracts, instruments, releases and other agreements or documents delivered under or in connection with the Plan and Plan Supplement or assumed pursuant to the Plan or assumed pursuant to Final Order of the Bankruptcy Court.

D.    *Injunctions*

Except as otherwise provided in the Plan or the Confirmation Order, as of the Confirmation Date, but subject to the occurrence of the Effective Date, all Entities who have held, hold or may hold Causes of Action, Claims or Equity Interests in the Debtors or the Estates that have been released or are subject to exculpation are, with respect to any such Causes of Action, Claims or Equity Interests, permanently enjoined, from and after the Effective Date, from: (i) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind (including any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Debtors, the Estates or any of their Assets, the Liquidating Trust, the IP/Austria Assets Trust, the Released Parties, the Exculpated Parties, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to any of the foregoing Entities or any property of any such transferee or successor; (ii) enforcing, levying, attaching (including any pre-judgment attachment), collecting or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree or order against the Debtors, the Estates or any of their Assets, the Liquidating Trust, the IP/Austria Assets Trust, the Released Parties, the Exculpated Parties or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing Entities, or any property of any such transferee or successor; (iii) creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the Debtors, the Estates or any of their Assets, the Liquidating Trust, the IP/Austria Assets Trust, the Released Parties, the Exculpated Parties, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing Entities, or any property of any such transferee or successor; (iv) commencing or continuing in any manner or in any place, any suit, action or other proceeding on account of or respecting any Claim, demand, liability, obligation, debt, right, Cause of Action, interest or remedy released or to be released pursuant to the Plan or the Confirmation Order, including the releases and exculpations provided under Article XII.A, Article XII.B and Article XII.C of the Plan; (v) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of this Plan to the fullest extent permitted by applicable law; and (vi) commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of this Plan; *provided*, *however*, that nothing contained herein shall preclude such persons from exercising their rights pursuant to and consistent with the terms of this Plan.  Each holder of an Allowed Claim or Allowed Equity Interest shall be deemed to have specifically consented to the injunctions set forth herein.  For the avoidance of doubt, the foregoing provisions of this Section shall not operate (i) to waive or release the rights of the Debtors or other parties in interest to enforce the Plan and the contracts, instruments, releases and other agreements or documents delivered under or in connection with the Plan and Plan Supplement or assumed pursuant to the Plan or assumed pursuant to Final Order of the Bankruptcy Court, (ii) to prevent Chase from pursuing an action in connection with a Chase Claim against any non-Debtor to the extent Chase deems it reasonably necessary to the pursuit of such Chase Claim against such non-Debtor; *provided*, that, the foregoing is without prejudice to the rights of any non-Debtor, including Magna and its Affiliates, to argue in any forum in which a Chase Claim is brought that it is not liable on account of any Chase Claim, including on the basis of a release given under the Plan, or (iii) to prevent Magna from asserting any Claim against Chase.

**For the avoidance of doubt and notwithstanding anything to the contrary in the Confirmation Order, the Plan, or any prior order of the Bankruptcy Court, effective upon the Effective Date, Chase or Magna or any Affiliate of Magna may name any of the Debtors (but not the Liquidating Trust or the IP/Austria Assets Trust) as defendants in an action related to a Chase Claim to the extent Chase or Magna or any Affiliate of Magna deem it reasonably necessary (a) to defend against such Chase Claim, or assert a counterclaim or crossclaim in connection with such Chase Claim, or (b) to Chase's pursuit of such Chase Claim against Magna or any Affiliate of Magna; provided, notwithstanding the foregoing, (i) the Debtors, the Liquidating Trust, the IP/Austria Assets Trust, the Liquidating Trustee, the IP/Austria Assets Trustee, and their respective Related Parties shall have no obligation (and shall suffer no adverse consequences (other than, solely with respect to the Debtors, a default judgment) for failing) to appear at any deposition, produce documents, appear in court in the capacity as defendant, or take any other action, in each case, in connection with such Chase Claim, and (ii) in the event a judgment is entered against any of the Debtors on account of any such Chase Claim, Chase, Magna and their respective Affiliates shall not (x) seek to collect any such judgment from the Liquidating Trust, the IP/Austria Assets Trust, the Liquidating Trustee, the IP/Austria Assets Trustee, and their respective Related Parties (other than the Debtors), or (y) take any other action that adversely affects any assets held or functions maintained by the Debtors for the purpose of implementing the Plan, including (1) the Professional Fee Escrow, (2) the First Tier Claims Reserve, (3) any Disputed Claims Reserve, or (4) any assets or functions of any Debtor relating to the Fleet Sale or any Stop-Sale Hold.**

E.      *Finality of Cash Collateral Orders*

On the Effective Date, (i) all Cash Collateral Stipulations shall (or, in the case of the Debtors, shall continue to) be effective and binding, in all circumstances and for all purposes, on (a) the Debtors and any and all of the Debtors' successors in interests and assigns, including the Liquidating Trust and the IP/Austria Assets Trust, and (b) all other Entities and each of their respective successors in interest and assigns; (ii) the Challenge Period (as defined in the Cash Collateral Orders) shall be deemed terminated as to all Entities and each of their respective successors in interests and assigns; and (iii) any and all asserted or potential Challenges (as defined in the Cash Collateral Orders) shall be forever waived, released, enjoined, and barred.  Without limiting the foregoing, this Plan shall be deemed an Acceptable Plan (as defined in the Sixth Interim Cash Collateral Order).

F.      *Satisfaction of Claims*

(a)      Subject to the occurrence of the Effective Date, as of the Effective Date, except as provided in the Plan, the Plan Distributions and rights afforded under the Plan and the treatment of Claims and Equity Interests under the Plan shall be in exchange for and in complete satisfaction of all Claims against the Debtors, and in satisfaction of all Equity Interests and the termination of Equity Interests in the Debtors.  Except as otherwise specifically provided in the Plan, as of the Effective Date any interest accrued on Claims against the Debtors from and after the Petition Date shall be cancelled.  Accordingly, except as otherwise provided in the Plan or the Confirmation Order, confirmation of the Plan shall, as of the Effective Date, satisfy, terminate and cancel all

Claims against the Debtors and Equity Interests and other rights of equity security holders in the Debtors.

(b)    Subject to the occurrence of the Effective Date, as of the Effective Date, except as provided in the Plan, all Entities shall be precluded from asserting against the Debtors, the Liquidating Trust, the IP/Austria Assets Trust, or their respective successors or property, any other or further Claims, debts, rights, Causes of Action, liabilities or Equity Interests based upon any act, omission, transaction or other activity of any kind or nature that occurred prior to the Petition Date.

(c)    No Entity holding a Claim may receive on account of such Claim any payment from, or seek recourse or recovery against, any Assets that are to be distributed under the Plan, other than Assets required to be distributed to that Entity under the Plan.

G.    *Compromise and Settlement of Claims and Controversies*

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims and Equity Interests and controversies resolved pursuant to the Plan. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Equity Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and holders of Claims and Equity Interests and is fair, equitable, and within the range of reasonableness.  Subject to Article IX of the Plan, all Plan Distributions made to holders of Allowed Claims and Allowed Equity Interests in any Class are intended to be and shall be final.  Notwithstanding any other provision of this Plan, the Debtors shall not receive a discharge pursuant to section 1141(d)(3) of the Bankruptcy Code.

H.    *Setoff Rights*

Except with respect to Claims released under the Plan, the Debtor, the IP/Austria Assets Trust, and the Liquidating Trust, as applicable, may set off any Claim (and any payments or other Plan Distributions to be made in respect of such Claim hereunder) against all Claims that the applicable Debtor may have held against the holder of such Claim or exercise recoupment with respect thereto.  Neither the failure to setoff nor the allowance of any Claim under the Plan shall constitute a waiver or release of any Claims that any Debtor, IP/Austria Assets Trust, or the Liquidating Trustee, as applicable, may have against the holder of any Claim.

I.    *Third Party Agreements; Subordination*

The Plan Distributions to the various classes of Claims hereunder shall not affect the right of any Entity to levy, garnish, attach or employ any other legal process with respect to such Plan Distributions by reason of any claimed subordination rights or otherwise.  All such rights and any agreements relating thereto shall remain in full force and effect, except as otherwise compromised and settled pursuant to the Plan.

Plan Distributions shall be subject to and modified by any Final Order directing distributions other than as provided in the Plan. The right of the Debtors, IP/Austria Assets Trust, or the Liquidating Trust to seek subordination of any Claim or Equity Interest pursuant to section 510 of the Bankruptcy Code is fully reserved, and the treatment afforded any Claim or Equity Interest that becomes a subordinated Claim or subordinated Equity Interest at any time shall be modified to reflect such subordination. Unless the Confirmation Order provides otherwise, no Plan Distributions shall be made on account of a subordinated Claim or subordinated Equity Interest.

J.     *Release of Liens*Except as otherwise provided herein or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date, all mortgages, deeds of trust, liens, pledges, or other security interests against any property of the estates shall be fully released and discharged, and the holders of such mortgages, deeds of trust, Liens, pledges, or other security interests shall execute such documents as may be reasonably requested by the Debtors, the IP/Austria Assets Trustee, or the Liquidating Trustee, as applicable, to reflect or effectuate such releases, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, liens, pledges, or other security interests shall revert to the Liquidating Trust or IP/Austria Assets Trust, as applicable, and their successors and assigns.

## ARTICLE XIII.
## CONDITIONS PRECEDENT TO CONFIRMATION OF THE PLAN
## AND THE OCCURRENCE OF THE EFFECTIVE DATE

A.     *Conditions Precedent to Confirmation*

The following are conditions precedent to confirmation of the Plan:

(1)     the Bankruptcy Court shall have entered an order or orders: (i) approving the Disclosure Statement, in form and substance acceptable to the Secured Noteholder, as containing "adequate information" pursuant to section 1125 of the Bankruptcy Code; (ii) authorizing the solicitation of votes with respect to the Plan; (iii) determining that all votes are binding and have been properly tabulated as acceptances or rejections of the Plan; (iv) confirming and giving effect to the terms and provisions of the Plan; (v) determining that all applicable tests, standards and burdens in connection with the Plan have been duly satisfied and met by the Debtors and the Plan; (vi) approving the Plan Documents; and (vii) authorizing the Debtors to execute, enter into and deliver the Plan Documents, and to execute, implement and to take all actions otherwise necessary or appropriate to give effect to the transactions and transfer of assets contemplated by the Plan and the Plan Documents;

(2)     the Plan Documents shall be in form and substance reasonably satisfactory to the Debtors, the Secured Noteholder, and the Committee;

(3)     the Debtors shall have not made any amendment, modification, or supplement to the Global Settlement Budget without the consent of the Secured Noteholder and the Committee; and

(4)     the Debtors shall have provided the Secured Noteholder and the Committee with a list that includes the Debtors' reasonable, informed, and good faith estimate of all known, anticipated, and potential First Tier Claims.

B.     *Conditions Precedent to the Occurrence of the Effective Date*

The following are conditions precedent to the occurrence of the Effective Date with respect to each of the Debtors' Estates:

(1)     the Confirmation Order shall be a Final Order and be in form and substance reasonably satisfactory to the Debtors, the Secured Noteholder, and the Committee;

(2)     the Liquidating Trust shall have been formed and the Liquidating Trustee shall have been appointed, and the Debtors shall have taken such actions and provided such information as reasonably requested by counsel to the Committee and the prospective Liquidating Trustee that are reasonably necessary to allow the Liquidating Trustee to perform its duties under and in accordance with the Plan and the Liquidating Trust Agreement;

(3)     the IP/Austria Assets Trust shall have been formed and the IP/Austria Assets Trustee shall have been appointed, and the Debtors shall have taken such actions and provided such information as reasonably requested by counsel to the Secured Noteholder and the prospective IP/Austria Assets Trustee that are reasonably necessary to allow the IP/Austria Assets Trustee to perform its duties under and in accordance with the Plan and the IP/Austria Assets Trust Agreement;

(4)     no orders, decisions, or injunctions shall have been issued by a governmental unit prohibiting, modifying, or conditioning any transaction contemplated herein;

(5)     all necessary consents, authorizations and approvals shall have been given for the transfers of property and the payments provided for or contemplated by the Plan Documents, including satisfaction or waiver of all conditions to the obligations of the Debtors under the Plan Documents in accordance with Article XIII.A of the Plan;

(6)     the Debtors shall be in compliance with the Global Settlement Budget (subject to a reasonable variance agreed to by the Debtors, the Secured Noteholder, and the Committee) and shall have not made any amendment, modification, or supplement to the Global Settlement Budget without the consent of the Secured Noteholder and the Committee;

(7)     the Debtors shall have provided the IP Assets Schedule to the Secured Noteholder, the Committee, and Magna;

(8)     no motion filed by the Secured Noteholder under Bankruptcy Rule 3018(a) to withdraw their votes in favor of the Plan in accordance with Article VI.H shall be pending;

(9)     the aggregate Tax Claims and Other Priority Claims shall not exceed those estimated by the recovery analysis provided by the Debtors to the Secured Noteholder and the Committee prior to the date of entry of the Sixth Interim Cash Collateral Order, in each case by

77

more than a reasonable variance agreed to by the Debtors, the Secured Noteholder, and the Committee;

(10)    unless waived by the Secured Noteholder, no Event of Default under the Sixth Interim Cash Collateral Order shall have occurred and be continuing and no Termination Date under the Sixth Interim Cash Collateral Order shall have occurred;

(11)    all Professional Fee Claims shall have been paid in accordance with Article V.C.1 of this Plan, the Professional Fee Escrow shall have been funded with the Professional Fee Escrow Amount in accordance with Article V.C.2 of this Plan (subject to the Professional Fee Cap), the Wind Down Amount shall have been funded in accordance with Article VII.C.1 of this Plan, and the First Tier Claims Reserve shall have been funded in accordance with Article I.A.77 of this Plan; and

(12)    the Debtors, the Secured Noteholder, Magna, and the Committee shall have reached an agreement regarding a restructuring plan in the insolvency proceeding of Fisker Austria and such restructuring plan shall have become effective.

C.    *Waiver of Conditions*

The Debtors, with the prior written consent of the Secured Noteholder and the Committee, may waive any one or more of the conditions set forth in Article XIII.A or Article XIII.B in a writing without notice or order of the Bankruptcy Court and without notice to any other parties in interest; *provided*, that the Committee's consent shall not be required for a waiver of the condition in Article XIII.B.9.

D.    *Effect of Non-Occurrence of the Effective Date*

If the Effective Date shall not occur (except as provided in Article XIII.E hereof), the Plan shall be null and void and nothing contained in the Plan shall: (i) constitute a waiver or release of any Claims against or Equity Interests in the Debtors; (ii) prejudice in any manner the rights of the Debtors, including any right to seek an extension of the exclusivity periods under section 1121(d) of the Bankruptcy Code; or (iii) constitute an admission, acknowledgement, offer or undertaking by the Debtors.

E.    *Option to Delay Occurrence of the Effective Date*

Notwithstanding anything in the Plan to the contrary, the Debtors reserve (with the written consent of the Secured Noteholder and the Committee) the right to delay the occurrence of the Effective Date with respect to one or more of the Debtors' Estates to a later date; *provided, however*, that any such election by the Debtors to delay the occurrence of the Effective Date with respect to one Estate shall not prevent the occurrence of the Effective Date with respect to any of the other Estates.

F.    *Modification of the Plan*

As provided in section 1127 of the Bankruptcy Code, modification of the Plan may be proposed in writing by the Debtors, with the consent of Debtors, the Secured Noteholder, and the

Committee at any time before confirmation, *provided*, that the Plan, as modified, meets the requirements of sections 1122 and 1123 of the Bankruptcy Code, and the Debtors have complied with section 1125 of the Bankruptcy Code.  The Debtors may, with the written consent of the Secured Noteholder and the Committee, modify the Plan at any time after confirmation and before substantial consummation, *provided*, that the Plan, as modified, meets the requirements of sections 1122 and 1123 of the Bankruptcy Code and the Bankruptcy Court, after notice and a hearing, confirms the Plan as modified, under section 1129 of the Bankruptcy Code, and the circumstances warrant such modifications.  A holder of a Claim that has accepted the Plan shall be deemed to have accepted such Plan as modified if the proposed alteration, amendment, or modification does not materially and adversely change the treatment of the Claim of such holder.

G.      *Revocation of Plan*

The Debtors, with the written consent of the Secured Noteholder and the Committee, reserve the right to revoke and withdraw the Plan and/or to adjourn the Confirmation Hearing prior to the occurrence of the Effective Date.  If the Debtors revoke or withdraw the Plan, or if the Effective Date does not occur, then the Plan and all settlements and compromises set forth in the Plan and not otherwise approved by a separate Final Order shall be deemed null and void and nothing contained herein and no acts taken in preparation for consummation of the Plan shall be deemed to constitute a waiver or release of any Claims against or Equity Interests in the Debtors or to prejudice in any manner the rights of the Debtors or any other Entity in any other further proceedings involving the Debtors.

## ARTICLE XIV.
## RETENTION OF JURISDICTION

On and after the Effective Date, the Bankruptcy Court shall retain jurisdiction over all matters arising in, arising under, and related to the Chapter 11 Cases for, among other things, the following purposes:

1.      to hear and determine any and all motions or applications pending on the Confirmation Date or thereafter brought in accordance with Article XI hereof for the assumption, assumption and assignment or rejection of Executory Contracts or Unexpired Leases to which any Debtor is a party or with respect to which a Debtor may be liable, and to hear and determine any and all Claims and any related disputes (including the exercise or enforcement of setoff or recoupment rights, or rights against any third party or the property of any third party resulting therefrom or from the expiration, termination or liquidation of any Executory Contract or Unexpired Lease); *provided*, that, for the avoidance of doubt, the foregoing shall not apply to the Chase Claims;

2.      to hear and determine any and all adversary proceedings, applications, motions and contested or litigated matters that may be pending on the Effective Date or that, pursuant to the Plan, may be instituted by the Liquidating Trustee after the Effective Date, including any adversary proceedings which the Liquidating Trustee may choose to bring in the Bankruptcy Court in respect to any of the Preserved Estate Claims;

3.      to hear and determine any and all adversary proceedings, applications, motions and contested or litigated matters that may be pending on the Effective Date or that, pursuant to the Plan, may be instituted by the IP/Austria Assets Trustee after the Effective Date, including any adversary proceedings which the IP/Austria Assets Trustee may choose to bring in the Bankruptcy Court in respect to any of the IP/Austria Assets;

4.      to hear and determine any objections to the allowance of Claims, whether filed, asserted, or made before or after the Effective Date, including, without express or implied limitation, to hear and determine any objections to the classification of any Claim and to allow, disallow or estimate any Disputed Claim in whole or in part;

5.      to issue such orders in aid of execution of the Plan to the extent authorized or contemplated by section 1142 of the Bankruptcy Code;

6.      to consider any modifications of the Plan, remedy any defect or omission, or reconcile any inconsistency in any order of the Bankruptcy Court, including the Confirmation Order;

7.      to hear and determine all Fee Applications and applications for allowances of compensation and reimbursement of any other fees and expenses authorized to be paid or reimbursed under the Plan or the Bankruptcy Code;

8.      to hear and determine all controversies, suits and disputes that may relate to, impact upon or arise in connection with the Plan Documents or their interpretation, implementation, enforcement or consummation;

9.      to the extent that Bankruptcy Court approval is required, to consider and act on the compromise and settlement of any Claim or Cause of Action by, on behalf of or against the Estates, any of the Preserved Estate Claims, or Causes of Action constituting IP/Austria Assets;

10.     to determine such other matters that may be set forth in the Plan or the Confirmation Order, or that may arise in connection with the Plan or the Confirmation Order;

11.     to hear and determine matters concerning state, local and federal taxes, fines, penalties or additions to taxes for which the Debtors may be liable in accordance with sections 346, 505 and 1146 of the Bankruptcy Code;

12.     to hear and determine all controversies, suits and disputes that may relate to, impact upon or arise in connection with any setoff and/or recoupment rights of the Debtors or any Entity under the Plan;

13.     to hear and determine all controversies, suits and disputes that may relate to, impact upon or arise in connection with Causes of Action of the Debtors or the Estates (including the Preserved Estate Claims and Causes of Action constituting IP/Austria Assets) commenced by the Liquidating Trustee, the IP/Austria Assets Trustee, the Debtors or any third parties, as applicable, before or after the Effective Date;

14.     to enter an order or final decree closing the Chapter 11 Cases;

80

15.     to issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with consummation, implementation or enforcement of the Plan or the Confirmation Order;

16.     to extend the initial stated terms of the Liquidating Trust in accordance with the provisions concerning such a potential extension in the Liquidating Trust Agreement;

17.     to extend the initial stated terms of the IP/Austria Assets Trust in accordance with the provisions concerning such a potential extension in the IP/Austria Assets Trust Agreement; and

18.     to hear and determine any other matters related hereto and not inconsistent with chapter 11 of the Bankruptcy Code.

## ARTICLE XV.
## MISCELLANEOUS PROVISIONS

A.     *Additional Documents*

On or before the Effective Date, the Debtors may file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The Debtors, the IP/Austria Assets Trustee, or the Liquidating Trustee (as applicable) and all holders of Claims or Equity Interests receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may reasonably be necessary or advisable to effectuate the provisions and intent of the Plan or the Confirmation Order.

B.     *Substantial Consummation*

On the Effective Date, this Plan shall be deemed to be substantially consummated (within the meaning set forth in section 1101 of the Bankruptcy Code) pursuant to section 1127(b) of the Bankruptcy Code.

C.     *Reservation of Rights*

The Plan shall have no force or effect unless and until the Bankruptcy Court enters the Confirmation Order. None of the Filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by the Debtors with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of the Debtors with respect to the holders of Claims or Equity Interests prior to the Effective Date.

D.     *Successors and Assigns*

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, beneficiaries or guardian, if any, of each Entity.

E.    *Notices*

After the Effective Date, any pleading, notice, or other document required by the Plan to be served on or delivered to (i) the Liquidating Trust shall be served on the Liquidating Trust and its counsel at the notice address set forth in the Liquidating Trust Agreement, and (ii) the IP/Austria Assets Trust shall be served on the IP/Austria Assets Trust and its counsel at the notice address set forth in the IP/Austria Assets Trust Agreement.

F.    *Governing Law*

Unless a rule of law or procedure is supplied by federal law (*including* the Bankruptcy Code and the Bankruptcy Rules), the laws of the State of Delaware, without giving effect to the conflicts of laws principles thereof, shall govern the construction of the Plan and any agreements, documents and instruments executed in connection with the Plan, *except* as otherwise expressly provided in such instruments, agreements or documents.

G.    *Exemption from Transfer Taxes*

Pursuant to, and to the fullest extent permitted by, section 1146 of the Bankruptcy Code, any transfers (including any transfer from a Debtor to the IP/Austria Asset Trust, the Liquidating Trust) of property pursuant to, in contemplation of, or in connection with the Plan, including any transfer pursuant to:  (1) the issuance, distribution, transfer, or exchange of any debt, equity security, property, or other interest in the Debtors, the IP/Austria Asset Trust or the Liquidating Trust; (2) any transfer, sale or exchange of the assets that is the subject of a motion or notice pursuant to section 363 of the Bankruptcy Code filed by the Debtors before the Effective Date regardless of the date the transaction is approved by the Bankruptcy Court or the date such transfer, sale or exchange closes; (3) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (4) the making, assignment, or recording of any lease or sublease; or (6) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instruments of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any stamp, real estate transfer, personal property transfer tax, mortgage recording, sales, use or other similar tax, and the appropriate state or local government officials or agents shall, and shall be directed to, forgo the collection of any such tax and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax.  To effectuate the terms of this Section, the Bankruptcy Court may enter any order necessary or appropriate to implement this provision of the Plan.

H.    *Notice of Entry of Confirmation Order and Relevant Dates*

Promptly upon entry of the Confirmation Order, the Debtors shall publish as directed by the Bankruptcy Court and serve on all known parties in interest and holders of Claims and Equity Interests, notice of the entry of the Confirmation Order and all relevant deadlines and dates under the Plan, including the deadline for filing notice of Administrative Claims, and the deadline for filing rejection damage Claims.

I.      *Compliance with Tax Requirements*

In connection with the Plan, the Debtors, the IP/Austria Assets Trustee, and the Liquidating Trustee, as applicable, shall comply with all withholding and reporting requirements imposed by federal, state, local and foreign taxing authorities and all Plan Distributions hereunder shall be subject to such withholding and reporting requirements.  Notwithstanding the foregoing, the Debtors, the IP/Austria Assets Trustee, and the Liquidating Trustee shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including withholding in kind, liquidating a portion of the distributions to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate. For purposes of the Plan, any withheld amount (or property) paid to the applicable Tax Authority shall be treated as if paid to the applicable claimant. The Debtors, the IP/Austria Assets Trust and the Liquidating Trust reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support and other spousal awards, liens and encumbrances. Notwithstanding the foregoing, each holder of an Allowed Claim that is to receive a Plan Distribution shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any government unit, including income, withholding and other tax obligations, on account of such Plan Distribution.  The Liquidating Trustee and the IP/Austria Assets Trustee have the right, but not the obligation, to not make a Plan Distribution until such holder has made arrangements satisfactory to the Liquidating Trustee or IP/Austria Assets Trustee for payment of any such tax obligations and, if any party issuing any instrument or making any distribution under the Plan fails to withhold with respect to any such holder's distribution, and is later held liable for the amount of such withholding, the holder shall reimburse such party. The Debtor, IP/Austria Assets Trustee, or the Liquidating Trustee may require, as a condition to the receipt of a distribution, that the holder complete the appropriate IRS Form W-8 or IRS Form W-9, as applicable to each holder.

J.      *Rates*

The Plan does not provide for the change of any rate that is within the jurisdiction of any governmental regulatory commission after the occurrence of the Effective Date.

K.      *Immediate Binding Effect*

Notwithstanding Bankruptcy Rules 3020(e), 6004(h), 7062, or otherwise, upon the occurrence of the Effective Date, the terms of this Plan shall be immediately effective and enforceable and deemed binding upon and inure to the benefit of the Debtors, the Liquidating Trustee, the IP/Austria Assets Trustee, the holders of Claims and Interests, the Released Parties, and each of their respective successors and assigns. Any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable thereafter.

L.      *Severability*

In the event the Bankruptcy Court determines that any provision of the Plan is unenforceable either on its face or as applied to any Claim or Equity Interest or transaction, the

Debtors may modify the Plan in accordance with Article XIII.F so that such provision shall be not be applicable to the holder of any such Claim or Equity Interest or transaction. Any such determination of unenforceability shall not (i) limit or affect the enforceability and operative effect of any other provision of the Plan or (ii) require the re-solicitation of any acceptance or rejection of the Plan.

M.      *Closing of the Chapter 11 Cases*

On or after the Effective Date, the Liquidating Trustee shall be authorized to file a motion requesting entry of one or more orders of this Court closing any of the Chapter 11 Cases other than the case of Fisker Inc. Such motion may be heard by the Court on fourteen (14) days' notice to the U.S. Trustee and all other parties entitled to notice under Local Rule 2002-1(b). Each Debtor estate shall be entitled to appoint the Liquidating Trustee to prosecute claims and defenses and make distributions, and attend to other wind down affairs on behalf of each of the other prior Debtors as if such Debtor estates continued to exist solely for that purpose. The Liquidating Trustee shall, promptly after the full administration of the Chapter 11 Cases, file with this Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court, and file a motion under Local Rule 3022-1(a) to close the Chapter 11 Case of Fisker Inc. and of any other Debtor whose case remains open at that time. Upon the filing of such a motion, the Liquidating Trustee shall file a final report with respect to all of the Chapter 11 Cases pursuant to Local Rule 3022-1(c).

N.      *No Admissions*

As to contested matters, adversary proceedings and other Causes of Action or threatened Causes of Action, this Plan shall not constitute or be construed as an admission of any fact or liability, stipulation, or waiver, but rather as a statement made in settlement negotiations.

O.      *Dissolution of the Committee and Any Other Statutory Committee*

On the Effective Date, the Committee and any other statutory committee appointed in the Chapter 11 Cases shall dissolve automatically and the members thereof and the Professionals retained by the Committee shall be released and discharged from all rights, duties, responsibilities, and liabilities arising from, or related to, the Chapter 11 Cases and under the Bankruptcy Code; *provided*, that, the Committee shall continue to exist, and its Professionals shall continue to be retained, after the Effective Date and have standing and a right to be heard for the following limited purposes: (a) requests for payment of Professional Fee Claims for services and reimbursement of expenses incurred prior to the Effective Date, and (b) any appeals of the Confirmation Order or other appeal to which the Committee is a party.

**ARTICLE XVI.**
**<u>PLAN-RELATED RISK FACTORS</u>**

**THE PLAN AND ITS IMPLEMENTATION ARE SUBJECT TO CERTAIN RISKS, INCLUDING THE RISK FACTORS SET FORTH BELOW. HOLDERS OF CLAIMS WHO ARE ENTITLED TO VOTE ON THE PLAN SHOULD READ AND CAREFULLY CONSIDER THE RISK FACTORS, AS WELL AS THE OTHER INFORMATION SET FORTH HEREIN AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH,**

**REFERRED TO, OR INCORPORATED BY REFERENCE HEREIN, BEFORE DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN. THESE FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION.**

A.    *The Plan May Not Be Accepted*

The Debtors can make no assurances that the requisite acceptances to the Plan will be received, and the Debtors may need to obtain acceptances to an alternative plan for the Debtors, or otherwise, that may not have the support of the holders, or may liquidate the Estates under chapter 7 of the Bankruptcy Code. There can be no assurance that the terms of any such alternative plan would be similar to or as favorable to holders as those proposed in the Plan.

B.    *The Plan May Not Be Confirmed*

Even if the Debtors receive the requisite acceptances, there is no assurance that the Bankruptcy Court will confirm the Plan. Even if the Bankruptcy Court determines that the Disclosure Statement, the balloting procedures, and the results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it found that any of the statutory requirements for Confirmation had not been met. Moreover, there can be no assurance that modifications to the Plan will not be required for Confirmation or that such modifications would not necessitate the resolicitation of votes. If the Plan is not confirmed, it is unclear what distributions holders of Claims ultimately would receive with respect to their Claims in a subsequent plan.

C.    *Parties in Interest May Object to the Amount or Classification of Claims*

Section 1122 of the Bankruptcy Code requires that the Plan classify Claims against, and Interests in, the Debtors. The Bankruptcy Code also provides that the Plan may place a Claim or Interest in a particular Class only if such Claim or interest is substantially similar to the other Claims or interests of such Class. The Debtors believe that all Claims and interests have been appropriately classified in the Plan.

To the extent that the Bankruptcy Court finds that a different classification is required for the Plan to be confirmed, the Debtors may seek (a) to modify the Plan to provide for whatever classification might be required for Confirmation or (b) to use the acceptances received from any holder of Claims pursuant to this solicitation for the purpose of obtaining the approval of the Class or Classes of which such holder ultimately is deemed to be a member. Any such reclassification of Claims, although subject to the notice and hearing requirements of the Bankruptcy Code, could adversely affect the Class in which such holder was initially a member, or any other Class under the Plan, by changing the composition of such Class and the vote required for approval of the Plan. There can be no assurance that the Bankruptcy Court, if it were to find that a classification was inappropriate and required a reclassification, would approve the Plan based upon such reclassification. Except to the extent that modification of classification in the Plan requires resolicitation, the Debtors will, in accordance with the Bankruptcy Code and the Bankruptcy Rules, seek a determination by the Bankruptcy Court that acceptance of the Plan by any holder of Claims pursuant to this solicitation will constitute a consent to the Plan's treatment of such holder,

regardless of the Class as to which such holder is ultimately deemed to be a member.

The Bankruptcy Code also requires that the Plan provide the same treatment for each Claim or Interest of a particular Class unless the holder of a particular Claim agrees to a less favorable treatment of its Claim. The Debtors believe that the Plan complies with the requirement of equal treatment. To the extent that the Bankruptcy Court finds that the Plan does not satisfy such requirement, the Bankruptcy Court could deny confirmation of the Plan.

Issues or disputes relating to classification or treatment could result in a delay in the confirmation and consummation of the Plan and could increase the risk that the Plan will not be consummated.

D.      *The Debtors May Object to the Amount or Classification of a Claim*

Except as otherwise provided herein, the Debtors reserve the right to object to the amount or classification of any Claim or Interest under the Plan. The estimates set forth herein cannot be relied upon by any holder of a Claim where such Claim is subject to an objection. Any holder of a Claim that is subject to an objection thus may not receive its expected share of the estimated distributions described herein.

E.      *Nonconsensual Confirmation*

In the event that any Impaired Class of Claims or interests does not vote to accept the Plan, the Bankruptcy Court may nevertheless confirm the Plan if at least one Impaired Class has accepted the Plan, and, as to each Impaired Class that has not accepted the Plan, the Bankruptcy Court determines that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting Impaired Class(es). The Debtors believe that the Plan satisfies these requirements, and the Debtors may request such nonconsensual Confirmation in accordance with section 1129(b) of the Bankruptcy Code. Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion. In addition, the pursuit of nonconsensual Confirmation may result in, among other things, increased expenses relating to professional compensation.

F.      *The Chapter 11 Cases May Be Converted to Cases under Chapter 7 of the Bankruptcy Code*

If the Bankruptcy Court finds that it would be in the best interest of creditors or any Debtor, the Bankruptcy Court may convert such Debtor's Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code. In such event, a chapter 7 trustee would be appointed or elected to liquidate such Debtor's assets for distribution in accordance with the priorities established by the Bankruptcy Code. The Debtors believe that liquidation under chapter 7 would result in significantly smaller distributions being made to creditors than those provided for in the Plan because of (a) the likelihood that the Assets would have to be sold or otherwise disposed of in a disorderly fashion over a short period of time rather than selling the Assets at a later time in a controlled manner, (b) additional administrative expenses involved in the appointment of a chapter 7 trustee, and (c) additional expenses and Claims, some of which would be entitled to priority, that would be generated during a liquidation.

G.    *Plan Releases May Not Be Approved*

There can be no assurance that the releases, third-party agreements, exculpation, and injunction provisions, as provided in Article XII, will be granted.  Failure of the Bankruptcy Court to grant such relief may result in a plan of liquidation that differs from the Plan or the Plan not being confirmed.

H.    *Allowance of Claims May Substantially Dilute the Recovery to Holders of Claims under the Plan*

There can be no assurance that the estimated Claim amounts set forth herein are correct, and the actual Allowed amounts of Claims may differ from these estimates.  These estimated amounts are based on certain assumptions with respect to a variety of factors.  Should these underlying assumptions prove incorrect, the actual Allowed amounts of Claims may vary from those estimated herein.  Because certain Plan Distributions are linked to the amount and value of Allowed Claims, any material increase in the amount of Allowed Claims over the amounts estimated by the Debtors would materially reduce the recovery to certain holders of Allowed Claims under the Plan.

I.    *Certain Tax and Securities Implications of the Plan*

There are a number of material securities and income tax considerations, risks, and uncertainties associated with the Plan.  Each holder should consult its own advisors regarding these matters, based upon the particular circumstances pertaining to such holder.

J.    *Failure To Consummate the Plan*

The Plan provides for certain conditions that must be satisfied (or waived) prior to Confirmation and for certain other conditions that must be satisfied (or waived) prior to the Effective Date.  As of the date hereof, there can be no assurance that any or all of the conditions in the Plan will be satisfied (or waived).  Accordingly, even if the Plan is confirmed by the Bankruptcy Court, there can be no assurance that the Effective Date will occur.

K.    *Any Valuation of Any Assets for Plan Distributions Is Speculative and Could Potentially Be Zero*

The Debtors have not obtained or requested an opinion from any bank or other firm as to the value of the Liquidating Trust Assets and the IP/Austria Assets Trust Assets.  As such, any valuation of any of the Plan Distributions (*i.e.*, the Liquidating Trust Assets and the IP/Austria Assets Trust Assets) is necessarily speculative, and the value of certain of such assets could potentially be zero.  Accordingly, the ultimate value, if any, of the Plan Distributions (*i.e.*, the Liquidating Trust Assets and the IP/Austria Assets Trust Assets) could materially affect, among other things, recoveries to the Debtors' creditors, including holders of Allowed Claims in Class 3 and Class 4.

L.      *Costs of Administrating the Estates*

Liquidation of the Estates' remaining assets and the disbursement of the proceeds of such liquidation will require certain administrative costs that may vary based on a variety of factors. Such administrative costs cannot be predicted with certainty and may affect recoveries under the Plan.

M.      *The Retained Causes of Action May Be Pursued Against Holders that Vote To Accept or Reject the Plan*

Pursuant to Article VIII.B.3, the Liquidating Trust, as applicable, will be permitted to pursue Causes of Action that have not otherwise been expressly waived, relinquished, released, compromised or settled in the Plan or any Final Order. Accordingly, holders that vote to accept or reject the Plan can be sued with respect to such Causes of Action.

N.      *Certain Tax Considerations*

There are a number of material income tax considerations, risks and uncertainties associated with the Plan.

THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. NOTHING HEREIN SHALL CONSTITUTE TAX ADVICE. THE TAX CONSEQUENCES ARE IN MANY CASS UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S PARTICULAR CIRCUMSTANCES. ACCORDINGLY, HOLDERS ARE URGED TO CONSULT THEIR TAX ADVISORS ABOUT THE FEDERAL, STATE, LOCAL AND APPLICABLE FOREIGN TAX CONSEQUENCES OF THE PLAN.

## ARTICLE XVII.
## VOTING PROCEDURES AND REQUIREMENTS

Before voting to accept or reject the Plan, each holder of Allowed Claims or General Unsecured Claims should carefully review this Combined DS and Plan.

This section is qualified in its entirety by the Solicitation Order.

A.      *Voting Instructions and Voting*

Holders in Class 3 (Secured Notes Claims) and Class 4 (General Unsecured Claims) are entitled to vote to accept or reject the Plan. All holders within such Classes have been sent a Ballot together with this Combined DS and Plan. Such holders should read the Ballot carefully and follow the instructions contained therein. Please use only the Ballot that accompanies this Disclosure Statement to cast your vote. Each Ballot contains detailed voting instructions. Each Ballot also sets forth in detail, among other things, the deadlines, procedures, and instructions for voting to accept or reject the Plan, the Voting Record Date for voting purposes, and the applicable standards for tabulating Ballots. The Voting Record Date for determining which holders are entitled to vote on the Plan is September 11, 2024. The Voting Deadline is October 7, 2024, at 5:00 p.m. (prevailing Eastern Time).

**The Ballots have been specifically designed for the purpose of soliciting votes on the Plan from holders of Claims within Classes 3 and 4 who are entitled to a vote with respect thereto. Accordingly, in voting on the Plan, please use only the Ballot sent to you with this Combined DS and Plan. In order for your Ballot to be counted, please complete and sign your Ballot, and submit it so as to be received by 12:00 p.m. (Prevailing Eastern Time), on October 7, 2024 using <u>one</u> of the following methods:**

**<u>For holders of Claims in Class 3 (Secured Notes Claims) and Class 4 (General Unsecured Claims), if by Mail or Hand Delivery:</u>**

> **Fisker Ballot Processing Center**
> **c/o KCC dba Verita**
> **222 N. Pacific Coast Highway, Suite 300**
> **El Segundo, CA 90245**

**<u>If by Electronic, Online Submission:</u>**

> **Visit the Debtors' restructuring website at: www.veritaglobal.net/fisker, click on the "E-Ballot" tab, and follow the prompts and directions.**

**ANY BALLOTS RECEIVED AFTER THE VOTING DEADLINE WILL NOT BE COUNTED, NOR WILL ANY BALLOTS RECEIVED BY TELECOPY, FACSIMILE, OR EMAIL BE ACCEPTED.** Following the Voting Deadline, the Claims Agent will prepare and file with the Bankruptcy Court a certification of the results of the balloting with respect to the Plan. Ballots submitted to the Debtors or any of its agents and advisors (other than the Claims and Noticing Agent) will not be counted.

If you have any questions regarding the Ballot, did not receive a return envelope with your Ballot, did not receive an electronic copy of the Combined DS and Plan, or need physical copies of the Ballot or other enclosed materials, please contact the Claims and Noticing Agent at https://www.veritaglobal.net/fisker/inquiry or via telephone at (888) 926-3479 (toll-free in the U.S. and Canada) or (310) 751-1825 (international).

ANY BALLOT THAT IS EXECUTED AND RETURNED BUT (A) WHICH DOES NOT INDICATE EITHER AN ACCEPTANCE OR REJECTION OF THE PLAN, (B) PARTIALLY ACCEPTS AND PARTIALLY REJECTS THE PLAN, OR (C) INDICATES BOTH AN ACCEPTANCE AND A REJECTION OF THE PLAN WILL NOT BE COUNTED.

IF YOU ARE AN ELIGIBLE HOLDER AND YOU DID NOT RECEIVE A BALLOT, RECEIVED A DAMAGED BALLOT, OR LOST YOUR BALLOT, OR IF YOU HAVE ANY QUESTIONS CONCERNING THE PROCEDURES FOR VOTING ON THE PLAN, PLEASE CONTACT THE CLAIMS AND NOTICING AGENT AT HTTPS://WWW.VERITAGLOBAL.NET/FISKER/INQUIRY OR VIA TELEPHONE AT (888) 926-3479 (TOLL-FREE IN THE U.S. AND CANADA) OR (310) 751-1825 (INTERNATIONAL).

B.    *Parties Entitled to Vote*

Under the Bankruptcy Code, only holders of Claims or Interests in "impaired" classes are entitled to vote on the Plan. Under section 1124 of the Bankruptcy Code, a class of Claims or Interests is "impaired" under the Plan unless (1) the Plan leaves unaltered the legal, equitable, and contractual rights to which such Claim or interest entitles the holder thereof or (2) notwithstanding any legal right to an accelerated payment of such Claim or interest, the Plan cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.

If, however, the holder of an Impaired Claim or Interest will not receive or retain any distribution under the Plan on account of such Claim or interest, the Bankruptcy Code deems such holder to have rejected the Plan, and, accordingly, holders of such Claims and Interests do not vote on the Plan and will not receive a Ballot. If a Claim or interest is not impaired by the Plan, the Bankruptcy Code presumes the holder of such Claim or interest to have accepted the Plan and, accordingly, holders of such Claims and interests are not entitled to vote on the Plan, and also will not receive a Ballot.

A vote may be disregarded if the Bankruptcy Court determines, pursuant to section 1126(e) of the Bankruptcy Code, that it was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

As set forth above, the Bankruptcy Code defines "acceptance" of a plan by a class of: (1) claims as acceptance by creditors in that class that hold at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the claims that cast ballots for acceptance or rejection of the plan; and (2) interests as acceptance by interest holders in that class that hold at least two-thirds (2/3) in amount of the interests that cast ballots for acceptance or rejection of the plan.

Claims in Classes 3 and 4 are impaired under the Plan and entitled to vote to accept or reject the Plan.  Claims in all other Classes are either unimpaired and presumed to accept or will not receive a Distribution under the Plan and deemed to reject the Plan, and therefore are not entitled to vote. For a detailed description of the treatment of Claims and Interests under the Plan, see Article VI.B herein.

The Debtors will request confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code over the deemed rejection of the Plan by all holders of Claims or Interests in Class 5 (Intercompany Claims), Class 6 (Equity Interests) and Class 7 (Intercompany Interests). Under section 1129(b), a plan may be confirmed by a bankruptcy court if it does not "discriminate unfairly" and is "fair and equitable" with respect to each rejecting class. For a more detailed description of the requirements for confirmation of a nonconsensual plan, see Article XVIII.E of this Combined DS and Plan.

C.    *Agreements Upon Furnishing Ballot*

The delivery of an accepting Ballot pursuant to one of the procedures set forth above will constitute the agreement of the creditor with respect to such Ballot to accept (i) all of the terms of,

90

and conditions to, this solicitation; and (ii) to the extent such accepting Ballot does not opt out of the voluntary releases contained in Article XII.B of the Plan by checking the "opt out" box on the Ballot, the terms of the Plan including the injunction, releases, and exculpations set forth in Article XII.A through Article XII.D therein. All parties in interest retain their right to object to confirmation of the Plan.

D.      *Change of Vote*

Any party who has previously submitted to the Claims and Noticing Agent prior to the Voting Deadline a properly completed Ballot may change its vote by submitting to the Claims and Noticing Agent prior to the Voting Deadline a subsequent, properly completed Ballot for acceptance or rejection of the Plan.

E.      *Waivers of Defects, Irregularities, Etc.*

Unless otherwise directed by the Bankruptcy Court, all questions as to the validity, form, eligibility (including time of receipt), acceptance, and revocation or withdrawals of Ballots will be determined by the Claims and Noticing Agent and/or the Debtors, as applicable, in their sole reasonable discretion, which determination will be final and binding. The Debtors reserve the right to reject any and all Ballots submitted by any of their respective creditors not in proper form, the acceptance of which would, in the opinion of the Debtors or their counsel, as applicable, be unlawful. The Debtors further reserve their respective rights to waive any defects or irregularities or conditions of delivery as to any particular Ballot by any of their creditors; *provided*, *however*, that the Debtors may not waive the requirement that a Ballot must be signed to be counted. The interpretation (including the Ballot and the respective instructions thereto) by the applicable Debtor, unless otherwise directed by the Bankruptcy Court, will be final and binding on all parties. Unless waived, any defects or irregularities in connection with deliveries of Ballots must be cured within such time as the Debtors or the Bankruptcy Court may determine. Neither the Debtors nor any other person will be under any duty to provide notification of defects or irregularities with respect to deliveries of Ballots nor will any of them incur any liabilities for failure to provide such notification. Unless otherwise directed by the Bankruptcy Court, delivery of such Ballots will not be deemed to have been made until such irregularities have been cured or waived. Ballots previously furnished (and as to which any irregularities have not theretofore been cured or waived) will be invalidated.

F.      *Miscellaneous*

Unless otherwise ordered by the Bankruptcy Court, Ballots that are signed, dated, and timely received, but on which a vote to accept or reject the Plan has not been indicated, will not be counted. The Claims and Noticing Agent is authorized, but not required, to contact parties that submit incomplete or otherwise deficient votes to make a reasonable effort to cure such deficiencies. If you simultaneously return duplicative Ballots that are voted inconsistently, those Ballots will not be counted. An otherwise properly executed Ballot that attempts to partially accept and partially reject the Plan will likewise not be counted.

Under the Bankruptcy Code, for purposes of determining whether the requisite acceptances have been received, only holders of the Claims or Interests, as applicable, who actually vote will

be counted. The failure of a holder to deliver a duly executed Ballot to the Claims and Noticing Agent will be deemed to constitute an abstention by such holder with respect to voting on the Plan and such abstentions will not be counted as votes for or against the Plan.

Except as provided below, unless the Ballot is timely submitted to the Claims and Noticing Agent before the Voting Deadline together with any other documents required by such Ballot, the Debtors may, in their sole discretion, reject such Ballot as invalid, and therefore decline to include it in the tabulation of votes for or against the Plan.

As a cost saving measure, the Debtors are authorized to cause the Claims and Noticing Agent to distribute this Combined DS and Plan and the Solicitation Order (without exhibits) to claimholders by email to the extent possible. Additionally, for purposes of serving the solicitation packages, combined hearing notice, and notice of non-voting status, the Debtors are authorized to rely on the address information for voting and non-voting Classes as compiled, updated, and maintained by the Claims and Noticing Agent as of the Voting Record Date. The Debtors and the Claims and Noticing Agent are not required to conduct any additional research for updated addresses based on undeliverable solicitation packages, combined hearing notices, and notices of non-voting status. In the event the Debtors do not have an email address for a claimholder in a voting Class, the Claims and Noticing Agent will serve this Combined DS and Plan and the Solicitation Order on such voting claimholder in paper format or electronic format (i.e., a USB drive) via first class U.S. mail to the extent a valid physical mailing address is known.

G.    *Further Information; Additional Copies*

If you have any questions or require further information about the voting procedures for voting your Claim, or about the packet of material you received, or if you wish to obtain an additional copy of this Combined DS and Plan, the Solicitation Order, or any exhibits thereto, please contact the Claims and Noticing Agent.

## ARTICLE XVIII.
## <u>CONFIRMATION REQUIREMENTS</u>

The following is a brief summary of the Plan Confirmation process. Holders of Claims are encouraged to review the relevant provisions of the Bankruptcy Code consult their own legal, financial, and other advisors.

A.    *The Joint Hearing*

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a confirmation hearing. Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to Confirmation of the Plan. The Solicitation Order set the date and time for the Joint Hearing to consider (a) final approval of the combined Disclosure Statement and Plan as providing adequate information pursuant to section 1125 of the Bankruptcy Code and (b) Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code. The Confirmation Hearing may be adjourned from time to time by the Debtors without further notice, except for an announcement of the adjourned date made at the Joint Hearing or by filing a notice with the Bankruptcy Court.

Additionally, section 1128(b) of the Bankruptcy Code provides that a party in interest may object to Confirmation.  **Objections to Confirmation of the Plan must be made in writing and must be filed with the Bankruptcy Court and served in accordance with the Solicitation Order** (as described in the Preliminary Statement hereto).

B.    *Classification*

The Bankruptcy Code requires that, for purposes of treatment and voting, a chapter 11 plan divide the different claims (excluding administrative claims) against, and equity interests in, a debtor into separate classes based upon their legal nature.  Pursuant to section 1122 of the Bankruptcy Code, a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class.  The Debtors believe that the Plan classifies all Claims and Interests in compliance with the provisions of the Bankruptcy Code because valid business, factual, and legal reasons exist for separately classifying the various Classes of Claims and Interests created hereunder.  Accordingly, the classification of Claims and Interests in the Plan complies with section 1122 of the Bankruptcy Code.

C.    *Consensual Confirmation*

In general, the Bankruptcy Code requires, as a condition to confirmation, that, except as described in the following section, each class of claims or interests that is impaired under a chapter 11 plan accept the plan.  As further set forth in section 1124 of the Bankruptcy Code, a class is impaired unless the plan (1) leaves unaltered the legal, equitable, and contractual rights to which the claim or interest entitles the holder of such claim or interest or (2) cures any default, reinstates the original terms of the obligation, and does not otherwise alter the legal, equitable, or contractual rights to which the claim or interest entitles the holder of such claim or interest.  In addition, Classes that receive no Plan Distributions are not entitled to vote on the Plan and are deemed to have rejected the Plan.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two thirds in dollar amount and more than one half in number of allowed claims in that class, counting only those claims that actually voted to accept or to reject the plan.  Thus, a class of claims will have voted to accept the plan only if two thirds in amount and a majority in number actually voting cast their ballots in favor of acceptance.  For the avoidance of doubt, votes will be solicited and tabulated in accordance with the procedures approved in the Solicitation Order.

The Bankruptcy Court can confirm the Plan only if it determines that the Plan complies with the technical requirements of chapter 11 of the Bankruptcy Code.  One of these technical requirements is that the Bankruptcy Court finds, among other things, that the Plan has been accepted by the requisite votes of all Classes of Impaired Claims and Interests, unless approval will be sought under section 1129(b) of the Bankruptcy Code in spite of the nonacceptance by one or more such Classes.

In addition to the voting requirements, section 1129 of the Bankruptcy Code requires that, in order to confirm the Plan, the Bankruptcy Court must make a series of findings concerning the

Plan and the Debtors, including that (1) the Plan has classified Claims in a permissible manner, (2) the Plan complies with applicable provisions of the Bankruptcy Code, (3) the Plan has been proposed in good faith and not by any means forbidden by law, (4) the disclosure required by section 1125 of the Bankruptcy Code has been made, (5) the Plan has been accepted by the requisite votes of holders of Claims (except to the extent that cramdown is available under section 1129(b) of the Bankruptcy Code), (6) the Plan is "feasible" and Confirmation is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors unless such liquidation or reorganization is proposed in the Plan, (7) the Plan is in the "best interests" of all holders of Claims in an Impaired Class by providing such holders on account of their Claims property of a value, as of the Effective Date, that is not less than the amount that such holders would receive or retain in a chapter 7 liquidation, unless each holder of a Claim in such Class has accepted the Plan, and (8) all fees and expenses payable under 28 U.S.C. § 1930, as determined by the Bankruptcy Court at the Joint Hearing, have been paid or the Plan provides for the payment of such fees on the Effective Date.  The Debtors believe that the Plan fully complies with all the applicable requirements of section 1129 of the Bankruptcy Code (see "Best Interests Test" and "Feasibility" below), other than those pertaining to voting, which has not yet concluded.

D.      *Feasibility and Best Interests of Creditors*

1.      <u>Best Interests Test</u>

As noted above, even if a plan is accepted by the holders of each class of claims and interests, the Bankruptcy Code requires a court to determine that such plan is in the best interests of all holders of claims or interests that are impaired by that plan and that have not accepted the plan.  The "best interests" test, as set forth in section 1129(a)(7) of the Bankruptcy Code, requires a court to find either that all members of an impaired class of claims or interests have accepted the plan or that the plan will provide a member who has not accepted the plan with a recovery of property of a value, as of the effective date of the plan, that is not less than the amount that such holder would recover if the debtor were liquidated under chapter 7 of the Bankruptcy Code (the "**Best Interests Test**").

To calculate the probable distribution to holders of each impaired class of claims and interests if the debtor were liquidated under chapter 7 of the Bankruptcy Code, a court must first determine the aggregate dollar amount that would be generated from a debtor's assets if its chapter 11 cases were converted to chapter 7 cases under the Bankruptcy Code.  To determine if a plan is in the best interests of each impaired class, the present value of the distributions from the proceeds of a liquidation of the debtor's unencumbered assets and properties, after subtracting the amounts attributable to the costs, expenses, and administrative claims associated with a chapter 7 liquidation, must be compared with the value offered to such impaired classes under the plan.  If the hypothetical liquidation distribution to holders of claims or interests in any impaired class is greater than the distributions to be received by such parties under the plan, then such plan is not in the best interests of the holders of claims or interests in such impaired class.

2.      <u>Liquidation Analysis</u>

Amounts that Holders of Claims or Interests in Impaired Classes would receive in a hypothetical chapter 7 liquidation are discussed in the following liquidation analysis of the Debtors

prepared by the Debtors' management with the assistance of the Debtors' financial advisors (the "**Liquidation Analysis**"). As described below, the Debtors developed the Liquidation Analysis based on forecasted values as of an assumed chapter 7 conversion date of October 11, 2024. The recoveries may change based on further refinements of Allowed Claims and as the Debtors' claims objection and reconciliation process progresses.

As described in the Liquidation Analysis, underlying the analysis is a number of estimates and assumptions that, although developed and considered reasonable by the Debtors' management and financial advisor, are inherently subject to significant economic and competitive uncertainties and contingencies beyond the control of the Debtors and their management or a chapter 7 trustee. The Liquidation Analysis is based on assumptions with regard to liquidation decisions that are subject to change. Accordingly, the assumptions reflected in the Liquidation Analysis might not be realized if the Debtors were, in fact, to undergo a liquidation.

This Liquidation Analysis is solely for the purposes of (a) providing "adequate information" under section 1125 of the Bankruptcy Code to enable the holders of Claims entitled to vote under the Plan to make an informed judgment about the Plan and (b) providing the Bankruptcy Court with appropriate support for the satisfaction of the Best Interests Test, pursuant to section 1129(a)(7) of the Bankruptcy Code, and should not be used or relied upon for any other purpose, including the purchase or sale of Securities of, or Claims or interests in, the Debtors or any of their Affiliates.

Events and circumstances occurring after the date on which the Liquidation Analysis was prepared may be different from those assumed, or, alternatively, may have been unanticipated, and thus the occurrence of these events may affect financial results in a materially adverse or materially beneficial manner. The Debtors do not intend to and do not undertake any obligation to update or otherwise revise the Liquidation Analysis to reflect events or circumstances existing or arising after the date the Liquidation Analysis is initially filed or to reflect the occurrence of unanticipated events. Therefore, the Liquidation Analysis may not be relied upon as a guarantee or other assurance of the actual results that will occur.

In deciding whether to vote to accept or reject the Plan, holders of Claims must make their own determinations as to the reasonableness of any assumptions underlying the Liquidation Analysis and the reliability of the Liquidation Analysis.

<u>Liquidation Analysis</u>

Under a chapter 7 liquidation, no class of claims that is junior to a class of claims may be paid unless the senior class of claims is paid in full.

Once the Bankruptcy Court ascertains the recoveries in liquidation of secured claimants and priority claimants, it must determine the probable distribution to general unsecured claimants and equity security holders from the remaining available proceeds in liquidation. If such probable distribution has a value greater than the distributions to be received by such claimants and equity security holders under the Plan, then the Plan is not in the best interests of claimants and equity security holders and cannot be confirmed by the Bankruptcy Court. The Debtors believe that each member of each class of impaired claims will receive at least as much as, or more, under the Plan

than it would receive if the Debtors' Assets were liquidated under chapter 7 as explained below.

a.    **Liquidation under Chapter 7 of the Bankruptcy Code**

Because the Debtors will sell, liquidate, or otherwise dispose of their remaining assets during the Chapter 11 Cases (substantially the remaining vehicle inventory through the Fleet Sales Agreement), the Plan contemplates the liquidation of the Debtors' remaining Assets.  To calculate the probable distribution to members of each impaired class of holders of claims and interests if a Debtor were liquidated under Chapter 7, the Bankruptcy Court must first determine the aggregate dollar amount that would be generated from the Debtors' remaining Assets if these Chapter 11 Cases were converted to Chapter 7 cases under the Bankruptcy Code.  This "liquidation value" would consist primarily of the proceeds from a forced sale of such Debtor's Assets by a Chapter 7 trustee.

The amount of liquidation value available to unsecured claimants would be reduced by the costs and expenses of liquidation, as well as by other administrative expenses and costs of both the chapter 7 cases and these Chapter 11 Cases.  Costs of liquidation under chapter 7 of the Bankruptcy Code would include the compensation of one or more chapter 7 trustee(s), as well as of counsel and other professionals retained by the chapter 7 trustee(s), asset disposition expenses, all unpaid expenses incurred by the Debtors in their Chapter 11 Cases (such as compensation of attorneys, financial advisors, and accountants) that are allowed in the chapter 7 cases, litigation costs, costs associated with maintaining operations, and claims arising from the operations of the debtor during the pendency of the chapter 11 case.[14]  The fact that an estate's assets are being liquidated in a chapter 7 case may further depress the value received for such assets.  A chapter 7 trustee also may seek to abandon assets that have burdensome obligations.  Moreover, the lack of familiarity that a chapter 7 trustee and his advisors would have respecting the Debtors' Assets, business, and Chapter 11 Cases would likely increase the cost of administration.  A chapter 7 trustee and its professionals would need to review the entire docket in these Chapter 11 Cases and become familiar with, among other things, (i) the Debtors' books and records, (ii) the Debtors' historical capital structure, and (iii) the historical proceedings of these Chapter 11 Cases, while simultaneously undertaking investigations and valuations that may be duplicative of work already done by the Committee in these Chapter 11 Cases.  Moreover, given the complexities associated with performing under the Fleet Sale, chapter 7 would likely materially reduce and/or delay the receipt of proceeds thereunder.

As of the Petition Date, the Secured Noteholder has asserted that the Debtors are indebted and liable to the Secured Noteholder (a) under the 2025 Notes Documents, without objection, defense, counterclaim, or offset of any kind, in the aggregate principal amount of not less than

---

[14]    As explained in more detail in the *Debtors' Objection to Motion of CVI Investments, Inc. to Convert the Debtors' Chapter 11 Cases to Cases Under Chapter 7 of the Bankruptcy Code* [D.I. 304] and the *Declaration of John C. DiDonato as Chief Restructuring Officer of the Debtors in Support of Debtors' Objection to Motion of CVI Investments, Inc. to Convert the Debtors' Chapter 11 Cases to Cases Under Chapter 7 of the Bankruptcy Code* [D.I. 308], it is possible that more than one chapter 7 trustee would be appointed to liquidate the Debtors' estates.  Each additional chapter 7 trustee would have their own fees and would be entitled to appoint their own advisors, which, in turn, will incur their own fees.  The costs of multiple chapter 7 trustees and teams of chapter 7 professionals would multiply the costs of liquidating the Debtors' estates and further erode the amount of liquidation value available to unsecured claimants.

$183,050,000, plus accrued and accruing (both before and after the Petition Date) unpaid interest, fees, expenses, and other obligations under the 2025 Notes Documents and (b) under the Bridge Note Documents, without objection, defense, counterclaim, or offset of any kind, in the aggregate principal amount of not less than $3,456,000, plus accrued and accruing (both before and after the Petition Date) unpaid interest, fees, expenses, and other obligations under the Bridge Note Documents. The Secured Noteholder has further asserted that the Liens granted by the Debtors under the 2025 Notes Documents and the Bridge Note Documents to or for the benefit of the Secured Noteholder as security for the Secured Notes Claims encumber substantially all of the Debtors' assets and property.

The Plan provides for the creation of the Trusts for the purpose of liquidating or otherwise monetizing the Debtors' Assets for the benefit of the Liquidating Trust Beneficiaries and the IP/Austria Assets Trust Beneficiaries, including General Unsecured Creditors. If the Plan is not confirmed and the Chapter 11 Cases are converted to cases under chapter 7 of the Bankruptcy Code, and if the Secured Notes Claims of the Secured Noteholder become Allowed, there would be no distribution to General Unsecured Claims, because there would be no Assets remaining to administer for their benefit. In that scenario, the Assets would not be transferred to the respective Trusts and, instead, would be liquidated or otherwise monetized by a chapter 7 trustee solely for the benefit of the Secured Noteholder.

In light of the foregoing, the Debtors believe that the Plan meets the best interests test of section 1129(a)(7) of the Bankruptcy Code, and that the members of each impaired Class of Claims will receive more under the Plan than they would in a chapter 7 liquidation.

b.    **Alternative Liquidating Plan under Chapter 11 of the Bankruptcy Code**

If the Plan is not confirmed, the Debtors, the Committee, or any other party in interest could attempt to formulate a different plan providing for an orderly liquidation of the Debtors. The Debtors believe that the Plan described herein allows holders of Claims to realize the greatest recovery under the circumstances.

3.    Application of the Best Interests Test

Because the Plan is a liquidating plan, the "liquidation value" in the hypothetical chapter 7 liquidation analysis for purposes of the Best Interests Test is substantially similar to the estimates of the results of the chapter 11 liquidation contemplated by the Plan. However, the Debtors believe that, in a chapter 7 liquidation, there would be additional costs and expenses that the Estates would incur as a result of liquidating the Estates in a chapter 7 case. The Plan effects a wind-down and liquidation of the remaining assets of the Estates. Liquidating the Estates under the Plan would provide holders of Claims with larger, more timely recoveries due to the potential for delay and additional costs that would result from converting to a chapter 7 case at this stage of the Chapter 11 Cases.

As set forth in the Liquidation Analysis, the costs of liquidation under chapter 7 of the Bankruptcy Code would include the compensation of a trustee, as well as the costs of counsel and other professionals retained by the trustee. The Debtors believe such amount would exceed the

amount of expenses that would be incurred in implementing the Plan and winding up the affairs of the Debtors. Conversion also would likely delay the liquidation process. The Estates would also be obligated to pay all unpaid expenses incurred by the Debtors during the Chapter 11 Cases (such as compensation for professionals) that are allowed in the chapter 7 cases.

Accordingly, the Debtors believe that, based on the Liquidation Analysis, the Plan meets the Best Interest Test. As the Plan and the Liquidation Analysis indicate, Confirmation of the Plan will provide each of an Allowed Claim with an equal or greater recovery than the value of any distributions if the Chapter 11 Cases were converted to cases under chapter 7 of the Bankruptcy Code, and therefore, the classification and treatment of Claims and interests in the Plan complies with section 1129(a)(7) of the Bankruptcy Code.

4.      Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successors to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan. Inasmuch as the Debtors are being liquidated and the Plan provides for the distribution of all of the proceeds of that liquidation to holders of Claims that are Allowed as of the Effective Date, the Debtors maintain that the Plan is effectively exempted from the feasibility requirements in accordance with the express terms of section 1129(a)(11) of the Bankruptcy Code.

E.      *Confirmation Without Necessary Acceptances; Cramdown*

In the event that any impaired class of claims or interests does not accept a plan, a debtor nevertheless may move for confirmation of the plan. A plan may be confirmed, even if it is not accepted by all impaired classes, if the plan has been accepted by at least one impaired class of claims and the plan meets the "cramdown" requirements set forth in section 1129(b) of the Bankruptcy Code, which requires that a court find that a plan (1) "does not discriminate unfairly" and (2) is "fair and equitable" with respect to each non-accepting impaired class of claims or interests. Here, because holders of Claims or Interests in Classes 5, 6, and 7 are deemed to reject the Plan, the Debtors will seek Confirmation of the Plan from the Bankruptcy Court by satisfying the "cramdown" requirements set forth in section 1129(b) of the Bankruptcy Code. The Debtors believe that such requirements are satisfied, as no holder of a Claim or Interest junior to those Classes will receive any property under the Plan.

A plan "does not discriminate unfairly" if (1) the legal rights of a nonaccepting class are treated in a manner that is consistent with the treatment of other classes whose legal rights are similar to those of the nonaccepting class and (2) no class receives payments in excess of that which it is legally entitled to receive for its claims or interests. The Debtors believe that, under the Plan, all Impaired Classes of Claims and Interests are treated in a manner that is consistent with the treatment of other Classes of Claims and Interests that are similarly situated, if any, and no class of Claims or Interests will receive payments or property with an aggregate value greater than the aggregate value of the Allowed Claims or Allowed interests in such Class. Accordingly, the Debtors believe that the Plan does not discriminate unfairly as to any impaired Class of Claims or interests.

The Bankruptcy Code provides a non-exclusive definition of the phrase "fair and equitable."  In order to determine whether a plan is "fair and equitable," the Bankruptcy Code establishes "cramdown" tests for secured creditors, unsecured creditors, and equity holders, as follows:

1.  <u>Secured Creditors</u>.  Either (a) each impaired secured creditor retains its liens securing its secured claim and receives on account of its secured claim deferred Cash payments having a present value equal to the amount of its allowed secured claim, (b) each impaired secured creditor realizes the "indubitable equivalent" of its allowed secured claim, or (c) subject to section 363(k) of the Bankruptcy Code, the property securing the claim is sold free and clear of liens, with such liens to attach to the proceeds of the sale and the treatment of such liens on proceeds to be as provided in clause (a) or (b) above.

2.  <u>Unsecured Creditors</u>.  Either (a) each impaired unsecured creditor receives or retains under the Plan property of a value equal to the amount of its allowed claim or (b) the holders of claims and interests that are junior to the claims of the dissenting class will not receive any property under the plan.

3.  <u>Holders of Interests</u>.  Either (a) each holder of an equity interest will receive or retain under the plan property of a value equal to the greatest of the fixed liquidation preference to which such holder is entitled, the fixed redemption price to which such holder is entitled or the value of the interest or (b) the holder of an interest that is junior to the nonaccepting class will not receive or retain any property under the plan.

The Debtors believe that the distributions provided under the Plan satisfy the "fair and equitable" standard.  Accordingly, the Debtors are seeking Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to each rejecting Class of Claims or interests, and the Plan constitutes a motion for such nonconsensual Confirmation.

## ARTICLE XIX.
## CONCLUSION AND RECOMMENDATION

The Debtors believe that confirmation and consummation of the Plan are in the best interests of the Debtors, their Estates, and their creditors.  The Debtors believe that any alternative to confirmation of the Plan could result in significant delay and additional costs, as well as a reduction in Plan Distributions.  **Consequently, the Debtors urge all holders of Claims eligible to vote on the Plan to vote to ACCEPT the Plan and to complete and submit their Ballots so that they will be RECEIVED by the Claims and Noticing Agent on or before the Voting Deadline.**

Respectfully submitted,

October 8, 2024                    Fisker Inc. (for itself and all Debtors)

                                   By:      _/s/ DRAFT_____
                                   Name:    John C. DiDonato
                                   Title:   Chief Restructuring Officer